**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

DR. DANIEL BRANDWEIN, DPM

Case No.: 26-cv-60084

Plaintiff,

Judge Leibowitz

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,

Defendant.
__________________________________/

**PLAINTIFF'S EXPEDITED MOTION FOR INJUNCTION OR ALTERNATIVELY MOTION TO STAY RECOUPMENT AND TREASURY OFFSET PENDING JUDICIAL REVIEW AND MEMORANDUM OF LAW**

Plaintiff, Dr. Daniel Brandwein, DPM, by and through undersigned counsel, respectfully moves this Court, pursuant to Fed. R. Civ. P. 65 and the Court's authority under 28 U.S.C. § 1651 and 42 U.S.C. § 405(g), for an order enjoining or staying recoupment of disputed Medicare amounts at issue in this action by Mr. Kennedy, as Secretary of Health and Human Services, and its agents including but not limited to the Centers for Medicare and Medicaid Services ("CMS"), First Coast Services, LLC, and the U.S. Department of Treasury pending the Court's judicial review, and states as follows:

**INTRODUCTION**

Plaintiff operates a foot and wound-care clinic that provides advanced wound-care services to Medicare beneficiaries—including elderly and disabled patients suffering from diabetic foot ulcers and venous leg ulcers. CMS alleges that Plaintiff owes more than $3.8 million for services provided to those patients. Plaintiff has been navigating the administrative process to challenge these alleged overpayments since May 2024, without success. Despite CMS having already recouped over $1.2 million, and despite Plaintiff's numerous requests to pause recoupment while the appeal process plays out, Plaintiff has obtained no relief and is now in danger of losing his practice. Plaintiff is close to having to close its business and requests expedited relief on this motion. Plaintiff needs the ruling on this motion within 10 days of submission.

**MOTION**

1. This is an action for judicial review under 42 U.S.C. § 405(g) of three final decisions denying reimbursement for medically necessary wound-care services Plaintiff provided to Medicare beneficiaries. [Attached as Exhibits A – C]. While this review proceeds, CMS and its agents are withholding one hundred percent (100%) of the Medicare payments otherwise due to Plaintiff's practice, and the U.S. Treasury is separately offsetting other federal payments owed to him—all to collect the very overpayment determinations that are the subject of this lawsuit. [Attached as Exhibit D].

2. If collection is allowed to continue, Plaintiff's practice will be financially destroyed before this Court can decide the merits, and—because the funds are being collected by the sovereign—Plaintiff will have no practical means of recovering them even if he prevails. The Court should stay recoupment and offset of the disputed amounts until it resolves the § 405(g) review it is charged with conducting.

3. Plaintiff will be irreparably harmed if injunctive relief is not granted, because it will be forced to shut down the practice before his administrative remedies have been exhausted—leaving patients in dire need of advanced wound care without adequate treatment and forcing the layoff of Plaintiff's staff. Without this care, many of Plaintiff's patients face serious infection and the risk of amputation. Reimbursing a practice that has already closed would be meaningless—it cannot undo the loss of patients and staff, who are unlikely to return once they have moved on.

4. By contrast, there is no risk of harm to Defendant if the temporary restraining order and preliminary injunction are granted. The patients treated by Plaintiff are entitled to Medicare benefits, so the reimbursement Defendant would withhold would still have to be paid regardless of which provider treats them. And if Defendant ultimately prevails, Plaintiff will remain obligated to repay the

overpayments. By contrast, if the practice closes for lack of funds, the government risks losing any possibility of recoupment altogether.

5. Plaintiff is likely to succeed on the merits of the billing dispute underlying the $3.8 million recoupment, for several reasons. First, the wound-care services were ordered and provided by a board-certified podiatrist in accordance with all applicable guidelines, including the then-effective LCD 36377 (Local Coverage Determination - Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities). Second, the ALJ decisions rest on requirements that do not apply to the treatment Plaintiff provided. Third, Plaintiff's treatment was reviewed by an expert in his field, who approved it and testified that the wounds had failed to respond to conservative treatment. Fourth, the provider identified the necessary treatment and how it would be provided, and the medical records support the use of the identified products.

6. Finally, the public interest favors pausing recoupment until Plaintiff is able to complete the administrative appeals process so that the practice can continue providing care and treatment to those patients in need of its services.

