Department of Health and Human Services
Office of the Secretary

OFFICE OF MEDICARE HEARINGS AND APPEALS

Seattle Field Office
700 Stewart Street
Suite 11101
Seattle, WA 98101-4440
(206) 539-5300
(206) 539-5368 (Direct)
(206) 553-0122 (Fax)
855-518-5366 (Toll Free)

February 13, 2025

BLACK LAW, PA
ATTN: KELSEY BLACK/PATRICK WIER
1401 E BROWARD BLVD., SUITE 204
FT. LAUDERDALE, FL 33301

## NOTICE OF DECISION

Appellant: DANIEL BRANDWEIN DPM P A
OMHA Appeal Number: 3-14443431635

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

**What if I disagree with the decision?**

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

**How much time do I have to file an appeal?**

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

**How do I file an appeal?**

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:

1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

C2C Innovative Solutions, Inc.
Part B South C2C
301 W Bay Street, Ste. 1110
Jacksonville, FL 32231-4006

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Seattle, WA

| | | | |
|---|---|---|---|
| Appeal of: | DANIEL BRANDWEIN DPM P A | OMHA Appeal No.: | 3-14443431635 |
| Beneficiary: | J. F[redacted] | Medicare Part: | B |
| Medicare No.: | *****A7DY76 | Before: | S. Andrew Grace<br>Administrative Law Judge |

## DECISION

After considering the evidence and arguments presented in the record, I enter an **UNFAVORABLE** decision for Daniel Brandwein DPM PA (Appellant). The Appellant failed to prove that the Impax grafts (Q4262) and related procedures on October 1, 6, 10 and 19, 2023 were medically reasonable and necessary. The Appellant is responsible for the overpayment and any noncovered costs.

## PROCEDURAL HISTORY

The Appellant submitted four claims for codes Q4262 and 15271 (services at issue) provided to the Beneficiary on October 1, 6, 10 and 19, 2023 (dates of service). The Medicare Administrative Contractor (MAC) made payment for the claims.

Subsequently, the Unified Program Integrity Contractor (UPIC) reviewed the paid claims and determined an overpayment had occurred. (File 3, p. 218). Upon redetermination, the MAC issued an unfavorable decision for each of the dates of service and affirmed the UPIC's overpayment determination. (File 4, pp. 7-26). The Qualified Independent Contractor (QIC) issued an unfavorable appeal decision, upheld the overpayment determination, and determined the Appellant was financially responsible for the noncovered costs. (File 2). The Appellant requested a hearing before an Administrative Law Judge. (File 1).

I held a telephonic hearing for this appeal on December 30, 2024. (Hearing Recording (December 30, 2024)). Attorneys Patrick Weir and Kelsey Black appeared for the Appellant and Dr. Daniel Brandwein and Dr. Thomas Merill provided testimony for the Appellant. (*Id.*) The files listed in the Index of the Administrative Record and Exhibit List were admitted in the record without objection. (*Id.*) Post-hearing, the Appellant submitted additional evidence at the OMHA level as requested by the ALJ. I find good cause for the admission of new evidence pursuant to 42 C.F.R. § 405.1028(a)(2)(i).

## ISSUE(S)

Whether the medical and surgical supplies and related procedures at issue were medically reasonable and necessary under Medicare rules and regulations, and if not, which party is financially responsible for the overpayment.

## APPLICABLE LAW AND POLICY

Medicare generally entitles a beneficiary to coverage and payment for medical services that are reasonable and necessary. *See* 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1). 42 U.S.C. 1395l(e) of the Act states no payment shall be made to any provider of service unless supported by sufficient information and documentation.

Medicare Part B establishes a voluntary program of supplemental medical insurance covering physicians' charges and other medical services. *See* 42 U.S.C. §§ 1395j, 1395(a), and 1395x(s); *see also* 42 C.F.R. § 410.3(a)(1)-(3).

Subject to conditions and limitations, "medical and other health services" includes:

> (a) Physicians' services.
> (b) Services and supplies furnished incident to a physician's professional services, of kinds that are commonly furnished in physicians' offices and are commonly either furnished without charge or included in the physicians' bills.
> (c) Services and supplies, including partial hospitalization services, that are incident to physician services and are furnished to outpatients by or under arrangements made by a hospital or a CAH.
> (d) Diagnostic services furnished to outpatients by or under arrangements made by a hospital or a CAH if the services are services that the hospital or CAH ordinarily furnishes to its outpatients for diagnostic study.

42 C.F.R. § 410.10(a)-(d). Medicare does not cover certain items and services that may fall under general exclusions or an exclusion of particular services. *See* 42 C.F.R. § 411.15 *et seq.*

For Medicare to consider coverage and payment for any item or service, the information submitted by the supplier or provider must corroborate the documentation in the beneficiary's medical documentation and confirm that Medicare coverage criteria have been met. *Medicare Program Integrity Manual (MPIM) pub. 100-8*, ch. 3, § 3.3.2.1 (Effective July 2018). Medicare's general policy is "not to cover experimental or investigational items or services." CMS, *Medicare Benefit Policy Manual* (*MBPM*) (*Internet-Only Publ'n 100-02*) ch. 15, § 260.2 (Effective Jan. 2008). General exclusions from coverage can be found within *Medicare Benefit Policy Manual* (*MBPM*) (*Internet-Only Publ'n 100-02*) ch. 16, § 10 (Effective Jan. 2015), and includes items and services that are not reasonable and necessary, and investigational devices deemed excluded.