**<u>The Medicare Appeals Process</u>**

The Medicare program, enacted in 1965 under Title XVIII of the Social Security Act, provides health insurance to individuals sixty-five (65) years of age and older. Social Security Amendments of 1965, Pub. L. 89-97, 79 Stat. 286 (1965)

(codified as amended at 42 U.S.C. §§ 1395-1396y). CMS is tasked with the responsibility of reimbursing Medicare providers for covered claims. CMS contracts with Medicare Administrative Contractors ("MACs"), government contractors, to process and make payments on valid claims. 42 U.S.C. § 1395kk-1(a)(3). In practice, therefore, medical providers such as Plaintiff submit claims for reimbursement to the MAC appointed to its geographical area. 42 U.S.C. § 1395ff(a)(2)(A). The MAC covering Plaintiff's Medicare reimbursement during the relevant time period was First Coast Service Options, LLC.

Pursuant to the Social Security Act, appeals of post-payment claim denials are subject to a four-level administrative appeals process, ultimately leading to a fifth level known as judicial review. *See* 42 U.S.C. § 1395ff. The levels consist of the following:

1) In the first level of review, the denied claim is presented to the MAC for redetermination. 42 U.S.C. § 1395ff(a)(3)(A). The MAC is statutorily required to issue its decision on redetermination within sixty (60) days from its receipt of the request for redetermination. *Id.* at § 1395ff(a)(3)(C)(ii).
2) At the second level of review, a dissatisfied party may appeal the MAC's redetermination to a Qualified Independent Contractor ("QIC") within 180 days from the date the party received the redetermination decision. The QIC

is statutorily required to issue its decision on reconsideration within sixty (60) days of its receipt of the reconsideration request. *Id.* at § 1395ff(c).

3) At the third level of review, a dissatisfied party may appeal within 60 days of its receipt of the QIC reconsideration decision and request a hearing before an ALJ at the OMHA. The ALJ must hold a hearing on the denied claim and render its decision within ninety (90) days. 42 U.S.C. § 1395ff(b).

4) If a party is still dissatisfied after the ALJ issues its decision, it may appeal its claim within sixty (60) days to the Medicare Appeals Council ("Council") within the HHS Departmental Appeals Board ("DAB"). The Council must render a decision or remand the case to the ALJ within ninety (90) days from the date of the request for review. *See* 42 C.F.R. § 405.1116.

The first two levels of review are both conducted by CMS-affiliated entities. Importantly, providers may avoid recoupment during the first two levels of review by requesting appeals within the specified time frames. *See* Section 935 of the MMA, at 6183.1. This is referred to as a Limitation on Recoupments. *See id.* Should the appeals process follow its statutorily intended course, a provider should be able to complete the first four levels of appeal within one calendar year. As shown below, the appeal process does not follow its statutorily intended course. Rather, because of the length of time the decisions were pending at the ALJ (level 3) and the lack of action by the Council (level 4), Plaintiff has been embroiled

in this matter for over two years, during which time it has been subject to recoupment. The timeline is critical because the Limitation on Recoupments is not available while the appeal is pending at the ALJ or any subsequent stage. This allows CMS to recoup millions of dollars from providers before there has been a determination on the merits of the claim. Despite the Limitation on Recoupments being inapplicable, Plaintiff has made numerous requests to stay recoupment on this matter, hoping, without avail, for voluntary cooperation and agreement by the government. [Attached as Exhibit E]. In an effort to prevent recoupment, Plaintiff entered into an Extended Repayment Schedule ("ERS") but was ultimately unable to meet the requirements. By letter dated March 18, 2026, First Coast Service Options, the MAC, advised Plaintiff that his Extended Repayment Schedule had defaulted and that it had "reinstated 100% withholding in order to collect the balance." [Attached as Exhibit F].

**MEMORANDUM OF LAW**

Plaintiff is a board-certified podiatrist who provides advanced wound care—including treatment of diabetic foot ulcers and venous leg ulcers—to elderly and disabled Medicare beneficiaries. [ECF. No. 1. ¶¶ 4–6]. The total amount in controversy in this action exceeds $3.8 million. [*Id.* ¶ 11]. The overpayments CMS is now collecting arise from the coverage determinations challenged in this action. The Department of the Treasury is separately collecting the alleged debt through

the Treasury Offset Program. [Attached as Exhibit D[1]]. The amortization schedule reflects a balance, with interest, exceeding $5.1 million, on which interest accrues daily.