In the absence of either an NCD or LCD addressing a particular item or service, an item or service may be considered reasonable and necessary if: (1) it is safe and effective; (2) it is not experimental or investigational; and (3) the item or service is appropriate in terms of whether such is furnished "in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member," "in a setting appropriate to the beneficiary's medical needs and condition," "by qualified personnel," and "meets, but does not exceed, the beneficiary's medical need." CMS, *Medicare Program Integrity Manual* (*MPIM*) (*Internet-Only Publ'n 100-08*) ch. 3, § 3.6.2.2

(Effective Aug. 2020). A particular item or service should also be at least as beneficial as an existing and available medically appropriate alternative. *MPIM, supra, ch. 13,* § 13.5.4.

> In conducting a review, MACs shall use the available evidence of general acceptance by the medical community, such as published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines. Proprietary information, submitted by a requestor, not available to the public shall not be considered. Medicare data considered as part of the evidence review for an LCD shall be reported in the evidence summary. The reported data shall comply with Medicare Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule data disclosure requirements by using aggregate level information, such as aggregated statistics on Medicare beneficiary or provider utilization. The review shall include a summary of all the evidence used to support the determination, which may be grouped by type of evidence evaluated. [...]
>
> MACs shall explain the rationale that supports their coverage determination of covered, noncovered, or limited coverage. The rationale is the reasoning leading to the coverage determination.

*MPIM, supra,* ch. 13, § 13.5.3.

42 U.S.C. § 1395hh(a)(2) of the Act provides no rule, requirement, or statement of policy, other than a national coverage determination ("NCD"), can establish or change a substantive legal standard governing the scope of the benefits or payment for services under the Medicare program unless promulgated as a regulation by CMS. NCDs promulgated by the Secretary of HHS under the authority of 42 U.S.C. § 1395y(a)(1) sets forth the criteria under which Medicare covers specified services, procedures, or supplies. NCDs are mandatory or otherwise binding upon ALJs. 42 C.F.R. § 405.732(a)(4). "An ALJ may not disregard, set aside, or otherwise review an NCD." 42 C.F.R. § 405.732(b)(1). Although ALJs are not bound by CMS program guidance, such as program memoranda, manual instructions, and local coverage determinations, an ALJ will give substantial deference to these policies if they are applicable to a particular case. 42 C.F.R. § 405.1062(a). If an ALJ declines to follow a policy in a particular case, the ALJ decision must explain the reasons why the policy was not followed. 42 C.F R. § 405.1062(b).

Local Coverage Determination (LCD) L36377, the LCD in effect at the time of the claim, governs the application of skin substitute grafts. Local Coverage Determination L36377: Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities (LCD L36377) (Revision Effective Jan. 2019).

> **History/Background and/or General Information**
>
> This LCD addresses the reasonable and necessary (R&N) threshold for coverage of skin replacement surgery with particular emphasis on the indications for application of skin substitute grafts for diabetic foot ulcers DFU and venous leg ulcers VLU. Evaluation of the clinical literature indicates that studies comparing the efficacy of skin substitute grafts as an adjunct to chronic wound care are limited in number, apply mainly to generally healthy patients, and examine only a small portion of the skin substitute products available in the United States. Therefore, no individual product can be considered for payment unless the applicable skin replacement surgery code meets the requirements of this LCD.

...

It is the expectation that a specific skin substitute graft product will be used for the episode of skin replacement surgery wound care (defined as 12 weeks from the first application of a skin substitute graft) assuming its use is not in conflict with Food and Drug Administration (FDA) assessments (e.g., indications, contraindications, how supplied and directions for use, etc.) and/or the American Association of Tissue Banks (AATB) approved use and assuming there is one related wound (definitions in CPT). Repeat application of a skin substitute graft within the 12 week episode of skin replacement surgery wound care may be considered upon re-assessment and must be supported in the medical record documentation for that encounter. Continuation of a skin substitute product within the 12- week episode of skin replacement wound care is not expected if the wound has responded to the skin replacement surgery with epithelialization and other progression. This LCD does not endorse particular products for separate payment so the physician's documentation must support the need for skin replacement surgery and the product used. Specific products may be listed as noncovered in the future (LCD for Noncovered Services) based on clinical literature that establishes inferiority.

...

**Covered Indications:**

Application of a skin substitute graft for lower extremity DFU and VLU will be covered when the following conditions are met and documented as appropriate for the individual patient:

- Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks.
- Presence of a chronic, non-infected venous stasis ulcer with failure to respond to documented conservative wound-care measures (outlined below) for greater than 4-6 weeks with documented compliance.
- For purposes of this LCD, conservative wound care measures include, but are not limited to:
  - o Comprehensive patient assessment (history, exam, ABI (Ankle-Brachial Index) & diagnostic test as indicated) and implemented treatment plan.
  - o For patient with DFU-assessment of type I vs. II Diabetes Mellitus and management history with attention to certain comorbidities (vascular disease, neuropathy, osteomyelitis); review of the current blood sugars/ HgbA1c, diet and nutritional status, activity level, physical exam that includes assessment of skin and wound, ABI (Ankle-Brachial Index), check of off-loading prosthetics or shoes for signs of abnormal wear.
  - o For patient with VLU- assessment of history (prior ulcers, thrombosis risks), physical exam (edema, skin changes), ABI (Ankle-Brachial Index), and duplex scan to confirm CEAP classification (Clinical-Etiology-Anatomy-Pathophysiology (*CEAP) classification categorizes chronic venous disorders to facilitate communication between physicians, to serve as a basis for standardized reporting during scientific analysis of management alternatives, and to identify segments of venous incompetence amenable to vein ablation therapies.
  - o Implemented treatment plan as indicated.