The economics of Plaintiff's practice make the 100% withholding ruinous. Federal law requires Plaintiff to purchase and pay for skin-substitute tissue products and supplies at the time of treatment; approximately 87 cents of every reimbursement dollar is consumed by those already-incurred product costs and practice overhead, leaving only approximately 13 cents as funds available to the practice. The recoupment therefore does not return money sitting in an account—it forces Plaintiff to repay CMS for amounts his practice has already spent on the very patients whose claims are at issue. The ongoing and worsening financial harm is detailed in the Declaration of Dr. Daniel Brandwein. [Attached as Exhibit G].

Plaintiff is likely to prevail on this matter. All of the claims at issue are supported by the medical necessity requirements, were administered in adherence to established standards, and are supported by expert testimony. Plaintiff has been denied relief at the three previous levels of appeal based on reliance on future-effective standards and relief was not provided at the Council because it did not

[1] The total amount currently requested by the U.S. Treasury is $4,771,898.98.

take action on the appeal within the timeframes provided by statutes.[2] [ECF No. 1, ¶¶1-3]. Plaintiff has finally reached the last stage of relief. Plaintiff will be unable to continue serving patients unless this Court enters an injunction against recoupment and allows Plaintiff to continue providing care to its patients until it receives a final judgment regarding the underlying dispute.

## LEGAL STANDARD

A stay of recoupment pending judicial review is a form of preliminary injunctive relief governed by Fed. R. Civ. P. 65. In the Eleventh Circuit, a movant must establish: (1) a substantial likelihood of success on the merits of the underlying case; (2) irreparable harm in the absence of an injunction; (3) that the harm suffered by Plaintiff in the absence of an injunction would exceed the harm suffered by Defendant if the injunction issued; and (4) that an injunction would not disserve the public interest. *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002); *Miccosukee Tribe of Indians of Fla. v. United States*, 571 F. Supp. 2d 1280, 1283 (S.D. Fla. 2008).

## ARGUMENT

### I. The Court Has Authority to Stay Recoupment Pending Its § 405(g) Review

[2] 42 C.F.R. § 405.1116 provides that a notice of non-action can be filed if the Council does not act on a request for review within 90 days of submission.

This Court already has jurisdiction over this action under 42 U.S.C. § 405(g). Unlike providers who seek to enjoin recoupment before obtaining a final decision—and who must rely on the collateral-claim exception to 42 U.S.C. § 405(h) to establish jurisdiction—Plaintiff is already properly before this Court on judicial review. *See Family Rehab., Inc. v. Azar*, 886 F.3d 496, 503–05 (5th Cir. 2018). The relief sought here is therefore ancillary to the Court's existing jurisdiction: an order preserving the status quo so that the Court's eventual judgment is not rendered meaningless. The All Writs Act empowers the Court to "issue all writs necessary or appropriate in aid of [its] . . . jurisdiction[]," 28 U.S.C. § 1651(a), which includes preserving the subject matter of the litigation pending decision.

42 U.S.C. § 1395ddd(f)(2) limits administrative recoupment only through the first two levels of the appeals process and permits recoupment thereafter. That statute defines what CMS *may* do administratively; it does not divest this Court of its equitable authority to stay collection of a disputed debt pending the judicial review that the Medicare statute itself authorizes. To hold otherwise would allow the Government to collect in full the very sums in dispute before the Court could ever rule, defeating the purpose of § 405(g) review. That § 1395ddd(f)(2) authorizes administrative recoupment does not foreclose equitable relief: it speaks only to what CMS may collect through its own self-help process, not to the power of an Article III court to preserve the status quo of a case already pending before it. A

stay here does not override the statute; it protects the Court's jurisdiction to render the § 405(g) judgment Congress directed it to make.

Plaintiff recognizes that at least one court in this Circuit has declined to enjoin recoupment on a due-process theory, reasoning that a provider lacks a constitutionally protected property interest in an alleged overpayment. *See Alpha Home Health Sols., LLC v. Sec'y of U.S. Dep't of Health & Human Servs.*, 340 F. Supp. 3d 1291 (M.D. Fla. 2018).[3] This Motion does not depend on that theory as Plaintiff disputes the alleged overpayment. Rather he has a real interest in reimbursement for treatment properly provided. Plaintiff does not ask the Court to create a new substantive right; it asks only that the Court exercise its settled equitable power to preserve the status quo pending the judicial review now before it. *Alpha Home Health* was also decided as a collateral matter, unlike this matter that is fully before the Court based on the inaction of the Council. The Court's authority extends to the Treasury offset as well. The Treasury Offset Program is another mechanism for collecting the same disputed debt; an order staying recoupment necessarily reaches collection of that debt through offset, lest the relief be rendered illusory.