a. debridement
b. pressure relief [repositioning schedule, etc. for DFUs/VLUs; prior and on-going compression therapy (e.g., static compression includes compression hosiery (>20 mm HG) and compression bandages) for VLUs
c. infection control
d. management of exudate- maintenance of a moist environment (moist saline gauze, other classic dressings, bioactive dressing, etc.). (For indications of negative pressure wound therapy (NPWT) see DME MAC LCD Negative Pressure Wound Therapy Pumps (L5008))
e. Patient is a nonsmoker, or has refrained from smoking for at least 6 weeks prior to planned skin replacement surgery, or has received counseling on the effects of smoking on surgical outcomes and treatment for smoking cessation.

- Applied to ulcers that have failed to respond to documented conservative wound-care measures. "Failed response" is defined as an ulcer that has increased in size or depth, or no change in baseline size or depth or no sign of improvement or indication that improvement is likely (such as granulation, epithelialization or progress towards closing). Documentation of response requires measurements of the initial ulcer, measurements at the completion of at least four weeks DFU (4-6 weeks for VLU) of conservative wound-care measures and measurements immediately prior to placement of the skin substitute graft. For VLUs, completion of conservative wound-care measures must include 4-6 weeks and on-going compression therapy.
- A skin replacement surgery is considered an advanced treatment modality (not a conservative wound care measure). Pre-service record specifically addresses circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed based on the prior wound evaluation. Such record should include updated medication history, review of pertinent medical problems that may have arisen since the previous wound evaluation, and explanation of the planned skin replacement surgery with choice of skin substitute graft product. The procedure risks and complications should also be reviewed and documented.

LCD L36377.

Local Coverage Article A57680 covers Billing and Coding: Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities (A57680) (Revision Effective Aug. 2020). Article A57680 states:

**Documentation Requirements**

1. All documentation must be maintained in the patient's medical record and made available to the contractor upon request.
2. Every page of the record must be legible and include appropriate patient identification information (e.g., complete name, dates of service[s]). The documentation must include the legible signature of the physician or non-physician practitioner responsible for and providing the care to the patient.

3. The submitted medical record must support the use of the selected ICD-10-CM code(s). The submitted CPT/HCPCS code must describe the service performed.
4. The medical record must clearly show that the criteria listed in the LCD has been met, as well as, the appropriate diagnosis and response to treatment. Description of the wound(s) must be documented at baseline (prior to beginning conservative wound care measures) relative to size, location, stage, duration, and presence of infection, in addition to the type of treatment given and response. This information must be updated in the medical record throughout the episode of skin replacement surgery wound care. Wound description must also be documented pre- and post- treatment with the skin substitute graft being used. The reason(s) for any continued application should be specifically addressed in the medical record.
5. Documentation should include an assessment (generally in an E/M service) outlining the plan for skin replacement surgery and the choice of skin substitute product for the 12 week period as well as any anticipated repeat applications in the 12 week period. An operative note must support the procedure (e.g., application of skin substitute graft to legs) for the relevant date of service (first application starts the 12 week episode of care). At a minimum, the operative note(s) should include pre and post op diagnosis, name of surgeon, anesthesia, reason for the procedure, complete description of the procedure including product used (with identifying package label in the chart), and relevant findings.
6. Any amount of wasted skin substitute must be clearly documented in the procedure note with the following minimum information: Date, time and location of ulcer(s) treated; Name of skin substitute and how product supplied; Approximate amount of product unit used; Approximate amount of product unit discarded; Reason for the wastage; Manufacturer's serial/lot/batch or other unit identification number of graft material. When manufacturer does not supply unit identification, record must document such.
7. Documentation requirements include addressing how product supplied, any wastage, etc. The HCPCS code of the applicable skin substitute and the units billed must be consistent with medical record in regard to wound description and size.

Article A57680.

The Enrollee, as the Appellant and the moving party, has the burden of proof. *See* 5 U.S.C. § 556(d). The Enrollee meets this burden by furnishing sufficient information to show, by preponderance of the evidence, that Medicare coverage is warranted. *See* 42 U.S.C. § 1395l(e); 42 C.F.R. § 424.5(a)(6).

## <u>FINDINGS OF FACT AND ANALYSIS</u>

*Findings of Fact*

At the time of the dates of service at issue, the Beneficiary was 75 years old. (File 4, p. 29). He had a medical history of asthma, diabetes, muscle weakness, arthritis, high blood pressure, atrial fibrillation and shortness of breath. (File 4, p. 35). He was residing in a nursing home, and he had an external fixator on his left lower extremity. (File 4, p. 31). A July 26, 2023 visit note stated that he had developed ulcers on his legs about six weeks earlier. At the time of this visit, the

ulcer on his left leg was 200 cm in diameter and the ulcer on his right leg was 64 cm in diameter. Dr. Brandwein planned to start antibiotics and amniotic tissue membrane grafts. (File 4, p. 31).