## II. Plaintiff Satisfies the Standard for a Stay

### *A. Plaintiff has a substantial likelihood of success on the merits.*

---

[3] Plaintiff's posture is distinguishable in any event: the providers in that line of cases sought to enjoin recoupment *before* obtaining a final decision and thus needed an independent jurisdictional basis, whereas Plaintiff is already before this Court on § 405(g) review and seeks only to preserve the status quo pending that review.

As alleged, the challenged decisions denied reimbursement based on an evidentiary requirement that appears in no applicable statute, regulation, or coverage determination, and the Council failed to act within the time limits the governing regulations impose. Compl. ¶¶ 2–3, 13. An agency action that rests on a standard untethered to its own governing law is arbitrary, capricious, and contrary to law. LCD 36377—in effect when these patients were treated and still in effect today—provides coverage for DFUs and VLUs treated with skin grafts. [Attached as Exhibit H]. Its plain language covers DFU skin substitute grafts where a DFU has failed to respond to conservative treatment for more than four weeks—a requirement that was unquestionably met.

CMS, through its agents, relied on a future-effective LCD's conclusion (that the treatment at issue would not be covered)[4] and ignored the LCD. [Attached as Exhibit I]. Instead, they resorted to the Medicare Program Integrity Manuals ("MPIM") (requiring a three-step process of medical necessity based on peer-review). The denials were no more than a textbook case of government regret. While there could be great debate about whether the LCD was too permissive, that is not a question for this appeal. As the MAC, QIC, and ALJ reviews show, the

[4] Notably the future LCD was never implemented. At the time these cases appeared before the ALJ the future LCD was set to be effective as of February 11, 2025. Due to significant concerns with its applicability and inconsistent application, this was been pushed back and at that time the LCD was to be effective no earlier than April 12, 2025. The proposed LCD was then completely removed and the 2019 LCD remains the controlling LCD for skin graft treatment.

government now regrets approving these grafts and, through a new LCD, seeks to claw back its permission and punish providers who relied on it.[5] The government is not allowed to retroactively punish providers for its mistakes, yet that is what the underlying decision does to Dr. Brandwein. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) (an agency may not apply a new substantive standard retroactively absent clear congressional authorization).

Rather, the LCD requires appropriate documentation of the patient's condition, including a comprehensive assessment and an implemented (non-exclusive) treatment plan—e.g., management of comorbidities, blood-sugar and nutritional review, physical exam, debridement, pressure relief, infection control, and smoking-cessation counseling. The skin-graft product is covered when applied to ulcers showing four weeks of failed treatment, documented by initial and four-week measurements. The pre-service record must explain why the wound failed standard care, reference the specific interventions that failed, and set out the planned skin-replacement surgery and choice of graft product. Dr. Brandwein's records include all of these details.

The threshold question is whether an LCD applies; only when none does may CMS look to other requirements. Yet at every stage, the reviewers overlooked

[5] There is ample evidence and Dr. Brandwein has first-hand knowledge that this same product has been found medically reasonable and necessary and approved for care and treatment of other patients in the same condition. It is inexplicable to deny coverage for some but allow it for others when using the same product to provide the same service for the same conditions.

this and searched for other justifications to deny the claim. Although ALJs are not strictly bound by an LCD, they must give it substantial deference and explain any decision not to follow it. 42 C.F.R. § 405.1062(a)–(b). They may not set aside or disregard the validity of the operative LCD in a claim appeal. *Id;* § 405.1062(c). Here the reviewers did the opposite: they gave LCD 36377 no deference, offered no reasoned explanation for departing from it, and effectively set it aside in favor of a not-yet-effective LCD's standard. That said, even if it were proper for any reviewer to skip that requirement and look beyond the LCD, an item or service is reasonable and necessary if it meets the following criteria: (1) it is safe and effective; (2) it is not experimental or investigational; and (3) it is appropriate, including the duration and frequency, in terms of whether the service or item is furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition…and meets, but does not exceed, a beneficiary's medical need. *MPIM* ch. 3, § 3.6.2.2. Even under these considerations Dr. Brandwein's treatment was appropriate.