On October 1, 2023 (the first date of service at issue), the Beneficiary had a visit with Dr. Brandwein. Dr. Brandwein noted that the ulcer on the left leg was currently 64 cm. sq., and the Beneficiary planned to have the external fixator removed from his left leg later that week. Dr. Brandwein debrided the wound and applied an Impax amniotic tissue membrane with adaptic dressing over the Impax. There was no extra graft left over or wasted. Dr. Brandwein planned to see the Beneficiary again the next week. (File 4, p. 34). Another note from the same date contained additional details about the wound. The wound was 6.4 cm long x 10 cm wide x 2 mm deep. Two 32 cm Impax grafts were used to cover the 64 cm. sq. wound. There was no sign of infection, and the Beneficiary was pleased with the progress. (File 4, p. 35).

On October 6, 2023 (the second date of service at issue), the Beneficiary had a visit with Dr. Brandwein. Dr. Brandwein noted that the ulcer on the left leg was currently 64 cm. sq., and the Beneficiary planned to have the external fixator removed from his left leg later that week or weekend. Dr. Brandwein debrided the wound and applied an Impax amniotic tissue membrane with adaptic dressing and compression dressing over the Impax. Dr. Brandwein planned to see the Beneficiary again the next week. (File 4, p. 38). Another note from the same date contained additional details about the wound. The wound was 6.4 cm x 1 mm deep. Two 32 cm Impax grafts were used to cover the wound. No graft was wasted. (File 4, p. 39).

On October 10, 2023 (the third date of service at issue), the Beneficiary had a visit with Dr. Brandwein. Dr. Brandwein noted that the ulcer on the left leg was currently 56 cm. sq., and the Beneficiary planned to have the external fixator removed the next day. The wound was improving. Dr. Brandwein debrided the wound and applied a 56 cm. sq. Impax amniotic tissue membrane with kerlix and Jones dressing over the Impax. Dr. Brandwein noted that the graft at this visit "should be his final graft." There was no wasted graft. (File 4, p. 42). Another note from the same date contained additional details about the wound. The wound was 5.6 cm long x 10 cm wide x 1 mm deep. The wound continued to improve. (File 4, p. 43).

On October 19, 2023 (the fourth date of service at issue), the Beneficiary had a visit with Dr. Brandwein. Dr. Brandwein noted that the ulcer on the left leg was currently 38 cm. sq. The external fixator had been removed from the Beneficiary's left lower extremity. Dr. Brandwein debrided the wound and applied a 38 cm. sq. Impax amniotic tissue membrane with adaptic dressing over the Impax. There was no sign of infection. Dr. Brandwein noted that the wound was nearly resolved and noted he planned to see the Beneficiary again the next week. (File 4, p. 46). Another note from the same date contained additional details about the wound. The wound was 3.8 cm long x 10 cm wide x 1 mm deep. Two Impax grafts (one that was 32 cm and one that was 6 cm) were used to cover the 38 cm. sq. wound. (File 4, p. 47).

*Analysis*

This case consists of 4 claims for code Q4262 (Dual Layer Impax Membrane, Per Sq Cm) and 15271 (Skin Substitute Graft Trunk/Arm/Leg) for the Beneficiary for the dates of service October 1, 6, 10, and 19, 2023.

The UPIC and redetermination decisions asserted various denial bases. However, most of the denial bases were resolved prior to the reconsideration decision. By the time the QIC issued the reconsideration decision, the QIC determined that the sole basis for denial was their assertion that "there is insufficient peer-reviewed, evidence-based literature to support the use of dual

Layer Impax Membrane for wound care purposes." (File 2, p. 26). Therefore, this is the sole issue before me in this case.[1]

At hearing, I explained to the Appellant that the issue of peer-reviewed, evidence-based literature would be the sole issue in this case. The Appellant argued that there was sufficient medical evidence to support the use of the Impax membrane in this case. After the hearing, I allowed the Appellant additional time to submit medical studies into the record. The Appellant submitted File 14, which contains additional medical studies, and I admitted this document into the hearing record.

The first issue before me in this case is whether Medicare has issued a relevant NCD, LCD, or manual provision addressing coverage of the services at issue. The Appellant has the burden of proof to show coverage in this appeal. *See* 5 U.S.C. § 556(d). The Appellant meets this burden by furnishing sufficient information to show, by a preponderance of the evidence, that Medicare coverage is warranted. *See* 42 U.S.C. § 1395l(e); 42 C.F.R. § 424.5(a)(6). When no LCD exists for a particular item or service, an item or service will be considered to be reasonable and necessary if the item or service meets the following criteria: (1) it is safe and effective; (2) it is not experimental or investigational; and (3) it is appropriate, including the duration and frequency, in terms of whether the service or item is furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member, furnished in a setting appropriate to the beneficiary's medical needs and condition, ordered and furnished by qualified personnel, and meets, but does not exceed, a beneficiary's medical need. *MPIM, supra*, ch. 3, § 3.6.2.2.