Rather than apply the operative LCD's coverage language, CMS leapt to a future LCD and used it to invoke the MPIM—error that, once corrected under the applicable LCD, requires rescission of the overpayment.

LCD 36377 should have governed: it requires neither a specific product nor clinical literature, and it acknowledged a general lack of clinical literature while

still authorizing coverage where the skin-replacement surgery meets its requirements. The claims were nonetheless denied for lack of peer-reviewed, evidence-based literature—a requirement the LCD does not impose. Reading such a requirement into an LCD that approved these grafts despite acknowledging the literature gap is clear error. Because Plaintiff satisfied the LCD, coverage was appropriate, and on the administrative record he is substantially likely to succeed.

Dr. Brandwein's documentation and testimony met the requirements of both the LCD and the related Billing and Coding Article, A57680. As discussed above, the LCD required appropriate documentation that conservative treatment had failed longer than four weeks. A57680 states:

> Documentation should include an assessment (generally in an E/M service) outlining the plan for skin replacement surgery and the choice of skin substitute product for the 12 week period as well as any anticipated repeat applications in the 12 week period. An operative note must support the procedure (e.g., application of skin substitute graft to legs) for the relevant date of service (first application starts the 12 week episode of care). At a minimum, the operative note(s) should include pre and post op diagnosis, name of surgeon, anesthesia, reason for the procedure, complete description of the procedure including product used (with identifying package label in the chart), and relevant findings.

JF ALJ Decision, p. 9 (emphasis added by the ALJ). When the two documents are read together, appropriate documentation requires: (1) failed conservative treatment longer than four weeks; (2) an assessment outlining the plan for skin replacement surgery and the choice of skin substitute product; (3) and an operative

note that should[6] include: (a) pre and post op diagnosis, (b) surgeon, (c) anesthesia, (d) reason for the procedure, (e) description of the procedure including product use, and (f) relevant findings. CMS disregarded these records, dismissed them as not appropriate, and/or improperly relied on the purported lack of external studies instead of the requirements of the LCD. A conclusion that the medical records were inadequate, without contrary evidence, and did not support the product is clearly wrong.

Plaintiff's records will show that the treatment was proper and supported.[7] Dr. Brandwein was first referred for care of JF on July 26, 2023. The first office visit is titled "Initial Treatment Plan" and outlines the patient's condition, current treatment, provides nutrition counseling, states that conservative treatment has failed for six weeks (at this time, nearly 12 weeks before skin grafts are applied), and outlined a plan of care for skin grafting. The initial office visit then documented the size of the ulcers, documented that Dr. Brandwein performed conservative wound care measures, discussed vascular consultation, and recommended antibiotics. After covering all of those areas, Dr. Brandwein wrote that he is going to use amniotic tissue membrane grafts, and he has approval to apply them on this patient. There is no lack of appropriate documentation.

---

[6] Not a mandatory "shall" as not all of these items would be necessary or appropriate for each patient.
[7] Once the Administrative Record is provided this Motion will be supplemented as necessary for each patient.

These two pages alone establish that the criteria of LCD 36377 and A57680 were met; the balance of the records—including vascular testing—further supports the treatment. Dr. Brandwein also testified under oath that he had reviewed prior treatment records and conferred with the patients' primary care providers. *Schisler v. Bowen*, 851 F.2d 43, 47 (2d Cir. 1988) (as treating provider, his opinion should be "binding on the fact-finder unless contradicted by substantial evidence and [ ] entitled to some extra weight, even if contradicted by substantial evidence, because the treating source is inherently more familiar with a claimant's medical condition than are other sources."). Instead of crediting this documentation and testimony, CMS concluded the treatment was improper—a conclusion the records refute, since Dr. Brandwein documented the amniotic tissue graft used, why he used it, and its product labeling.

Plaintiff's expert podiatrist, Thomas Merrill, DPM, independently reviewed the records and concurred that the treatment was necessary and reasonable—testimony CMS ignored. Dr. Brandwein himself both documented and testified in detail about his assessment, selection, and use of the product. Given that the wound failed to respond to conservative treatment, that the provider identified what he was going to provide and how he would provide it, and that the medical records support the use of the identified product, Plaintiff is likely to succeed on the merits of this claim.

Plaintiff prevails under the plain language of the LCD, but Dr. Brandwein also met the MPIM criteria. The controlling documents required CMS to assess the medical records for appropriateness; anything beyond that was error. Instead, the reviewers adopted the QIC's literature requirement—a standard drawn from the future LCD or the MPIM in the absence of a controlling LCD, and a transparent attempt to escape the government's obligation to reimburse care provided under what it now deems an overly permissive LCD.