As an initial matter, I note that the MAC that has jurisdiction over the Appellant's state of Florida (First Coast Service Options, Inc.) has announced that a new LCD for skin substitute grafts for will take effect in April 2025. This LCD will specify that Impax is not covered because the MAC was unable to find any medical literature to support the use of this product. *See* LCD L36377 (Revision Effective April 2025).[2] However, the dates of service at issue in this case were in 2023, approximately 18 months before the effective date of the new LCD. Therefore, I will not be applying the provisions of the new LCD, which would prohibit coverage of the product at issue. Instead, I will be applying the LCD that was in effect at the time of the dates of service at issue.

At the time of the dates of service at issue in this case, the then-current version of LCD L36377: Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities, had been in effect since January 8, 2019. This version of LCD L36377 did not address specific skin substitute products. This version of LCD L36377 merely discussed the general requirements for coverage of skin substitute products. However, this version of LCD L36377 included the following discussion about the various skin substitute products:

> **History/Background and/or General Information**
>
> This LCD addresses the reasonable and necessary (R&N) threshold for coverage of skin replacement surgery with particular emphasis on the indications for

[1] 42 C.F.R. § 405.1032(a) states that the issues before me are limited to the issues that were considered in the lower-level decisions and not decided in the Appellant's favor. 42 C.F.R. § 405.1032(b) outlines requirements to consider a new issue. Here, the criteria for considering new issues are not met, so this decision will only address the specific denial bases cited in the reconsideration decisions.

[2] In fact, all of the MACs have issued future or proposed LCDs that specifically exclude Impax because none of the MACs were able to find medical literature to support the use of this product. See Future LCDs L39806, L35041, L39764, L39760, L39756, L39865 (Revisions Effective April 2025) and Proposed LCD DL39828.

> application of skin substitute grafts for diabetic foot ulcers DFU and venous leg ulcers VLU. Evaluation of the clinical literature indicates that studies comparing the efficacy of skin substitute grafts as an adjunct to chronic wound care are limited in number, apply mainly to generally healthy patients, and examine only a small portion of the skin substitute products available in the United States. Therefore, no individual product can be considered for payment unless the applicable skin replacement surgery code meets the requirements of this LCD.
>
> ...
>
> It is the expectation that a specific skin substitute graft product will be used for the episode of skin replacement surgery wound care (defined as 12 weeks from the first application of a skin substitute graft) assuming its use is not in conflict with Food and Drug Administration (FDA) assessments (e.g., indications, contraindications, how supplied and directions for use, etc.) and/or the American Association of Tissue Banks (AATB) approved use and assuming there is one related wound (definitions in CPT). Repeat application of a skin substitute graft within the 12 week episode of skin replacement surgery wound care may be considered upon re-assessment and must be supported in the medical record documentation for that encounter. Continuation of a skin substitute product within the 12- week episode of skin replacement wound care is not expected if the wound has responded to the skin replacement surgery with epithelialization and other progression. This LCD does not endorse particular products for separate payment so the physician's documentation must support the need for skin replacement surgery and the product used. Specific products may be listed as noncovered in the future (LCD for Noncovered Services) based on clinical literature that establishes inferiority.

LCD L36377 (Revision Effective Jan. 2019) (emphasis added). The underlined portions of the then-current LCD indicate that medical documentation was required to support the reasonableness and necessity of the product that was chosen. While the LCD did not give any specific guidance about individual products or the criteria that should be used to select a product, the LCD did note that the product itself must be supported by the medical evidence.

At the time of the dates of service at issue in this case, the then-current version of related Billing and Coding Article A57680: Billing and Coding: Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities (A57680) had been in effect since August 13, 2020. Like LCD L36377, the then-current version of A57680 did not address specific products. However, this version of A57680 contained the following requirement:

> Documentation should include an assessment (generally in an E/M service) outlining the plan for skin replacement surgery and the choice of skin substitute product for the 12 week period as well as any anticipated repeat applications in the 12 week period. An operative note must support the procedure (e.g., application of skin substitute graft to legs) for the relevant date of service (first application starts the 12 week episode of care). At a minimum, the operative note(s) should include pre and post op diagnosis, name of surgeon, anesthesia, reason for the procedure, complete description of the procedure including product used (with identifying package label in the chart), and relevant findings.

A57680 (emphasis added). Similar to the LCD, the then-current Article A57680 did not discuss specific products, but it did require medical documentation to support the product that was chosen.

Overall, the LCD and Billing and Coding Article that were in effect at the time of the dates of service at issue provide little specific guidance about the process that should be used to select a specific product. However, LCD L36377 and Article A57680 were clear that the choice of skin substitute product had to be explained and supported.