Under MPIM determining whether an item is reasonable and necessary "contractors must consider available evidence of general acceptance by the medical community, such as published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines." Ch. 13 § 13.5.3. (emphasis added). Despite several criteria, reviewers only considered one factor: peer-reviewed, evidence-based literature. They discredited and/or ignored evidence of the general acceptance of the medical community as provided by the testimony of Plaintiff's expert podiatrist. Dr. Merrill testified in detail about hospitals' use of these skin grafts, the FDA-approval process, the similarity among the products, the difficulty of obtaining multiple product studies, and their reviews. That these treatments are used and reimbursed in hospitals—facilities held to stricter standards than an outpatient practice—is powerful evidence of their acceptance.

The MPIM does not specify that all the factors, or even a/one certain factor(s), is a prerequisite for reasonableness. Instead, it allows for a reasonable consideration of all available evidence and trusts the contractors and the medical community to make an applicable decision. Further, the MPIM states that biologicals are covered if, among other criteria, the biologic has not been determined by the FDA to be less than effective. MPIM, ch 15 § 50; ch. 16 § 20. Dr. Brandwein administered FDA approved products, not products that had been determined to be less than effective. In fact the evidence shows that the use of skin substitute grafts is superior to traditional skin grafting procedures. When all the factors are considered, the treatment here is reasonable and medically necessary.

**B. Plaintiff will suffer irreparable harm absent a stay.**

The 100% withholding is depriving Plaintiff's practice of substantially all of its operating revenue while the practice remains obligated to pay the suppliers and staff who made the underlying treatment possible. As set forth in Dr. Brandwein's declaration, the practice cannot sustain operations under total withholding, threatening its continued existence and the wound-care services on which Plaintiff's patients depend. The threatened loss of an ongoing business is a classic form of irreparable harm that damages cannot remedy. Money damages cannot bring a shuttered business—particularly a medical practice—back to life. Every day of continued collection inflicts loss that no later judgment can undo.

**C. The balance of equities favors a stay.**

A stay imposes minimal harm on the Secretary. It would merely defer collection of a disputed debt that, if ultimately upheld, remains fully recoverable—with interest that continues to accrue in the Government's favor. Against that modest delay stands the destruction of Plaintiff's practice. The equities are not close. Further, the Government is always able to recoup these funds as long the business exists, thus it would suffer minimal harm and there should be no requirement for a bond to be posted. *See Bell South Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (the amount of security "is a matter within the discretion of the trial court," which "may elect to require no security at all").

**D. A stay serves the public interest.**

The public has a strong interest in preserving access to medically necessary care for elderly and disabled Medicare beneficiaries, and other government insured patients, like Veterans, including the diabetic and wound-care patients who face serious infection and risk of amputation without treatment. Compl. ¶¶ 2–4. Allowing collection to force the practice to close before the merits are decided would disserve that interest, while a stay preserves both the parties' positions and continuity of patient care pending the Court's review.

**CONCLUSION**

**WHEREFORE**, Plaintiff respectfully requests the Court enter an order staying the recoupment and Treasury offset of the disputed Medicare amounts at issue in this action pending the Court's judicial review and final judgment, and granting such further relief as the Court deems just and proper.

**LOCAL RULE 7.1(a)(3) CERTIFICATION**

Pursuant to Local Rule 7.1(a)(3), conferral is not required for a motion seeking injunctive relief. Nevertheless, undersigned counsel certifies that the parties previously conferred regarding a suspension of recoupment in connection with Defendant's Motion for Extension of Time [ECF No. 18], and Defendant was unable to agree to pause recoupment. Counsel has conferred via phone and email multiple times following that Motion but Defendant's Counsel does not have authority to grant a stay at this time. Plaintiff therefore understands the relief requested herein to be opposed.

Respectfully submitted,

**BLACK LAW P.A.**
*Attorneys for Plaintiffs*
1401 East Broward Boulevard
Victoria Park Centre Suite 304
Fort Lauderdale, Florida 33301
Telephone: (954) 320-6220

By: Patrick Wier
**KELSEY K. BLACK, ESQ.**
Florida Bar No. 0078925
kb@blacklawpa.com
**PATRICK WIER, ESQ.**

Florida Bar No. 1029540
pw@blacklawpa.com