In this case, the individual treatment records did not address the choice of skin substitute product. While the treatment records noted the type of product that was used, the treatment records did not discuss why the physician chose Impax, and the treatment records did not address the medical evidence supporting that choice. In the absence of any evidence in the treatment records, I permitted the Appellant to provide medical studies to support the reasonableness and necessity of the choice of skin substitute products in this case. The Appellant submitted the full text[3] of the following six published studies:

| **File** | **Primary Author** | **Year** | **Journal** | **Title** |
|---|---|---|---|---|
| 12, p. 4 | Zelen | 2013 | *Journal of Wound Care* | *An Evaluation of Dehydrated Human Amniotic Membrane Allografts in Patients with DFUs* |
| 12, p. 8 | Su | 2020 | *Int. Wound J.* | *Human Amniotic Membrane Allograft, A Novel Treatment for Chronic Diabetic Foot Ulcers: A Systematic Review and Meta-Analysis of Randomised Controlled Trials* |
| 12, p. 20 | Tettlebach | 2019 | *Int. Wound J.* | *A Confirmatory Study on the Efficacy of Dehydrated Human Amnion/Chorion Membrane dHACM Allograft in the Management of Diabetic Foot Ulcers: A Prospective, Multicentre, Randomised, Controlled Study of 110 Patients From 14 Wound Clinics* |
| 14, p. 71 | Mohammed | 2022 | *Journal of Foot/Ankle Research* | *Human Amniotic Membrane Products for Patients with Diabetic Foot Ulcers. Do They Help? A Systematic Review and Meta-Analysis* |
| 14, p. 84 | Game | 2021 | *Int. Wound J.* | *The Effectiveness of a New Dried Human Amnion Derived Membrane In Addition To Standard Care In Treating Diabetic Foot Ulcers: A Patient and Assessor Blind, Randomized Controlled Pilot Study* |
| 14, p. 97 | Carpenter | 2024 | *Wounds* | *Evaluating the Number of Cellular and/or* |

[3] The hearing record also contains several lists, summaries and abstracts of other articles. However, I explained at the hearing that I required the full text of medical studies. The lists and summaries consist of a third party's summary of the information in each study. Without the full text of each study, I have no way of knowing if the summary of the study is accurate. The hearing record also contains two single-page "case studies" documented by the manufacturer of Impax. (File 14, pp. 94-95). However, there is no indication that these case studies have ever been published or peer-reviewed in any way. These single case studies are no different than the anecdotal evidence of the Beneficiary's own treatment. This anecdotal evidence is not the type of medical literature that is referenced in *MPIM*, ch. 13, § 13.5.3. Therefore, I have only considered the six studies listed in the table above.

| | | | | |
|---|---|---|---|---|
| | | | | *Tissue-Based Product Applications Required to Treat Diabetic Foot Ulcers and Venous Leg Ulcers in Non-Hospital Outpatient Department Settings* |

As noted above, when no LCD exists for a particular item or service, an item or service will be considered to be reasonable and necessary if the item or service meets the following criteria: (1) it is safe and effective; (2) it is not experimental or investigational; and (3) it is appropriate, including the duration and frequency, in terms of whether the service or item is furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member, furnished in a setting appropriate to the beneficiary's medical needs and condition, ordered and furnished by qualified personnel, and meets, but does not exceed, a beneficiary's medical need. *MPIM, supra*, ch. 3, § 3.6.2.2. When determining whether an item or service is reasonable and necessary, contractors must consider available evidence of general acceptance by the medical community, such as published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines. *See MPIM, supra*, ch. 13, § 13.5.3. I apply these same criteria when reviewing the studies submitted by the Appellant,

Notably, the first five studies listed in the table above do not address Impax at all. These studies involved multiple other skin substitute products, but did not include Impax in the study.[4] Therefore, the first five studies are of little value in assessing the reasonableness and necessity of Impax. While these first five studies might support the safety and efficacy of other skin substitute products, these studies do not support the safety and efficacy of Impax.

The sixth study in the table above, by Carpenter, *et. al.*, does include some discussion of Impax. This study was a retrospective analysis of 257 wounds that were treated with cellular or tissue-based products (CTPs) between 2018 and 2023. The study found that patients receiving CTP treatment in addition to the standard of care treatment demonstrated a significant reduction in average wound area. (File 14, p. 97). The patients whose records were part of the study had been treated with nine different skin substitute products. A total of 10 of the 257 wounds that were included in the study had been treated with Impax. (File 14, p. 103). Four of the 10 wounds treated with Impax achieved wound closure. (File 14, p. 106). This is the only substantive study data in the entire hearing record that addresses the Impax product.

In their post-hearing position paper, the Appellant argued that the Carpenter study concluded that Impax was, "found not only to be both safe and effective, but the authors also concluded there was sufficient literature to support the use of Impax in the management of diabetic foot ulcers." (File 14, p. 2). This statement is somewhat misleading. Contrary to the Appellant's statement, the authors of the Carpenter study did not reach any conclusions that were specific to the use of Impax. Instead, the authors of the Carpenter study reached conclusions about CTPs in general. In addition, the goal of the Carpenter study was not to determine the overall safety and efficacy of Impax or any other specific product. Instead, the goal of the Carpenter study was to determine the ideal number of CTP applications after the physician has already made the decision to use a

[4] In their post-hearing position paper, the Appellant argued that the Mohammed *et. al.* study "demonstrate[s] the utility of the Impax allograft." (File 14, p. 2). However, I am unable to locate any reference to Impax in the Mohammed study (File 14, pp. 71-83). It is unclear how the Appellant concluded that the Mohammed study specifically supports the use of Impax, except by analogy to other products. The Appellant also argued that the Game, *et. al.* study discussed 11 clinical trials that, "considered Impax or a similar product." (File 14, p. 2). Again, I am unable to locate any reference to Impax in the Game study.

CTP. (File 14, p. 98). While it is true that the authors of the Carpenter study included a background conclusion that they believed there is sufficient evidence to support the use of CTPs generally (File 14, p. 98), this background conclusion was based on their review of the literature prior to the study and not based on the study itself. Moreover, as discussed in more detail below, general conclusions about the use of CTPs are not helpful for resolving the contested issues in this case. The relevant LCD and manual provisions require an analysis of the reasonableness and necessity of the selected product (Impax) and not of CTPs in general. Therefore, the Appellant's citation to the Carpenter study's general background conclusion is not sufficient to meet their burden of proving that Impax is safe, effective, reasonable and necessary.

In sum, the studies submitted by the Appellant discuss Impax treatment of a grand total of 10 wounds. The hearing record does not contain any other study data to support the use of the Impax product. The study of a mere 10 wounds provides far too little data to support a conclusion that Impax is safe, effective, reasonable and necessary. In order to support the reasonableness and necessity of Impax, the Appellant would have to submit much more Impax data from "published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines," as required by *MPIM, supra*, ch. 13, § 13.5.3. Having reviewed the medical evidence in the record, I conclude that the Appellant has not met its burden of proving that the use of Impax was reasonable and necessary.

In their post-hearing position paper (File 14), the Appellant argued that I should consider the findings of studies of other CTP's. The Appellant argued that the evidence showing that other products are safe and effective also supports a conclusion that Impax is safe and effective. This argument is not persuasive. The Appellant has not shown that the study data for one CTP necessarily applies to all other CTPs. In fact, it seems extremely unlikely that all CTPs function in the same way, and it seems extremely unlikely that all CTPs are equally effective at treating wounds. The fact that there are so many different skin substitute products indicates that manufacturers are adjusting the cells or tissue in some way in order to offer a new product with a different name. This conclusion is supported by the language in then-current LCD L36377 and Article A57680, which require a product-specific analysis of reasonableness and necessity. As noted above, LCD L36377 states:

> Evaluation of the clinical literature indicates that studies comparing the efficacy of skin substitute grafts as an adjunct to chronic wound care are limited in number, apply mainly to generally healthy patients, and examine only a small portion of the skin substitute products available in the United States. Therefore, no individual product can be considered for payment unless the applicable skin replacement surgery code meets the requirements of this LCD.... This LCD does not endorse particular products for separate payment so the physician's documentation must support the need for skin replacement surgery <u>and the product used</u>.

LCD L36377 (emphasis added). Article A57680 similarly instructs that, "[d]ocumentation should include an assessment (generally in an E/M service) outlining the plan for skin replacement surgery <u>and the choice of skin substitute product</u>." A57680 (emphasis added). This language from LCD L36377 and Article A57680 directly contradicts the Appellant's argument that I should rely general studies or studies of other CTPs as evidence that Impax is safe and effective.

In their post-hearing position paper (File 14), the Appellant also argued that additional studies of Impax were not required because Impax has met the FDA's requirements under Section 361. This argument is not persuasive. The Appellant did not put forward any authority for the proposition that Section 361 is determinative for the analysis of Medicare coverage for the product at issue. (*See* Hearing Recording). The Appellant did not provide any Medicare statute or regulation that implies or states that Medicare will accept a Section 361 designation as proof that the product is safe and effective, not investigational or experimental, and reasonable and necessary. Instead, because there is no NCD or LCD for the product at issue, I must analyze whether the Medicare coverage exists under the provisions of the *MPIM* discussed above. Notably, LCD L36377 and Article A57680 also do not state that Medicare will simply adopt or defer to the FDA's Section 361 determination. To the contrary, the LCD and Article emphasize that the individual selected product must meet Medicare's requirements for reasonableness and necessity, which requires a separate product-specific analysis. Therefore, the product's status under Section 361 does not control the outcome of this case.

In their post-hearing position paper, the Appellant further argued that the approval of a HCPCS code for Impax supports the reasonableness and necessity of this product. However, the Appellant did not put forward any authority for the proposition that the assignment of a HCPCS code is determinative for the analysis of Medicare coverage for the product at issue. (See Hearing Recording). The Appellant did not provide any Medicare statute or regulation that implies or states that the assignment of a HCPCS code is proof that the product has been found to be safe and effective and reasonable and necessary, as defined in the *MPIM*. The 2022 Impax HCPCS document submitted by the Appellant (File 14, p. 17) also does not state that the assignment of a HCPCS code indicates that CMS has determined that the product is safe and effective, and reasonable and necessary, and will be covered. Therefore, the assignment of a HCPCS code does not control the outcome of this case.

For the reasons discussed above, the six studies submitted by the Appellant are not sufficient to meet the Appellant's burden of proving that Impax has been proven to be safe and effective and reasonable and necessary. The requirements of *MPIM*, ch. 3, § 3.6.2.2 and ch. 13, § 13.5.3 have not been met. Therefore, the Impax treatment and related procedures provided to the Beneficiary on the dates of service were not medically reasonable and necessary under Medicare rules and regulations and are not covered by Medicare. The decision is UNFAVORABLE.

*Liability*

Where the Medicare coverage requirements have not been met, waiver of liability pursuant to section 1879(a) of the Social Security Act, 42 U.S.C. § 1395pp(a), may apply. In order for payment to be made pursuant to section 1879 of the Act, the Appellant and the Beneficiary must not have known, or be reasonably expected to know, that Medicare payment would not be made for the item or service at issue. There is nothing in the record that would tend to show that the Beneficiary in this case knew or should have known that Medicare probably would not pay for the item or service furnished by the Appellant. On the other hand, the Appellant, a supplier or provider, should have known what steps were required to submit and sustain valid claims for the item or service and should have known that if those steps were not taken, it was unlikely that Medicare would pay for such items or services. Accordingly, the Appellant is solely responsible for the costs of denied claims for the item or service provided to this Beneficiary.

Medicare intends to recoup the overpayment in this claim. Section 1870(b) of the Social Security Act, 42 U.S.C. § 1395gg(b), prohibits recovery of Medicare overpayments from providers of services under certain conditions, including when the provider of service was without fault with

respect to the payment of such excess over the correct amount. 42 U.S.C. § 1395gg(b). Unless a provider is found without fault, the provider is liable for any received overpayments. CMS, *Medicare Financial Management Manual* (*MFMM*), pub. 100-06, ch. 3, § 90 (Feb. 2014). A provider considered "without fault" is one who exercised reasonable care in billing and accepting payment from Medicare. "Reasonable care" includes making full disclosure of all material facts, having a reasonable basis for assuming the payment was correct and promptly bringing any questions about the payment to the contractor. *Id.*

As a Medicare provider, the Appellant had access to pertinent statutes, regulations, coverage determinations, coding rules and Medicare manuals detailing requirements for reimbursement. The Appellant should have known documentation did not support the product at issue was not medically reasonable and necessary for the Beneficiary. As noted above, even the then-current versions of LCD L36377 and Article A57680 explicitly required a product-specific analysis of reasonableness and necessity of the product selected. LCD L36377 requires that "the physician's documentation must support the need for skin replacement surgery and the product used," and Article A57680 requires that the "[d]ocumentation should include an assessment (generally in an E/M service) outlining the plan for skin replacement surgery and the choice of skin substitute product." There is no indication that the Appellant performed this assessment prior to selecting the product, as required by LCD L36377 and Article A57680. The Appellant did not exercise reasonable care in billing and accepting payment for this product. As a result, the Appellant does not meet the statutory requirement for waiver of recovery of the assessed overpayment, and Medicare may recoup the overpayment arising from these claims.

## CONCLUSIONS OF LAW

The medical and surgical supplies and related procedures provided to the Beneficiary on the dates of service were not reasonable and necessary under Medicare rules and regulations and are not covered by Medicare. The Appellant is financially responsible for the overpayment.

## ORDER

For the reasons discussed above, this decision is **UNFAVORABLE**. I direct the Medicare administrative contractor to process the claim in accordance with this decision.

**SO ORDERED**

S. Andrew Grace
Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD Form DAB-101 (12/19)

**REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL**

| | |
|---|---|
| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| | |
|---|---|
| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |

7. Medicare claim type: ☐ Part A ☐ Part B ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes If Yes, skip to Block 9.
☐ No If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated________________________. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

____________________________________________________________

____________________________________________________________

____________________________________________________________

____________________________________________________________

(Attach additional sheets if you need more space)

**PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.**

| | | | | | |
|---|---|---|---|---|---|
| DATE | | | DATE | | |
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

---

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

---

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Seattle, WA**

| | | | |
|---|---|---|---|
| Appeal of: | **DANIEL BRANDWEIN DPM P A** | OMHA Appeal No.: | **3-14443431635** |
| Beneficiary: | J. F[redacted] | Medicare Part: | **B** |
| Medicare No.: | *****A7DY76 | Before: | **S. Andrew Grace**<br>Administrative Law Judge |

Index of the Administrative Record and Exhibit List

| Exhibit Record | Administrative File Reference: File Name | Page Range |
|---|---|---|
| Guidance: Medical Literature: New Evidence | File 12 | 1 : 69 |
| Procedural - CMS Levels: Reconsideration | File 2 | 1 : 30 |
| Procedural - CMS Levels: Redetermination Case File | File 3 | 1 : 487 |
| Procedural - CMS Levels: Request for Reconsideration | File 4 | 1 : 53 |
| Procedural - CMS Levels: Request for Case File | File 5 | 1 : 3 |
| Procedural - CMS Levels: QIC Acknowledgement Letter | File 6 | 1 : 3 |
| Procedural - CMS Levels: Claim information: Excel sheet doc | File 7 | 1 : 1 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 1 | 1 : 60 |
| Procedural - OMHA Level: Response to Notice of Hrg: From Rep | File 10 | 1 : 4 |
| Procedural - OMHA Level: Rep appointment | File 11 | 1 : 1 |
| Procedural - OMHA Level: Post Hearing info: From Rep | File 14 | 1 : 126 |
| Procedural - OMHA Level: Proof of cc of RFH to Bene | File 8 | 1 : 1 |
| Procedural - OMHA Level: Notice of Hearing | File 9 | 1 : 9 |
| Proceeding (Audios): Hearing audio | File 13 | 1 : 1 |

| Non-Exhibit Record | Administrative File Reference: File Name | Page Range |
|---|---|---|
| Records not considered: Duplicate evidence: Post hrg info from Rep | File 15 | 1 : 127 |

OMHA-156
Dated: 2025-02-13