Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Atlanta Field Office
77 Forsyth Street SW
2nd Floor
Atlanta, GA 30303
470-633-3500
(470) 633-3489 (Direct)
404-332-9566 (Fax)
833-636-1474 (Toll Free)

March 17, 2025

BLACK LAW PA
ATTN: KELSEY BLACK
1401 EAST BROWARD BVLD
STE 204
FT LAUDERDALE, FL 33301

# NOTICE OF DECISION

Appellant: DANIEL BRANDWEIN DPM P A
OMHA Appeal Number: 3-14470343406

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

## What if I disagree with the decision?

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

## How much time do I have to file an appeal?

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

## How do I file an appeal?

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:

1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
Atlanta, GA

| | | | |
|---|---|---|---|
| Appeal of: | DANIEL BRANDWEIN DPM P A | OMHA Appeal No.: | 3-14470343406 |
| Beneficiary: | A. J[redacted] | Medicare Part: | B |
| Medicare No.: | *****R1TN53 | Before: | Kyle Alexander Administrative Law Judge |

## DECISION

After carefully considering the evidence presented in the record the undersigned enters an **UNFAVORABLE** decision against Daniel Brandwein DPM PA ("Appellant") for the application of skin substitute graft to wound total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area (15275), application of skin substitute graft to wound total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area (15276), and Zenith amniotic membrane, per square centimeter (Q4253) (hereinafter "Zenith grafts") he provided to [redacted] ("Beneficiary") during 24 visits that occurred from September 22, 2022 to May 1, 2023. The Appellant is liable for the overpayment of the non-covered charges.

## PROCEDURAL HISTORY

The Appellant submitted claims to the Medicare Administrative Contractor ("Contractor") for the following services, application of skin substitute graft to wound total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area (15275), application of skin substitute graft to wound total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area (15276), and Zenith amniotic membrane, per square centimeter (Q4253) (hereinafter "Zenith grafts") provided to the Beneficiary on the date of service at issue in this case. The Contractor initially paid the claims. Upon review, the Unified Program Integrity Contractor ("UPIC") found that an overpayment had been made for 24 claims filed for the Beneficiary consisting of 75 line items for services 15275, 15276, and Q4253. (*See* File 13, pp. 4-11; *see also id.* at 275-282, 288-290, 300-310, 314-383, 389-391, and 400-405 (includes initial demand letters, including those for claims not at issue in this case)).

The Appellant submitted a request for redetermination. (File 13, pp. 2-3, 15-34 (includes a valid appointment of representative for the Appellant's counsel); *see also* File 4, pp. 2-3). The Contractor issued a redetermination for each date of service. (File 13, pp. 35-202). The redetermination decisions upheld the denial finding the documentation provided is inconclusive to support the services as billed. (*Id.*). Specifically, the documentation provided generally did not include clear or sufficient wound measurements, the amount of Zenith graft applied to each wound and any waste was not documented, how the Zenith graft was secured was not documented, baseline measurements and comprehensive evaluations were not included to determine if the skin grafts were necessary, there was no supportive documentation that the Beneficiary's systemic conditions were stable, and there was insufficient information about the

Beneficiary's failure to respond to prior conservative wound care treatments. (*See e.g., id.* at 38). The Contractor's determination relied, in part, on coverage and documentation provided in LCD L36377 Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities. (*Id.*). The Contractor found the Appellant remained liable for the overpayment of the noncovered charges. (*Id.* at 39).

The Appellant submitted a request for reconsideration for the claims at issue in this case. (File 12, pp. 1-275 (includes copies of the redetermination decisions and medical records)). The request for reconsideration includes a letter from the Appellant that is dated both April 4, 2024 and April 15, 2024. (*Id.* at 271-272). The Appellant reports, in part, that the Beneficiary is diabetic and on dialysis. (*Id.*). The Beneficiary has multiple ulcers on his feet that showed no signs of improvement with conventional treatment. (*Id.* at 271). The physician asserts that he treated the Beneficiary comprehensively and with a high level of care including performing blood tests, not using grafts when he has an infection, treating the Beneficiary with IV and oral antibiotics, and performing surgery. (*Id.*). The Appellant states, "I am including this letter and I would try to get more lab tests and more documentation regarding the patient's care." (*Id.*).

Upon reconsideration, the Qualified Independent Contractor ("QIC") upheld the denial. (File 8, pp. 1-22; *see also* File 5, pp. 1-42 and File 7, pp. 1-22). First, the QIC found that based on the documentation provided the Beneficiary received wound debridement services with the application of a skin substitute graft almost on a weekly basis. (*Id.* at 10). However, upon review the QIC found the evidence did not include sufficient details of the circumstances that led to the failure to respond to standard wound care treatment, did not include evidence of a comprehensive exam addressing any underlying conditions, lacked evidence the Beneficiary's system conditions were stable, and did not document the reason for weekly debridement with the application of the skin substitute graft was indicated. (*Id.*). The QIC also noted the office notes provided included vague statements about the Beneficiary's condition and care; however, these statements alone without supporting documentation do not support the patient's systemic conditions are adequately controlled and stable. (*Id.*). Second, the QIC found that although wound measurements were provided, each note lacked a clear description of the wound, history, or other details such as how long the wound has been present, the history of specific treatment attempted prior to the date of service billed, and why prior treatment was not effective. (*Id.*). The QIC further noted the office notes did not include an updated medication history and although medications were briefly addressed in some of the office notes, they appeared to be addressed only in passing. (*Id.*). The office notes provided also lacked a review of pertinent medical problems that may have arisen since the previous wound evaluation and an explanation of how the provider arrived at the decision to use the application of skin substitute grafts. (*Id.*). Lastly, the QIC found that the type of skin graft provided, Zenith Amniotic Membrane, while eligible to be marketed, there is overall insufficient evidence and a lack of peer reviewed, evidence-based literature in its use. (*Id.*). For these reasons, the QIC found the documentation provided failed to support that the services were medically reasonable and necessary as required for Medicare coverage and payment. (*Id.* at 9-10). The Appellant remained liable for the overpayment of the non-covered charges. (*Id.* at 11-19).

The Office of Medicare Hearings and Appeals ("OMHA") timely received the Appellant's request for an Administrative Law Judge ("ALJ") hearing. (File 3, pp. 1-6). Along with the request for hearing, the Appellant submitted a significant amount additional documents including medical records. Upon review, the undersigned finds that these additional documents include duplicates of the records submitted with the request for reconsideration as well as new evidence. There is no indication in the record nor in the lower level decisions that this evidence was previously submitted. (*See* File 13, pp. 35-202 (redetermination decisions), File 8, pp. 1-22

(reconsideration decision); *see also* File 12, pp. 271-272 (Appellant's request for reconsideration appeal letter indicating he would try to collect additional documentation)). The Appellant did not submit a good cause statement addressing why this evidence was submitted for the first time at the OMHA level. (*See* File 3, p. 3 (request for hearing form indicating evidence was previously submitted) and Hearing Recording (February 12, 2025)(Appellant's counsel only addressing additional new evidence submitted after the request for hearing)). Pursuant to 42 C.F.R. § 405.1028(a)(3), the undersigned does not find good cause and the evidence is excluded from consideration.

In lieu of appearing at the hearing, the UPIC submitted a submitted position paper. (File 20, pp. 1-8).

Prior to the hearing, the Appellant's counsel submitted additional new evidence. (File 23, pp. 1-365 (includes filing of new evidence form with good cause statement)). Pursuant to 42 C.F.R. § 405.1028(a)(2), the undersigned had examined the new evidence, finds good cause, and will allow it into the record because it addresses a material issue.

Judge Kyle Alexander conducted a telephone hearing on February 12, 2025. Attorneys Patrick Wier and Kelsey Black appeared as counsel for the Appellant. Dr. Daniel Brandwein, DPM, PA was present and testified under oath. Dr. Thomas Merrill was present as a witness on behalf of the Appellant and testified under oath. Jean Acevedo, a billing consultant for the Appellant was present. The exhibits were admitted into the record without objection. (Hearing Recording (February 12, 2025)). The administrative record is now closed.

## ISSUES

1. Whether the Zenith grafts (15275, 15276, and Q4253) the Appellant provided to the Beneficiary on the dates of service at issue met Medicare coverage criteria.

2. Whether the services were reasonable and necessary in accordance with section 1862(a)(1)(A) of the Social Security Act ("Act").

3. If the services are found to be excluded from coverage under section 1862(a)(1)(A) of the Act, whether payment may nevertheless be made to the Appellant under the limitation on liability provisions of section 1879 of the Act.

4. If payment cannot be made pursuant to section 1879 of the Act and an overpayment has been made, whether the Appellant is at fault with respect to the overpayment and is, accordingly, liable for the overpayment pursuant to section 1870 of the Act.

## APPLICABLE LAW AND POLICY

### I. Principles of Law

#### *A. Social Security Act*

In Title XVIII of the Social Security Act ("the Act"), Congress established the scope of benefits that are included in the Medicare program. (*See* § 1832 (scope of Part B)). The Act does not contain a comprehensive list of specific items or services eligible for Medicare coverage. Rather, it lists categories of items and services, and vests in the Secretary the authority to make

determinations about which specific items and services within these categories can be covered under the Medicare program. (*See* 42 U.S. Code § 1395ff; *see also* 42 C.F.R. § 410.10).

Section 1862(a)(1) of the Act excludes from Medicare coverage and payment, items and services which are "not medically reasonable and necessary for the diagnosis and treatment of an illness or injury, to improve the functioning of a malformed body member."

Section 1833(e) of the Act requires that all Medicare claims must be supported by sufficient information and documentation to support that payment is due and the services were medically necessary and provided as billed. (*See also* 42 C.F.R. § 424.5(a)(6)).

Section 1879 of the Act, "the limitation on liability provision," provides financial relief to beneficiaries, providers, practitioners, and other suppliers by permitting Medicare payment to be made, or requiring refunds to be made, for certain services and items for which Medicare payment would otherwise be denied. Section 1879 provides, in pertinent part, that the liability of the beneficiary and/or provider of services may be waived in cases where payment may not be made by reason of Section 1862(a)(1) or (9) of the Act or § 1879(g)(2) of the Act, and if such individual or provider did not know or could not be reasonably expected to know that the care was not covered.

Section 1870 of the Act provides the authority for waiver of overpayments and other payment adjustments for incorrect payments on behalf of individuals. Overpayments shall not be recovered with respect to an individual who is "without fault" and where such recoupment "would be against equity and good conscience."

### ***B. Policy and Guidance***

Although not binding on the Administrative Law Judge, local coverage determinations ("LCD") issued by Medicare contractors and manuals issued by CMS provide guidance in the administration of the Medicare program and are entitled to "substantial deference." 42 C.F.R. § 405.1062(a). In *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 102 (1995), the United States Supreme Court concluded an agency manual section is a valid interpretive rule and it is reasonable for the agency to follow it.

#### *i.* *LCD L36377 – Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities*

LCD L36377 for Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities provides Medicare coverage and documentation requirements for these products and services. The version of LCD L36377 effective on the dates of service at issue in this case covers services performed on or after January 8, 2029 through September 29, 2023. (First Coast Service Options Inc., LCD for Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities L36377, (Effective January 8, 2019)). LCD L36377 provides in relevant part:

> **Coverage Indications, Limitations, and/or Medical Necessity**
>
> **History/Background and/or General Information**
> This LCD addresses the reasonable and necessary (R&N) threshold for coverage of skin replacement surgery with particular emphasis on the indications for application of skin substitute grafts for diabetic foot ulcers DFU and venous leg

ulcers VLU. Evaluation of the clinical literature indicates that studies comparing the efficacy of skin substitute grafts as an adjunct to chronic wound care are limited in number, apply mainly to generally healthy patients, and examine only a small portion of the skin substitute products available in the United States. Therefore, no individual product can be considered for payment unless the applicable skin replacement surgery code meets the requirements of this LCD.

Application of skin substitute graft for indications other than for DFU or VLU are not addressed by this LCD. Such application must meet the reasonable and necessary threshold for coverage and the supply must be used per its FDA requirements.

Chronic wounds of the lower extremities, including venous stasis ulcers, diabetic foot ulcers and pressure sores, are a major public health problem. While lower extremity ulcers have numerous causes such as burns, trauma, mixed venous-arterial disease, immobility and vasculitis, nutritional or other neuropathy, over 90% of the lesions in the United States are related to venous stasis disease and diabetic neuropathy. Standard treatment of lower extremity ulcers (e.g., diabetic foot ulcers (DFU) and/or venous leg ulcers (VLU)) may include mechanical offloading, infection control, mechanical compression, limb elevation, debridement of necrotic tissue, management of systemic disease and counseling on the risk of continued tobacco use. In addition, maintenance of a moist wound environment through appropriate dressings facilitates development of healthy granulation tissue and epithelialization and thus may potentiate complete healing at a wound site. Dressings are an integral part of wound management by not only maintaining a moist environment but by stopping contamination and absorbing exudate. Despite advancements in various synthetic occlusive dressings some ulcers fail to heal so other adjuncts to wound care such as the development of skin substitutes have been employed to increase success rates of healing.

Generally depending on the purpose of the product and how it functions, skin substitutes are regulated by the FDA premarket approval (PMA) process, FDA 510(k) premarket notification process, or the FDA regulations for human cells, tissues, and cellular and tissue-based products, and the FDA humanitarian device exemption process. Although skin substitutes have attributes of both biologicals and devices, the current Medicare position is that these products are best characterized as surgical supplies or devices as a result of their required surgical application and their similarity to other surgical supplies. It has been noted that there are instances in which certain products might have a wound healing indication, but may not necessarily meet the definition of skin substitutes and similar products that aid wound healing. Therefore, FDA classification and indication alone does not determine if a product meets the definition of skin substitute and/or meets the reasonable and necessary threshold for coverage.

Per the American Medical Association (AMA) and the Current Procedural Terminology (CPT), skin replacement surgery consists of surgical preparation and topical placement of an autograft (including tissue cultured autograft) or skin substitute graft (i.e., homograft, allograft, xenograft). The graft is anchored using the individual's choice of fixation. When services are performed in the office, routine dressing supplies are not reported separately. Skin substitute graft procedures include the application of non-autologous human skin (dermal or

epidermal, cellular and acellular) grafts (e.g., homograft, allograft), non-human skin substitute grafts (i.e., xenograft), and biological products that form a sheet scaffolding for skin growth. These procedures are not to be reported for application of non-graft wound dressings (e.g., gel, ointment, foam, liquid) or injected skin substitutes. Removal of current graft and/or simple cleansing of the wound is included, when performed. Non-graft wound dressings are generally included in standard wound care management though such products may provide value and, in fact, may preclude the need for skin substitute grafts. The application of skin substitute grafts is distinguished according to the anatomic location and surface area rather than by product description. The ideal skin substitute for the treatment of DFU and VLU of the lower extremity has yet to be developed, and current products are sometimes utilized inappropriately as dressings.

Chronic wounds and frequently recurring wounds related to DFUs and VLUs are a challenge to treat effectively. Chronic wounds are unresponsive to appropriate initial therapy or persistent in the face of appropriate additional care. A wound that has not healed within one to three months may be considered chronic and the application of a skin substitute graft, an advance treatment modality, may be considered for certain patients.

*Patients receiving skin replacement surgery with a skin substitute graft should be under the care of a physician for the treatment of their systemic disease process (e.g., diabetes mellitus, chronic venous insufficiency, and/or peripheral vascular disease). It is imperative that their systemic disease be monitored/treated in order to insure adequate healing of the wound site. This concurrent medical management and the identity of the managing medical physician should be clearly discernable in the medical record and available upon request.*

It is the expectation that a specific skin substitute graft product will be used for the episode of skin replacement surgery wound care (defined as 12 weeks from the first application of a skin substitute graft) assuming its use is not in conflict with Food and Drug Administration (FDA) assessments (e.g., indications, contraindications, how supplied and directions for use, etc.) and/or the American Association of Tissue Banks (AATB) approved use and assuming there is one related wound (definitions in CPT). Repeat application of a skin substitute graft within the 12 week episode of skin replacement surgery wound care may be considered upon re-assessment and must be supported in the medical record documentation for that encounter. Continuation of a skin substitute product within the 12- week episode of skin replacement wound care is not expected if the wound has responded to the skin replacement surgery with epithelialization and other progression. This LCD does not endorse particular products for separate payment so the physician's documentation must support the need for skin replacement surgery and the product used. Specific products may be listed as noncovered in the future (LCD for Noncovered Services) based on clinical literature that establishes inferiority.

**Definitions per CPT:**

Autografts/tissue cultured autografts: Include the harvest and/or application of an autologous skin graft.

Skin substitute grafts: Include non-autologous human skin (e.g., dermal or epidermal, cellular and acellular) grafts (e.g., homograft, allograft), non-human skin substitute grafts (i.e., xenograft), and biological products that form a sheet scaffolding for skin growth.

**Covered Indications:**
Application of a skin substitute graft for lower extremity DFU and VLU will be covered when the following conditions are met and documented as appropriate for the individual patient:

- *Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks.*
- Presence of a chronic, non-infected venous stasis ulcer with failure to respond to documented conservative wound-care measures (outlined below) for greater than 4-6 weeks with documented compliance.
- For purposes of this LCD, conservative wound care measures include, but are not limited to:
    - o *Comprehensive patient assessment (history, exam, ABI (Ankle-Brachial Index) & diagnostic test as indicated) and implemented treatment plan.*
    - o *For patient with DFU-assessment of type I vs. II Diabetes Mellitus and management history with attention to certain comorbidities (vascular disease, neuropathy, osteomyelitis); review of the current blood sugars/ HgbA1c, diet and nutritional status, activity level, physical exam that includes assessment of skin and wound, ABI (Ankle-Brachial Index), check of off-loading prosthetics or shoes for signs of abnormal wear.*
    - o For patient with VLU- assessment of history (prior ulcers, thrombosis risks), physical exam (edema, skin changes), ABI (Ankle-Brachial Index), and duplex scan to confirm CEAP classification (Clinical-Etiology-Anatomy-Pathophysiology (*CEAP) classification categorizes chronic venous disorders to facilitate communication between physicians, to serve as a basis for standardized reporting during scientific analysis of management alternatives, and to identify segments of venous incompetence amenable to vein ablation therapies.
    - o *Implemented treatment plan as indicated.*
        - a. *debridement*
        - b. *pressure relief [repositioning schedule, etc. for DFUs/VLUs; prior and on-going compression therapy (e.g., static compression includes compression hosiery (>20 mm HG) and compression bandages) for VLUs*
        - c. *infection control*
        - d. *management of exudate- maintenance of a moist environment (moist saline gauze, other classic dressings, bioactive dressing, etc.). (For indications of negative pressure wound therapy (NPWT) see DME MAC LCD Negative Pressure Wound Therapy Pumps (L5008))*
        - e. *Patient is a nonsmoker, or has refrained from smoking for at least 6 weeks prior to planned skin replacement surgery, or has received counseling on the effects of smoking on surgical outcomes and treatment for smoking cessation.*
- *Applied to ulcers that have failed to respond to documented conservative wound-care measures. "Failed response" is defined as an ulcer that has*

*increased in size or depth, or no change in baseline size or depth or no sign of improvement or indication that improvement is likely (such as granulation, epithelialization or progress towards closing). Documentation of response requires measurements of the initial ulcer, measurements at the completion of at least four weeks DFU (4-6 weeks for VLU) of conservative wound-care measures and measurements immediately prior to placement of the skin substitute graft.* For VLUs, completion of conservative wound-care measures must include 4-6 weeks and on-going compression therapy.

- A skin replacement surgery is considered an advanced treatment modality (not a conservative wound care measure). *Pre-service record specifically addresses circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed based on the prior wound evaluation. Such record should include updated medication history, review of pertinent medical problems that may have arisen since the previous wound evaluation, and explanation of the planned skin replacement surgery with choice of skin substitute graft product.* The procedure risks and complications should also be reviewed and documented. (Emphasis added).

**Limitations:**

- One specific skin substitute graft product will be allowed for the episode of skin replacement surgery wound care (defined as 12 weeks from the first application of a skin substitute graft) assuming its use is not in conflict with FDA assessments and assuming there is one related wound.
- Switching products in a 12-week episode of skin replacement surgery wound care or application of a product beyond 12-weeks is not expected.
- Repeat applications of skin substitute grafts are not considered medically reasonable and necessary when a previous application was unsuccessful. Unsuccessful treatment is defined as increase in size or depth of an ulcer or no change in baseline size or depth and no sign of improvement or indication that improvement is likely (such as granulation, epithelialization or progress towards closing).
- Application of skin substitute grafts are contraindicated and noncovered in patients with inadequate control of underlying conditions or exacerbating factors, or other contraindication (e.g., uncontrolled diabetes, active infection, active charcot arthropathy of the ulcer extremity, active vasculitis).
- Application of skin substitute grafts are contraindicated in patients with known hypersensitivity to any component of the specific skin substitute graft (e.g., allergy to bovine).
- Use of surgical preparation services in conjunction with routine, simple and/or repeat application of skin substitute grafts is not reasonable and necessary and will be denied accordingly.
- Most repeat applications of skin replacement materials will not require separate debridement procedures. Such procedures may be subject to pre or post payment medical review. If documentation does not support cross contamination requiring extended cleansing and removal of appreciable amounts of devitalized tissue was performed, the service will be denied.
- Only a reasonable amount of wastage (discarded amount) is covered.

- Though arterial insufficiency ulcers, pressure sores, traumatic wounds, mixed ulcers, and post-surgical wounds are not directly addressed by this LCD, the comprehensive patient assessment and treatment plan requirement would apply to any patient with lower extremity ulcers/chronic wounds.
- The patient must be under the care of a qualified Physician/ NPP for their underlying chronic condition. Skin replacement surgery services must be performed by a qualified physician/NPP within their scope of practice.
- The rare clinical circumstance necessitating switching to a different product must be clearly supported in the medical record and may be subject to pre or post payment medical review. Repeat application of a skin substitute graft within the 12 week episode of skin replacement surgery wound care may be considered upon re-assessment and must be supported in the medical record documentation for that encounter. Repeated application of a skin substitute graft after 12 weeks could result in claim denial(s) and/or initiate a request for records and complex medical review addressing DFU and VLU wound care services.
- It is noted the FDA labeling for most skin substitute grafts include language suggesting frequency of applications. Some products highlight one application needed in an episode of care so no anticipated repeat applications and some products note the need for repeat application at varying intervals in the 12 week episode of skin replacement surgery wound care. Medicare does not expect that every ulcer in every patient will require the maximum number of applications listed on the product label. The expectation is the fewest repeat applications and amount of product to heal the wound.
- Utilization of more than one application of a skin substitute product in the 12 week episode of skin replacement surgery wound care, for all indications, may be subject to pre or post payment medical review (record requested).
- Physician and allied providers demonstrating higher application utilization than peers for similar episodes of care may be subject to prepayment medical review (records requested) or post payment audit.
- The risk versus benefit of the procedure and alternative options for care should be documented as discussed with the patient.
- Documentation of smoking history and that the patient has received counseling on the effects of smoking on surgical outcomes and treatment for smoking cessation (if applicable).
- One would not expect E/M with each procedure (application of skin substitute graft) in an episode of care unless a separately identified service.
- Medicare coverage for wound care on a continuing basis, for a given wound, in a given patient, is contingent upon evidence documented in the patient's medical record that the wound is improving in response to the specific wound care being provided. It is neither reasonable nor medically necessary to continue a given type of wound care if evidence of wound improvement cannot be clearly demonstrated as documented in the medical record.

## FINDINGS OF FACT AND ANALYSIS

The undersigned finds the following facts were established by a preponderance of the evidence:

1. The record contains a physician's visit note dated July 14, 2022. The note indicated it was an initial plan of care. The physician recounted he had a lengthy discussion with the Beneficiary "regarding his kidneys, his medical condition, his diabetes, and his comorbidities." The physician explained the plan was to do amniotic tissue membrane grafts when the Beneficiary's conditions are right. Grafts would not be done over any bone capsules or tendons. Grafts would not occur when there is an infection. The physician noted he explained to the Beneficiary that the grafts have to be on for a week when there is an infection, osteomyelitis, or bone exposure and there will be daily dressing changes with antibiotic solutions, topicals, and medication whether it is p.o. or IV. The physician also discussed a nutritionist, drinking as much water as the Beneficiary's kidney doctor will allow, and being in touch with the Beneficiary's primary care physician and vascular care doctor. The physician noted the Beneficiary has a good support system. His diabetes is in good control. He is well nourished. His neurovascular status is intact and the physician believed the Beneficiary will do well with the treatments.

   The note further reports the Beneficiary is completely neuropathic. The next part of the statement regarding types of food is not completed. The physician stated he believes "it would be a challenge" and will do his best as all conservative treatments have failed. The physician reported the Beneficiary is eager to start treatment, will have home health assistance, and is compliant in taking his medications. (File 12, p. 171).

2. The record contains an office visit note dated July 14, 2022 entitled "Addendum." The addendum stated "This ulcer has been opened since the amputation which is over two months. I am preparing this patient for skin graft with Kerecis fish skin graft which I will order. I want the cultures come back (*sic*) negative or normal flora and then I will apply it if it does not look infected. The ulcer is 8ccm (*sic*) squared; 4x2 with 1 mm depth." (File 12, p. 172).

3. The record contains an office visit note dated September 8, 2022. The visit note reported the Beneficiary returned with nonhealing ulcers on the lateral aspect of his right foot as first metatarsal head is exposed on his right foot. The fish graft did not work. The Beneficiary went to the hospitalize to re-vascularize, had an incision and drainage performed for debridement of the ulcer, the foot is warm, and he is on IV antibiotics for 3 more weeks. The physician planned to order a stem cell graft which will help him try to close the wounds and save his foot. The Beneficiary is diabetic and on dialysis.

   The visit note reported the Beneficiary received physical therapy during the visit. He was also prescribed Lac-Hydrin cream. The physician debrided the foot ulcer around the first metatarsal head area of the lateral fifth ray area with a #10 blade. The physician applied Bactroban on the necrotic tissue of the lateral foot and Betadine on the exposed first metatarsal after debridement with some healthy bleeding tissue. The Beneficiary would return in one week for the graft. The physician noted it is a chronic nonhealing wound and he is trying to save the Beneficiary's foot. (File 12, p. 173).

4. The record contains an office visit note dated September 22, 2022. The visit note reported the Beneficiary is a diabetic patient on dialysis with non-healing ulcers on his right foot. The note reported aggressive debridement was performed and a Zenith amniotic graft was applied totaling 64 units to cover both ulcers with no waste. Dry sterile dressing and

gauze were also applied. The note reported the wounds measured 8 x 4cm. The note also included an addendum stating that on July 14, 2022 the ulcer started out at 8cm squared and fish grafts were not responding well, so the treatment switched to amniotic tissue membrane grafts. The physician reported that all conventional treatments had failed before using grafts to heal the Beneficiary including multiple debridements, antibiotics, IV, p.o., and topical. The addendum stated both ulcers on the right foot measured 64cm squared with one millimeter of depth. (File 12, p. 174).

5. The record includes another addendum dated September 22, 2022. The note stated the Beneficiary is in good metabolic condition, his vital signs are stable, and he is under the care of a primary care doctor and vascular doctor. The physician reported the Beneficiary was on Renvela, atorvastatin, Prolitazone, and vitamin D. He has been a type 2 diabetic for 12 years. Other conditions include kidney failure, dialysis for 7 years, and a history of high blood pressure. The physician reported ulcers were debrided to repeat application, no graft was wasted. The Beneficiary would return in 1 week. (File 12, p. 175).

6. The record contains a visit form dated September 22, 2022. The form included bar codes for the graft and noted that 64 units were used. (File 12, p. 176).

7. The record contains a visit note, form, and graft products barcodes for a visit on September 29, 2022. The visit note reported the Beneficiary returned for follow up treatment. He has a large ulcer lateral aspect along the fifth ray of the right foot. The physician debrided the wound and used 48 square cm of Zenith graft. The wound showed signs of healing and was stable. The Beneficiary was finishing a course of antibiotics by Friday. Dressing, cling, and wrap were also applied. The wound measured 12cm in length x 4cm in width at the widest part. The note included an addendum stating the ulcer measures 48 cm square. It is 8x6cm with 1 mm of depth. No graft was wasted. (File 12, pp. 177-179).

8. The record contains a visit note, addendum, graft products barcodes, and form for a visit on October 6, 2022. The visit note reported the Beneficiary continued to have granulation tissue. The wound still measures the same in diameter and width. The wound was debrided and the Zenith graft was applied. The physician reported using "8 x 4 as well as 4 x 4 again today to cover the ulcer." The Beneficiary is diabetic, on dialysis, and is afraid to save his foot. The physician also debrided an ulcer over the first metatarsal head and a small ulcer distal medial second digit on the right foot. On these wounds the physician applied Santyl and sterile dressing. The physician reported the wounds were negative for drainage, infection, and odor. The Beneficiary had finished his antibiotics. The addendum stated two grafts were used 8 x 4 and 4 x 4. The ulcer measures 8 x 6 cm square with 2 mm in depth. The physician reported the wound was debrided and no graft was wasted. The physician noted the Beneficiary "is fighting for his life, is a diabetic, is on dialysis, and has high blood pressure." He is under the care of his primary care doctor, vascular doctor, and infectious disease specialist. He is well nourished and his blood glucose is in good control. (File 12, pp. 180-183).

9. The record contains an office visit note, graft product barcodes, and a form for a visit on October 13, 2022. The note reported the Beneficiary returned for a chronic ulcer on his right foot along the fifth ray. The Beneficiary is diabetic on dialysis, and improving with no drainage or signs of infection. The physician reported he debrided the wound and applied Zenith grafts measuring 8 x 4 and 3 x 3 because the wound is decreasing in depth, diameter, width, and length. The physician noted the Beneficiary has osteomyelitis and

an exposed first metatarsal head on the right foot. He was scheduled for surgery on Tuesday for a resection. The note then reported the Zenith graft was placed on health bleeding tissue and sterile dressing was also applied. The Beneficiary is not on blood thinner. The Beneficiary will return in one week post op day #2 and for another graft on the right fifth lateral ray.

The note included an addendum stating the ulcer measured 38 cm square and is 1 millimeter in depth. No graph was wasted. The Beneficiary is under the care of a primary physician and vascular doctor. The Beneficiary's blood sugars are under control. No graft was applied to exposed tendon, bone, or capsule. (File 12, pp. 184-186).

10. The record contains an office visit note, graft product barcodes, and a form for a visit on October 20, 2022. The note reported the physician debrided an ulcer on along the fifth ray on the Beneficiary's right foot. The Beneficiary continues to improve. The physician reports there is red beefy base to the tissue, negative drainage, and no signs of infection. The Beneficiary was going to have surgery for a resection of the head of the first metatarsal but he was not medically cleared on that date. He is diabetic on dialysis. He will be rescheduled for this Tuesday. The Zenith graft was applied to cover the ulcer on the lateral aspect of the right foot and 38 units were used. The Beneficiary would return the next week.

    The visit note includes an addendum. The addendum stated two grafts were used 32 cm and a 6 cm for a total of 38 cm. The ulcer measured 3.8 x 10 with 2 mm of depth. This was a repeat application and no graft was wasted. The Beneficiary is stable and under the care of a primary physician and vascular doctor. He is well nourished. He is taking atorvastatin, Renvela, vitamin D and "_____" – the entry was left blank. He is on dialysis. (File 12, pp. 187-190).

11. The record contains an office visit note, graft product barcodes, and a form for a visit on October 27, 2022. The note reported the Beneficiary was post op day 3 from removing his first metatarsal head on the right foot. During the visit, the physician debrided a lateral ulcer along the fifth ray to remove a lot of necrotic tissue. The Beneficiary was under anesthesia. The ulcer now measures 48 square cm regarding length and width. The physician applied two Zenith grafts of 4 x 4 and 8 x 4 to total 48 sq cm which "properly covered the ulcer." The wound was negative for drainage, odor, and signs of infection. Surgical dressing was also applied. The Beneficiary would return in one week. The Beneficiary was improving. Some breakdown was noted on the dorsal aspect at the med cuneiform joint of the right foot which would be monitored. The Beneficiary is diabetic and on dialysis. X-rays were taken of three views of the right foot which shows the first metatarsal removed at distal one-third.

    The visit note included an addendum. The addendum stated 48 sq cm of grafts were used in the form of two grafts one measuring 4 x 4 and one measuring 8 x 4. No graft was wasted. The Beneficiary is well nourished. This was a repeat application. The Beneficiary is a type 2 diabetic with peripheral neuropathy, lymphedema, chronic kidney disease, and high blood pressure. He is taking medication under the care of his doctor. His metabolic condition is stable. He is metabolically fit. His medications include Renvela, atorvastatin, vitamin D, and prolitazone. The ulcer measures 4.8 x 10 x 2 mm in depth. (File 12, pp. 191-194).

12. The record contains an office visit note, addendum, graft product barcodes, and form for a visit dated November 7, 2022. The visit note stated the Beneficiary's surgery was canceled for a second week in a row due to high potassium levels. He was rescheduled for November 11, 2022 for a resection of his first metatarsal. The physician reported the Beneficiary's ulcer along the fifth ray is granulating nicely with amniotic grafts. The Beneficiary is diabetic and on dialysis. The physician reported he did aggressive debridement to areas where the graft did not take. He applied a 4 x 6 and 2 x 3 grafts to cover the wound. There was no drainage or sign of infection. The addendum stated the physician used a 24 cm and 6 cm grafts. The physician reported he used a 4 x 6 for the 4 x 6 cm ulcer with a 2 mm depth and a 2 x 3 again. There were no signs of infection. The Beneficiary is well nourished. His medications include Renvela, atorvastatin, vitamin D, and prolitazone. He is a type 2 diabetic with kidney failure, dialysis with high blood pressure. He is under the care of multiple doctors. No graph was wasted. The Beneficiary's blood sugar is intact. (File 12, pp. 195-198).

13. The record contains an office visit note, graft product barcodes, and a form for a visit on November 14, 2022. The note stated the Beneficiary was post op day 3 after removing his first metatarsal head on the right foot that was exposed and closing primarily. The rest of the visit is the exact same content, word for word, reported in the October 27, 2022 visit note. The only difference is the date listed and the addendum is different. The addendum states, "patient is under the care of his primary care doctor and his vascular dr. no graft was wasted. Patient's blood sugar is under control he is well nourished and pleased with his progress." (File 12, pp. 199-201).

14. The record contains an office visit note, addendum, graft product barcodes, and form for November 21, 2022. The visit note reported the Beneficiary returned for treatment of chronic ulcer right foot lateral aspect along the fifth ray. The wound was positive for granulation tissue. There was no drainage and no signs of infection. The wound had the graft on it. The physician debrided the ulcer and applied a new graft of 48 square cm to cover the ulcer. The ulcer is healing. The Beneficiary was post op day 10 from surgery on his metatarsal. The Beneficiary's stitches would remain. The Beneficiary was pleased with the progress. The physician noted pictures were taken of the ulcer showing its size, length, width, and diameter. The Beneficiary is diabetic and on dialysis. The addendum stated the physician used two grafts, a 16cm and a 32 cm. The ulcer measured 8 x 6 in length and width and 2 mm in depth. The Beneficiary is complaint and there is no sign of infection. No graft was wasted. The Beneficiary is on Renvela, atorvastatin, vitamin D, and pioglitazone for his diabetes. He has kidney failure and high blood pressure and is on dialysis. (File 12, pp. 202-206).

15. The record contains an office visit note, addendum, graft product bar codes, and form for November 28, 2022. The Beneficiary returned for treatment of painful feet and ankles. The Beneficiary had a little serosanguineous drainage coming out of the surgical site. "Cultures were taken on both sides where the graft is on the lateral just for comparison purposes as well as the medial side where there is a little bit of drainage." A stitch was removed from the surgical side and blood was expressed. The Beneficiary was prescribed Cipro and clindamycin as instructed due to his kidney impairment. A graft was applied to the lateral aspect using an 8 x 4 and 4 x 4 totaling 48 cm squared which "covered the chronic ulcer perfectly." There are previous grafts since the debridement in the operating room three weeks ago or 17 days ago and they were taken very well. The addendum stated the wound size is 8 x 6 square cm with 1 mm depth. No graph was wasted. The Beneficiary is under the care of a primary physician and vascular doctor. He is well

nourished, his blood sugars are under control, his vital signs are stable, and his neurovascular status is intact. (File 12, pp. 207-209).

16. The record contains an office visit note dated December 5, 2022. The physician debrided the ulcer lateral aspect of the right foot along the fifth ray. The graft has taken. There was some serous drainage. The Beneficiary was on antibiotics. The Beneficiary has improved. There was no drainage on the right medial side of the foot. It is closed. He is post op day 24 from surgery. The Beneficiary was instructed to leave the stitches in for 1 more week. The physician reported using 38 units to cover the ulcer as well as dry sterile dressing. The wound was closing and improving. The physician noted that next week he may not need the graft and he would remove the stitches. The ulcer site measures a total of 38 cm squared which is down from 48 over the last two weeks due to aggressive debridement in the OR. The addendum stated two grafts were used a 32 cm and a 16 cm. The ulcer measures 38 cm by 3.8 with a 2 mm depth. The Beneficiary is well nourished. He is under the care of a primary physician and vascular dr. He is on dialysis. He has high blood pressure and diabetes. He takes Renvela, atorvastatin, prolitazone, and vitamin D. No graft was wasted. No anesthesia was used due to neuropathy. (File 12, pp. 210-213).

17. The record contains notes for a visit on January 2, 2023 that is not at issue in this case. The visit note reported, in part, that the Beneficiary has ulcers on his right foot that are medial and lateral. The medial status post metatarsal surgery never stayed closed and the lateral with the graft is. The note is not entirely clear. The Beneficiary's revascularization collapsed, but is now open again. The Beneficiary underwent a duplex arterial examination of the lower extremities. Overall, the results were unremarkable. (File 12, pp. 214-217).

18. The record contains an office visit note, addendum, treatment plan addendum, graft product barcodes, and form for a visit on February 6, 2023. The visit note reported the Beneficiary returned for wound care and grafting. He is now revascularized with no signs of infection. He has chronic ulcers along the first ray of the right foot which is 32 cm squared on the medial aspect of the right foot and what appears to state 78 but was rewritten to 32 cm squared on the fifth ray in the lateral aspect of the right foot. Two Zenith grafts were applied after debridement. The note stated that Zenith grafts worked last year. Some of the Beneficiary's digits appeared gangrenous. Grafts were applied with Adaptic and dry sterile dressing. The Beneficiary is diabetic on dialysis with peripheral neuropathy, lymphedema, and ankle pain.

    The addendum stated two grafts were used, each one 32 cm. The first ray measured 8 x 4 cm with 2 mm depth on the right side. The fifth ray also measured 8 x 4 x 2 cm. There was no sign of infection. The Beneficiary was taking medication. His blood sugars are under good control.

    The treatment plan addendum stated that the Beneficiary was now revascularized so the plan was to try again with the grafts. The notes explained that grafts cannot be used on wounds where the bone is exposed. At the time of the visit the Beneficiary was well nourished with a neurovascular status intact and good control of the sugars and comorbidities. He currently goes to dialysis. The plan was to have weekly visits until he was improved. (File 12, pp. 218-222).

19. The record contains a visit note, graft product barcodes, and form for a visit on February 13, 2023. The visit note reported the Beneficiary returned for ulcers on his right foot

along the medial aspect of the first ray and lateral aspect of the fifth ray. The Beneficiary is improving. The physician debrided the first ray which has decreased to 24 sq. cm. The physician applied the Zenith graft. The other fifth ray ulcer was also improving. The physician debrided it and applied 40 sq. cm of Zenith graft. The physician noted, "I am able to finally cover both sides of the foot with 64 units or sq. cm of the Zenith graft." There were no signs of infection. The Beneficiary was improving since the revascularization. The Beneficiary's toes were coming back. The Beneficiary was diabetic on dialysis. An addendum at the end of the note said no graft was wasted. (File 12, pp. 223-225).

20. The record contains a visit note, a separate addendum, graft product barcodes, and form for a visit on February 20, 2023. The visit note reported the Beneficiary returned for treatment of two ulcers on the first met right foot and fifth met right foot. The physician applied a 40cm graft on the fifth ray and a 24 cm graft on the first ray which continues to improve. Both wounds are granulating. Both wounds were debrided. There were no signs of infection. The Beneficiary's temperature gradient was good. The Appellant dispensed an IPOS surgical show to the Beneficiary for off-loading pressure. The Beneficiary goes to dialysis three times per week. He is diabetic. The addendum reports two grafts were used each one 32cm and no graft was wasted. The fifth ray ulcer was 10 x 4 cm with 1 mm depth and the first ray ulcer was 6 x 4 cm with 2 mm in depth. The physician listed the Beneficiary's medications. He is well nourished. His blood sugars are under good control. He is under the care of his primary physician and vascular doctor. (File 12, pp. 226-229).

21. The record contains a visit note, separate addendum note, graft product bar codes, and form dated February 27, 2023. The visit note reported continued treatment for the first and fifth metatarsal ulcers. After debridement, the wounds measured 46 square cm and 24 square cm. There was no drainage and no signs of infection. The Appellant applied 64 sq. cm of Zenith graft, but also with the note 40, on the fifth ray and 24 square cm graft on the first ray. The Beneficiary was continuing to improve and his ulcers were decreasing in size. Some of the Beneficiary's digits still had dry gangrene on them, but they are warm to the touch. An addendum at the end of the note stated, "no graft wasted." A separate addendum note reported two grafts were used, both 32 cm in the package. The wounds measured 46 cm or 8 x 6 with 1 mm depth and 6 x 4 cm. The Appellant reported applying a 24 cm graft. (File 12, pp. 230-235).

22. The record contains a visit note, separate addendum, graft product bar codes, and form for March 6, 2023. The visit note reported the Beneficiary continues to improve. The Appellant again prescribed clindamycin this time for the maceration between the Beneficiary's toes. The Appellant debrided the ulcers on the Beneficiary's first and fifth rays. The first ray measured 20 square cm. The Appellant applied 40 sq. cm of graft to the fifth ray ulcer. There was granulation tissue. The wounds were negative for drainage, odor, and infection. The Beneficiary reported some pain and was prescribed Percocet. The addendum reports two grafts were used, each one 32 cm. The note also states "40 cm." The Appellant reports the wounds measured 10 x 4 x 1 mm depth on the fifth ray and 5 x 4 with 1 mm depth on the first ray. There was no drainage or signs of infection. No graft was wasted. The Beneficiary was currently taking medication. (File 12, pp. 235-238).

23. The record contains a visit note, a second visit note, graft product bar codes, and form for March 13, 2023. The visit note reports that three grafts were used this visit out of three

packages that were 32 cm, 16 cm, and 16 cm. The first metatarsal wound measured 5 x 4 with 2 mm of depth and a 20 cm graft was used. Another wound was 9 x 5 with 2 mm of depth and a 44 cm graft was used. Another visit note reports the Beneficiary returned for chronic ulcers on his right foot. The Appellant debrided the ulcers. There was positive granulation and the wounds were decreasing in size. The Beneficiary had revascularization. There was some dry gangrene on his toes. (File 12, pp. 238-242).

24. The record contains a visit note, addendum, graft product bar codes, and form for March 20, 2023. The visit note reports the Beneficiary's chronic ulcers on his fifth ray and first metatarsal were debrided. The Appellant used a 16 cm graft to cover it. There was granulation tissue without any signs of infection. The Appellant also used a 38 cm graft. The wounds were decreasing in size. The addendum at the end of the paragraph stated that all conservative treatments have failed before using the grafts. No graft was wasted. The Beneficiary is under the care of his primary physician, vascular doctor, and infectious disease doctor. His blood sugar is under control. The Beneficiary is diabetic on dialysis with multiple comorbidities and multiple medications. He is taking medication as instructed. His vital signs are stable. A separate addendum reported, in part, that three grafts were used during this visit. (File 12, pp. 243-246).

25. The record contains a visit note, addendum, graft product bar codes, and form for March 27, 2023. The addendum stated the Appellant treated two ulcers after debridement without local due to neuropathy. Two grafts were used, one was 32cm and the other was 16cm. The fifth ray wound measured 8 x 4 square cm with 2 mm depth and the first metatarsal wound measured 4 x 4 with 2 cm of depth. It appears the 2 cm may be a type instead of 2 mm. There were no signs of infection. The visit note reported the same procedure noting the wounds had granulation and no drainage. An addendum after the visit note stated no graft was wasted. (File 12, pp. 247-250).

26. The record contains a visit note, addendum, graft product bar codes, and form for March 31, 2023. The visit note reports x-rays were taken of the right foot. The Appellant also debrided the two wounds reporting he used a 16 square cm graft for one wound and a 32 cm graft for the other. The Beneficiary's A1C is under control. His diabetes is under control. The addendum stated no graft was wasted, the ulcer on the 5th metatarsal measures 8 x 4 cm with 1 mm of depth and the 1st metatarsal ulcer measures 4 x 4 cm with 1 mm depth. The addendum reiterated that two grafts were used. The Beneficiary is stable. There were no signs of infection. (File 12, pp. 251-254).

27. The record contains a visit note, addendum, graft product bar codes, and form for April 10, 2023. The Appellant debrided the two wounds. The wounds had granulation. The physician applied 32 cm of graft on the fifth ray ulcer and 16 cm of graft on the first metatarsal ulcer. The note reported both wounds were improving. The Beneficiary was also scheduled to have amputations on his lesser right toes last Friday but would have to be rescheduled due to medical clearance issues. The note reported the grafts were medically necessary and the Appellant would like to continue with the course of treatment. The addendum at the end of the note stated no graft was wasted and the Beneficiary is nourished and stable. A separate addendum reported the same debridement and graft information, though noted the use of 16cm graft and a 32 cm graft multiple times. The ulcers measured 8 x 4 cm and 4 x 4 cm with 2 mm depth. There were no signs of infection or drainage. (File 12, pp. 255-258).

28. The record contains an April 17, 2024, visit note, separate addendum, graft product barcodes, and form. The addendum stated the Appellant used a 48 cm graft, but then reported he used a 32 cm graft and a 16 cm graft. The note reported the measurements of an ulcer that was 10cm x 4.8 cm that is 2mm in depth. The Beneficiary is well nourished. The visit note reported the Beneficiary had an operation on April 14, 2023 for the amputation of digits 3 and 4 and debriding of digits 2 and 5. The first metatarsal head was again resected. The fifth ray ulcer was aggressively debrided and now measured 48 sq. cm. There was no infection, odor, or drainage. An addendum stated no graft was wasted, the Beneficiary is under the care of his doctors, and his blood sugar is under control. (File 12, pp. 259-262).

29. The record contains an April 24, 2023 visit note, addendum, graft product barcodes, and form. The visit note reports the Beneficiary post op 10 days from amputation of two digits, a resection of the first metatarsal, and primary closure of chronic ulcer. The physician debrided the ulcer on the fifth metatarsal/ray. There was granulation tissue. There was no drainage or signs of infection. Parts of the ulcer were getting more narrow. The physician reported applying 48 cm of Zenith graft to cover the wound. The wound is getting smaller. A brief addendum at the end of the note stated that no graft was wasted, the Beneficiary is under the care of primary care, vascular, and infectious disease doctors, his blood sugar is under control, and he continues to go to dialysis. A separate addendum stated two grafts were used a 32cm and a 16 cm. The ulcer measurements are 10 cm x 4.8 cm with 2 mm depth. There is no sign of infection. The Beneficiary is in good metabolic control. His diabetes is under control. He is a type 2 diabetic for 12 years, high blood pressure, and kidney failure. He is on dialysis. His current medications are atorvastatin and vitamin D. (File 12, pp. 263-266).

30. The record contains a visit note, addendum, graft product barcodes, and form for May 1, 2023. The visit note state the Beneficiary returns for treatment of the right foot. He is status post multiple amputations and first metatarsal resection of the right lower extremity 17 days ago. The surgical sites are coapted with a little bit of maceration. It is unclear whether or not stitches were removed based on contradictory statements. The physician debrided an ulcer on the fifth ray of the right foot. The graft is improving. It is decreased in depth and diameter. The physician applied a Zenith graft of 38 square cm to cover the graft which was originally over 64 square cm. The Beneficiary was on clindamycin. The physician would add another antibiotic as well. The addendum stated the wound is 8 x 4.5 cm sq. cm and no graft was wasted. There is another office visit note stating that the grafts used were 32 cm and 6 cm. No graft was wasted with repeat application. The Beneficiary is well nourished. His blood sugar is in good control. He is under the care of a primary and vascular physician. (File 12, pp. 267-270).

31. The record contains photos of medical records in which the Appellant highlighted contact information for the Beneficiary's various physicians. (File 12, pp. 273-275).

32. The record does not include an Advance Beneficiary Notice of Non-Coverage.

*<u>Other Documents</u>*

33. The record contains a request for the establishment of a HCPCS Level II code for Zenith Amniotic Membrane. The final decision for the request states that based on written feedback from the FDA, the product appears to be regulated solely under section 361 of the Public Health Service Act and regulations at 21 C.F.R. Part 1271. Therefore, CMS

established a new HCPCS Level II code Q4253 "Zenith amniotic membrane, per square centimeter" effective October 1, 2021. (File 23, p. 30).

34. The record contains a copy of the Zenith amniotic membrane allograft manufacturer's 2023 reimbursement guide. The guide includes common criteria and documentation elements in the patient's medical record required by payors/insurance for coverage and payment. Criteria and documentation elements include, "determine the medical necessity, duration of ulcer, location of ulcer, whether the ulcer has failed to respond to conservative treatment measures, baseline measurements of the ulcer, description of the underlying disease process contributing to the ulcer, patient diagnosis codes, status of the wound including as applicable presence or absence of cellulitis, infection, tunnels, tracts, eschar, or necrotic material, extent of the ulcer (e.g., dermis, involvement of tendon, muscle, capsule, or bone, etc.), evaluation of venous sufficiency/insufficiency ulcers, and whether the patient is competent and/or has the support services necessary to participate in follow up care). (File 23, pp. 37-48).

35. The record contains a case study sheet from the Zenith manufacturer demonstrating product usage and results. (File 23, p. 86).

36. The record contains a 2024 case report entitled "A Small WIN: A Case Review on Amniotic Grafting for Wound Healing" published in *BioMedical Journal of Scientific and Technical Research* authored by C. Chauhan, *et al.* (File 23, pp. 88-92).

37. The record contains a June 5, 2024 letter from Legacy Medical Consultants to CMS requesting changes and updates to draft LCDs entitled "Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Leg Ulcers" released on April 25, 2024. The draft LCDs cited are not applicable to the dates of service in this case. (File 23, pp. 175-182).

38. The record contains a document entitled, "A Summary of the Current High-Quality Evidence Examining the Clinical Impact of Human Amnion/Chorion Skin Substitutes on Diabetic Foot Ulcers" authored by Legacy Medical Consultants. The document indicates it was created and submitted in response to a rescinded LCD and asserts that the summarized studies should have been part of the creation of the updated LCD. The summary includes synopses and abstracts of studies from January 1, 2013 through March 15, 2023. (File 23, pp. 184-222).

39. The record contains a 2015 medical journal article entitled, "The Use of Human Amnion/Chorion Membrane in the Clinical Setting for Lower Extremity Repair" published in *Clinics in Podiatric Medicine and Surgery* authored by C. Zelen *et al.* The article found that randomized controlled trials of using dehydrated human amnion chorion membrane allografts to treat wounds show improved healing, clinical effectiveness, and cost effectiveness. However, the allografts examined in this article did not include the Zenith graft. (File 23, pp. 224-235).

40. The record contains a 2021 medical journal article entitled, "Systematic Review on the Rational Use of Amniotic Membrane Allografts in Diabetic Foot Ulcer Treatment" published in *BMC Surgery* authored by K. Lakmal *et al.* The article reviewed twelve studies with publication dates from January 1, 2000 to March 30, 2020. The review found, "current studies using amniotic membrane allografts give reliable evidence of reduction in healing time over conventional methods." (File 23, pp. 237-244).

41. The record contains a 2021 medical journal article entitled, "Observed Impact of Skin Substitutes in Lower Extremity Diabetic Ulcers: Lessons from the Medicare Database" published in the *Journal of Wound Care*. The review found that use of advanced treatment measures in patients with lower extremity diabetic ulcers "demonstrates statistically significant reductions in the rates of major and minor amputations, ED visits, and hospital readmission." (2015-2018). (File 23, p. 246-257).

42. The record contains a chapter from a medical textbook entitled "Amniotic Membrane in the Treatment of Hard-to-Heal Wounds." (File 23, pp. 259-287).

43. The record contains a 2013 medical journal article entitled, "An Evaluation of Dehydrated Human Amniotic Membrane Allografts in Patients with DFUs" published in the *Journal of Wounds Care* authored by C.M. Zelen. The conclusion found that the incorporation of dHAM into the standard of care for patients with chronic DFUs can be beneficial and is a viable option for the treatment of recalcitrant DFUs. (File 23, pp. 288-291).

44. The record contains a 2020 medical journal article entitled, "Human amniotic membrane allograft, a novel treatment for chronic diabetic foot ulcers: A systematic review and meta-analysis of randomized controlled trials" published in the *International Wound Journal* authored by Y. Su *et al.* The conclusion stated, in part, "this meta-analysis of randomized controlled trials showed that HAM plus SOC is effective and safe in treating patients which chronic DFUs, which can significantly increase wound healing rate and reduce complete healing time." (File 23, pp. 293-304).

45. The record contains a 2018 medical journal article entitled, "A confirmatory study on the efficacy of dehydrated human amnion/chorion membrane dHACM allograft in the management of diabetic foot ulcers: A prospective, multicentre, randomised, controlled study of 110 patients from 14 wound clinics" published in the *International Wound Journal* authored by W. Tettelbach *et al.* The review found that dHACM is an efficacious treatment for lower extremity ulcers in a heterogenous patient population. (File 23, pp. 306-316).

46. The record contains a 2021 medical journal article entitled "The effectiveness of a new dried human amnion derived membrane in addition to standard care in treating diabetic foot ulcers: A patient and assessor blind, randomized controlled pilot study" published in the *International Wound Journal* authored by F. Game *et al.* (File 23, pp. 318-326).

47. The record contains a medical journal article entitled, "Evaluating the number of cellular and/or tissue-based product applications required to treat diabetic foot ulcers and venous leg ulcers in non-hospital outpatient department settings," in the journal *Wounds* authored by S. Carpenter *et al.* (File 23, pp. 328-342).

48. The record contains a 2014 medical journal article entitled, "A prospective, randomized comparative study of weekly versus biweekly application of dehydrated human amnion/chorion membrane allograft in the management of diabetic foot ulcers" published in the *International Wound Journal* authored by C. Zelen *et al.* (File 23, pp. 344-350).

49. The record contains a copy of a favorable OMHA ALJ decision for a different Appellant and different skin graft. (File 23, pp. 352-365).

At issue in this case is the denial of Medicare coverage for Zenith grafts and services (15275, 15276, and Q4253) the Appellant provided to the Beneficiary on the dates of service at issue.

The undersigned has reviewed the record *de novo*. The undersigned finds that the record as a whole does not sufficiently support that the Zenith grafts (15275, 15276, and Q4253) were reasonable and necessary for the Appellant in accordance with sections 1833(e) and 1862(a)(1)(A) of the Social Security Act ("Act"). Therefore, the Appellant remains liable for the overpayment of the non-covered charges.

The determination of whether the Zenith grafts and services (15275, 15276, and Q4253) provided to the Beneficiary are eligible for Medicare coverage and payment centers on two key issues. First, whether the services are covered by Medicare, meaning that the services are *not* experimental or investigational. Second, if the services are covered by Medicare, whether the services were medically reasonable and necessary for the Beneficiary based on the record provided.

I. <u>Medicare Coverage:</u>

On the dates of service at issue in this case, there was an active version of LCD L33637 for Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities provides that provides Medicare coverage and documentation requirements for these products and services. (First Coast Service Options Inc., LCD for Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities L36377, (Effective January 8, 2019 through September 29, 2023)). Specifically, the LCD "addresses the reasonable and necessary threshold for coverage of skin replacement surgery with particular emphasis on the indications for application of skin substitute grafts for diabetic foot ulcers (DFU) and venous leg ulcers (VLU)." (LCD L33637). The LCD goes on to state, "no individual product can be considered for payment unless the applicable skin replacement surgery code meets the requirement of this LCD" and "such application must meet the reasonable and necessary threshold for coverage and supply must be used per its FDA requirements." (LCD L33637). Regarding types of skin graft, this LCD does not endorse particular products for separate payment so the physician's documentation must support the need for skin replacement surgery and the product used, with the caveat that specific products may be listed as noncovered in the future. (LCD L33637). LCD L33637 then discusses the expectation that a specific skin substitute graft will be used for the episode of skin replacement surgery wound care, defined as 12 weeks from the first application of a skin substitute graft, and that continuation of a skin substitute product within the 12 week episode of skin replacement wound care is not expected if the wound has responded to the surgery. LCD L33637 provides list of limitations including, in part, "it is noted the FDA labeling for most skin substitute grafts include language suggesting frequency of applications. Some products highlight one application needed in an episode of care so no anticipated repeat applications and some products note the need for repeat application at varying intervals in the 12 week episode of skin replacement surgery wound care" and "repeated application of a skin substitute graft after 12 weeks could result in claim denial(s) and/or initiate a request for records and complex medical review addressing DFU and VLU wound care services."

Based on the newness and product specifications of the Zenith amniotic graft, it is not entirely clear whether this product fully meets the skin graft usage expectations outlined in LCD L33637. As an amniotic membrane allograft, LCD L33637 would generally apply to the Zenith graft, but

the direct application of the LCD's contents, specifically some of its limitations, may not fully appreciate the advancement in allografts like the Zenith graft that appear to be designed for more frequent applications than the grafts considered by the LCD. Furthermore, both the Contractor and the QIC found the Zenith graft to be experimental and investigational. (File 13, pp. 35-202 and File 8, pp. 1-22). For these reasons, although a version of LCD L33637 was applicable on the dates of service at issue, the undersigned will review whether the Zenith grafts were experimental and investigational. For this review, the undersigned turns to chapter 13 of the *MPIM* which provides that the reasonable and necessary provisions in the creation of LCD are based on a determination that the services are safe and effective, not experimental or investigational, and are appropriate. (*MPIM*, *supra*, ch. 13, § 13.5.4). Based on the evidence provided the undersigned finds that Zenith grafts (Q4253) were not experimental and investigational on the dates of service at issue and therefore were eligible for Medicare coverage. (42 C.F.R. § 411.15(o)).

*A. Safe and Effective*

FDA regulations at 21 C.F.R. § 1271.10 identify the criteria for human cells, tissues, and cellular and tissue-based product (HCT/P) regulation solely under section 361 of the PHS Act and 21 C.F.R. part 1271. If the HCT/P meets the criteria provided in approved in 21 C.F.R. § 1271.10, then it will be regulated solely under section 361 of the PHS Act and 21 C.F.R. part 1271. If the HCT/P does not meet the criteria of 21. C.F.R. § 1271.10, then it will be regulated as a drug, device, and/or biological product and a premarket review is required. Here, the record supports that Zenith amniotic membrane is regulated under section 361 of the PHS Act and 21 C.F.R. part 1271. (File 23, p. 30). Therefore, Zenith graft does not require pre-market approval. The FDA's classification as minimally manipulated and thus regulated under section 361 of the PHS Act and 21 C.F.R. part 1271 supports that Zenith graft is safe and effective for its intended use. However, it is important to note that CMS adopts FDA determinations and then CMS evaluates whether or not the product or procedure is reasonable and necessary for the Medicare population. In this case, and as will be discussed further below, CMS granted Zenith graft a Level II HCPCS code. (File 23, p. 30). For these reasons, the undersigned finds the FDA's minimally manipulated classification of Zenith amniotic membrane and its exemption from being regulated as a drug, device, and/or biological product requiring premarket review in conjunction with CMS's granting of a Level II HCPCS code establishes that Zenith graft (Q4253) is safe and effective and can be considered reasonable and necessary for purposes of Medicare coverage.

*B. Not Experimental or Investigational*

Pursuant to chapter 13 of the *MPIM*, a determination whether a service is not experimental or investigational must be based on the peer-reviewed literature, consensus of experts, and whether or not the relevant medical community has adopted the technology. In this case, the Appellant has submitted medical journal articles and clinical studies information in support of the assertion that the use of Zenith grafts to treat diabetic foot ulcers is not experimental or investigational. (File 23, pp. 1-365; *see also* Hearing Recording (February 12, 2025)).

The lower levels denied the claims, in part, due to, "insufficient support from double-blinded, randomized human clinical trials for safety and effectiveness." (*See e.g.*, File 8, p. 10 (reconsideration decision)). Upon review, the record includes copies of full text, peer reviewed literature regarding the use of amniotic membrane allografts in treating diabetic foot ulcers. (File 23, pp. 88-350). These articles include studies specifically addressing the use of amniotic membrane allografts in the treatment of diabetic foot ulcers in Medicare beneficiaries. (*Id.*). The articles include a 2021 study that was carried out as a randomized, controlled, double-blind

study. (*Id.* at 318-326). Notably, the studies found that amniotic membrane allografts are a viable, safe, and effective treatment option to treat skin ulcers including diabetic foot ulcers in patients who had non-healing ulcers that are unresponsive to standard treatment protocols. (File 23, pp. 88-350; *see also* Hearing Recording (February 12, 2025)). Based on the FDA's approval of Zenith graft as a minimally manipulated HCT/P product eligible to be marketed under section 361 of the PHS Act, CMS's approval of a Level II HCPCS for Zenith graft, and the growing body of peer-reviewed published clinical studies finding the use of amniotic membrane allografts is safe and effective in the treatment of diabetic foot ulcers and venous leg ulcers, the undesigned finds there is a consensus of experts as well as adoption by the medical community of the appropriateness and effectiveness of amniotic membrane allografts such as Zenith graft in treating these types of ulcers. For these reasons, the use of Zenith amniotic membrane grafts (Q4253) is not experimental or investigational.

*C. Appropriate*

Based on the documentation provided, there has been widespread adoption of Zenith graft (Q4253) that supports its appropriateness in treating diabetic foot ulcers. Upon review, the undersigned finds amniotic membrane allografts like Zenith graft is appropriate and adopted by the medical community as evidenced by CMS's granting of a Level II HCPCS code in Q4253. (File 23, p. 30; *see also* Hearing Recording (February 12, 2025)). Level II HCPCS codes are established so providers can submit claims for services and supplies that are not identified by the HCPCS Level I CPT codes. (CMS, *HCPCS Level II Coding Procedures*, November 21, 2024, www.cms.gov/medicare/coding-billing/healthcare-common-procedure-system/level-ii-coding-process (last accessed March 12, 2025)). Although the granting of a Level II HCPCS code does not determine the coverage and payment under Medicare, the undersigned finds the creation of the Level II HCPCS code along with the additional evidence provided supports that the use of amniotic membranes, such as the Zenith grafts (Q4253) in this case, has achieved significant adoption by the relevant medical community, is appropriate, and therefore eligible for Medicare coverage.

For these reasons, the undersigned finds that the Zenith grafts and related services (15275, 15276, and Q4253) meets the Medicare's reasonable and necessary criteria and is covered by Original Medicare.

II. Medically Reasonable and Necessary

While the undersigned finds the Zenith grafts (15275, 15276, and Q4253) were eligible for coverage under Original Medicare on the dates of service at issue, in this case the documentation provided is insufficient and therefore does not clearly support that the services (15275, 15276, and Q4253) provided as billed were reasonable and necessary for the Beneficiary. (§§ 1833 and 1862(a)(1)(A) of the Act). Section 1833 of the Act requires that all Medicare claims must be supported by sufficient information and documentation that the services are medically necessary and entitled to payment. This information should be documented at the time that the services were rendered and should be provided when the claim was filed. (*See e.g., MPIM*, pub. 100-08, ch. 5, §§ 5.7 and 5.8).

In this case, the documentation provided is insufficient and therefore does not clearly support that the Zenith grafts (15275, 15276, and Q4253) were reasonable and necessary for the Beneficiary. (§§ 1833 and 1862(a)(1)(A) of the Act). Section 1833 of the Act requires that all Medicare claims must be supported by sufficient information and documentation that the services are medically necessary and entitled to payment. This information should be

documented at the time that the services were rendered and should be provided when the claim was filed. (*See e.g., MPIM*, pub. 100-08, ch. 5, §§ 5.7 and 5.8). The documentation provided includes visit notes for each date of service at issue consisting of a paragraph drafted by the physician, often a separate addendum that consists of an additional paragraph, a sheet with product barcodes for the Zenith graft, and a form that includes handwritten notes and sometimes a check mark regarding the Zenith graft used. (File 12, pp. 171-270). Overall, the physician visit notes confirm the Beneficiary was a type 2 diabetic on dialysis with diabetic foot ulcers. (*Id.*; *see also* Hearing Recording (February 12, 2025)). However, these visit notes only provide general statements about the Beneficiary's condition and medical history, are inconsistent regarding what information is included in the physician's paragraph and/or addendum for each visit, sometimes provide contradictory information, and in one instance the Appellant provided visit notes for two different dates of service weeks apart, but the notes are exact duplicates. (*Id.*). Based on the documentation submitted, the Zenith graft and services provided and the Beneficiary's actual condition on the dates of service at issue cannot be confirmed. (*Id.*). Without sufficient documentation, the Zenith graft and services provided were not medically reasonable and necessary and thus ineligible for Medicare coverage and payment. (§§ 1833 and 1862(a)(1)(A) of the Act).

The undersigned references LCD L36377 as guidance for documentation content and coverage requirements for the Zenith skin grafts at issue in this case. LCD L36377 coverage indications include, "the presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks; a comprehensive patient assessment including history, exam, ABI, and diagnostics tests, an assessment of the beneficiary's type 2 diabetes management history with attention to other comorbidities such as vascular disease, neuropathy, and osteomyelitis, a review of current blood sugars and the beneficiary's HgbA1c, diet and nutritional status, activity level, and physical exam that includes an assessment of the beneficiary's skin and wound(s), ABI, and a check of any prosthetics or shoes for signs of abnormal wear; documentation of the implemented treatment plan including debridement, pressure relief, infection control, wound management, and nonsmoker or smoking cessation status; documentation of failed wound care measures necessitating the skin graft including measurements of the initial ulcers, measurements at the completion of at least 4 weeks of conservative treatment measures, and reference to specific interventions that have failed." LCD L36377 also provides limitations, in the form of documentation, usage, and coverage requirements for the application of skin grafts, including but not limited to, "application of skin substitute grafts are contraindicated and non-covered in patients with inadequate control of underlying conditions or exacerbating factors such as uncontrolled diabetes and active infection; most repeat applications of skin replacement materials will not require separate debridement procedures; documentation of waste; and a comprehensive patient assessment and treatment plan that addresses more complex patients who have lower extremity ulcers/chronic wounds as well as other types of wounds of sores such as post-surgical wounds." Notably, the usage, documentation, and coverage requirements in LCD L36377 include the documentation and coverage conditions the manufacturer of Zenith grafts provides in their product literature. (LCD L36377 and File 23, pp. 37-48).

In this case, the Appellant asserts that the Zenith grafts and services provided on the dates were medically reasonable and necessary. (File 12, pp. 171-270 and Hearing Recording (February 12, 2025)). The Appellant testified that he comprehensively examined the Beneficiary including taking vitals signs each visit, that he collaborated closely with the Beneficiary's primary care physician, vascular doctor, and infectious disease doctor, and that no amount of the Zenith graft was wasted when he applied it to the Beneficiary's wound(s). (Hearing Recording (February 12, 2025). For coverage and payment, Medicare Part B requires documentation in the Beneficiary's

medical record to support each claim and the services provided. In this case, records should include documentation of the treatment provided, the Beneficiary's medical history and condition at the time of the visit, notes and information from other practitioners if they were consulted, and the actual amount of Zenith graft used for the graft and services to be considered reasonable and necessary for the Beneficiary and entitled to coverage and payment. (*See e.g.*, *MPIM*, pub. 100-08, ch. 5, §§ 5.7 and 5.8 and LCD L36377; *see also* § 1833 of the Act).

The medical records provided are insufficient to support the claims as filed and the medical necessity of the services rendered. As discussed, the visit notes for each date of service consists of a paragraph, sometimes with an additional addendum providing primarily subjective information about the Beneficiary. (File 12, pp. 171-270). The notes include general statements about the Beneficiary's condition such as "vital signs stable," "he is well nourished" and/or "diabetes is well managed" but there is no objective information or measurements to support these statements. (*Id.*). The visit notes do not include the actual results of a vital signs check, the Beneficiary's actual blood sugar reading or record of blood sugar checks, or the Beneficiary's weight and nutrition status. (*Id.*). The Appellant asserts, in part, that a blood sugar check was not needed based on what the Beneficiary reported to him and his own observations of the Beneficiary's condition. (Hearing Recording (February 12, 2025)). However, the notes do not report any information or blood sugar levels the Beneficiary may have provided at the time of the visit, nor is there any documentation of the Appellant's evaluation subjective or objective of the Beneficiary's condition based on suspected blood sugar levels, only at times, a general note stating, "under control" or "managed." (File 12, pp. 171-270; *see also* LCD L36377). The visit notes do not include a comprehensive history of present illness or medical history for the Beneficiary. (*Id.*) The notes only generally reported the Beneficiary's conditions, at times stating he's been diabetic for 12 years, and sometimes very generally list the Beneficiary's medications often inconsistently depending on the visit note. (*Id.*). The visit notes do not include a physical exam or review of systems documenting the Beneficiary's condition at each visit. (*Id.*). The visit notes do not clearly or sufficiently document the Beneficiary's wounds historically and at the time of the visit. (*Id.*). Though the visit note and addendum paragraphs often include additional measurements of the wounds and additional information such as "no signs of infection" and "negative for drainage," the measurements and wound characteristics reported are often inconsistent within the note itself and the details reported vary from note to note, for example some notes will report the wounds had no odor while others will omit this information. (*Id.*). Regarding the Zenith graft applications, the visit notes report the sizes of the grafts applied, usually two, pursuant to the manufactured sizes selected, and report that there was no waste. (*Id.*). The veracity of these reports cannot be confirmed, because there is limited information about the technique used to apply, whether any graft was folded, and whether the graft needed trimming especially in light of any changes in wound sizes and as with other elements of the notes, there are often inconsistent measurements, which size products were used, and/or typos within the same visit note. (*Id.*). Notably, the visit notes do not include any photos that would support the reported wound sizes, condition, and quantity of graft applied. Lastly, some of the visit notes do not clearly support that the grafts should have been applied due to the Beneficiary's active infections. (*See e.g.*, File 12, pp. 173 (September 8, 2022 note prior to the dates of service stating the Beneficiary will be on IV antibiotics for 3 more weeks), 177-179 (September 29, 2022 notes reporting the Beneficiary was finishing up a course of antibiotics by Friday), 210-213 (December 5, 2022 notes stating the Beneficiary is on antibiotics), and 235-238 (May 6, 2023 note reporting the Beneficiary prescribed was antibiotics)). In accordance with LCD L36377 and the manufacturer's literature, active infections are a contraindication for a Zenith graft application. (LCD L36377 and File 23, pp. 37-48). Lastly, the record does not sufficiently document the Beneficiary's failure of conservative treatment measures resulting in the decision to pursue more advanced care with the Zenith grafts. (File 12, pp. 171-270 and LCD

L36377). Some of the notes provided report the Beneficiary failed conservative treatment measures, without any specific documentation about the effect of treatments, the conditions of the wounds during this period, and the Beneficiary's condition during this time. (*Id.*). The Appellant testified and the September 8, 2022 notes prior to the dates of service at issue confirm that the Beneficiary tried a Kerecis graft, also referred to in the notes as a fish graft, which failed; however once again the specific details of this treatment and how/why it failed are not provided. (Hearing Recording (February 12, 2024) and File 12, p. 173).

For these reasons, the undersigned finds the record as a whole fails to sufficiently document the Beneficiary's condition and the services provided on the dates of service at issue. (*See generally*, File 12 and §§ 1833 and 1862(a)(1)(A) of the Act). Without sufficient documentation, the Zenith graft and services provided were not reasonable and necessary and are ineligible for coverage and payment under Medicare Part B. (*See generally*, File 12 and §§ 1833 and 1862(a)(1)(A) of the Act).

For the services denied, the issue remains whether payment may nonetheless be made for the services as billed under section 1879 of the Act. The file did not contain an advance beneficiary notice or any other form of notice. There is no evidence the Beneficiary knew, or should have known, the provision of the services would not be covered under the Medicare program. The Beneficiary's liability is waived.

Section 1870(b) of the Act allows waiver of recovery of an overpayment to a provider of services whenever that provider is "without fault" in incurring the overpayment. A provider is not "without fault" under Section 1870 of the Act if the provider "does not submit documentation to substantiate that services billed to [Medicare] were covered," or if Medicare paid the provider for services that the provider should have known were non-covered. (CMS, *Medicare Financial Management Manual*, pub. 100-06, ch. 3, §§ 90.1(e) and (h)). A provider is generally deemed to have such knowledge based on its receipt of CMS notices, manuals, issuances by CMS contractors, and other publications. (42 C.F.R. § 411.406(e)).

Here, because the Appellant billed Medicare and received payment for services that it knew or should have known, based on its constructive knowledge of Medicare policies, were not covered, it cannot be found "without fault" in incurring the overpayment. The overpayment is therefore not waived. The Appellant remains liable for the non-covered charges.

## CONCLUSIONS OF LAW

The Zenith grafts (15275, 15276, and Q4253) the Appellant provided to the Beneficiary on the dates of service at issue failed to meet Medicare's documentation and therefore coverage requirements pursuant to Sections 1833 and 1862(a)(1)(A) of the Act. Accordingly, the Appellant is liable for the overpayment of the non-covered charges.

## ORDER

For the reasons discussed above, this decision is **UNFAVORABLE**. The Appellant is responsible for the overpayment of the non-covered charges. The undersigned directs the Medicare Administrative Contractor to process the claim in accordance with this decision.

**SO ORDERED**

Kyle Alexander
Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD Form DAB-101 (12/19)

**REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL**

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7. Medicare claim type: ☐ Part A ☐ Part B ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes If Yes, skip to Block 9.
☐ No If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated__________________________. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

________________________________________________

________________________________________________

________________________________________________

(Attach additional sheets if you need more space)

**PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.**

| DATE | | | DATE | | |
|---|---|---|---|---|---|
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

---

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Atlanta, GA**

| | | | |
|---|---|---|---|
| Appeal of: | **DANIEL BRANDWEIN DPM P A** | OMHA Appeal No.: | **3-14470343406** |
| Beneficiary: | **A. J**[redacted] | Medicare Part: | **B** |
| Medicare No.: | *******R1TN53** | Before: | **Kyle Alexander**<br>Administrative Law Judge |

Index of the Administrative Record and Exhibit List

| Exhibit Record | Administrative File Reference<br>File Name | Page Range | | |
|---|---|---|---|---|
| Position Statements: CMS contractor | File 20 | 1 | : | 8 |
| Procedural - CMS Levels: Excel Spreadsheet | File 1 | 1 | : | 1 |
| Procedural - CMS Levels: Request for Reconsideration: Includes Medical Records | File 12 | 1 | : | 275 |
| Procedural - CMS Levels: Redetermination: Case File Request Form | File 13 | 1 | : | 3 |
| Procedural - CMS Levels: Claim information | File 13 | 4 | : | 11 |
| Procedural - CMS Levels: Request for Redetermination | File 13 | 15 | : | 30 |
| Procedural - CMS Levels: Certificate of Service | File 13 | 31 | : | 33 |
| Procedural - CMS Levels: Redetermination: Decision | File 13 | 34 | : | 202 |
| Procedural - CMS Levels: CMS Receivables Balance Detail Report | File 13 | 203 | : | 274 |
| Procedural - CMS Levels: Overpayment Letter : Initial Request | File 13 | 274 | : | 282 |
| Procedural - CMS Levels: Overpayment Letter : Continuance | File 13 | 288 | : | 290 |
| Procedural - CMS Levels: Overpayment Letter : Continuance | File 13 | 300 | : | 304 |
| Procedural - CMS Levels: Overpayment Letter : Initial Request | File 13 | 305 | : | 310 |
| Procedural - CMS Levels: Notice of Overpayment Findings | File 13 | 314 | : | 368 |
| Procedural - CMS Levels: Emails | File 13 | 369 | : | 373 |
| Procedural - CMS Levels: UPIC Overpayment Referral to MAC: Form | File 13 | 374 | : | 375 |
| Procedural - CMS Levels: Overpayment Letter : Initial Request | File 13 | 376 | : | 383 |
| Procedural - CMS Levels: Overpayment Letter : Continuance | File 13 | 389 | : | 391 |
| Procedural - CMS Levels: Overpayment Letter : Continuance | File 13 | 400 | : | 405 |
| Procedural - CMS Levels: Effectuation Acknowledgement | File 15 | 1 | : | 3 |
| Procedural - CMS Levels: QIC Acknowledgement Letter | File 2 | 1 | : | 4 |
| Procedural - CMS Levels: Effectuation Acknowledgement | File 21 | 1 | : | 3 |
| Procedural - CMS Levels: Redetermination: Case File Request Form | File 4 | 1 | : | 3 |
| Procedural - CMS Levels: Reconsideration: QIC Decision | File 5 | 1 | : | 21 |
| Procedural - CMS Levels: Reconsideration: QIC Decision-Rep copy | File 5 | 22 | : | 42 |

Index of the Administrative Record and Exhibit List

| | | | |
|---|---|---|---|
| Procedural - CMS Levels: Excel Spreadsheet | File 6 | 1 | : 1 |
| Procedural - CMS Levels: Reconsideration: QIC Decision | File 7 | 1 | : 22 |
| Procedural - CMS Levels: Reconsideration: QIC Decision-Provider copy | File 8 | 1 | : 22 |
| Procedural - OMHA Level: Report of contact | File 14 | 1 | : 1 |
| Procedural - OMHA Level: Notice of Hearing | File 16 | 1 | : 13 |
| Procedural - OMHA Level: Response to Notice of Hrg: UPIC NOI - participant | File 17 | 1 | : 2 |
| Procedural - OMHA Level: Response to Notice of Hrg: Appellant - includes AORs | File 18 | 1 | : 5 |
| Procedural - OMHA Level: UPS Tracking receipt for case file | File 19 | 1 | : 2 |
| Procedural - OMHA Level: Filing of New Evidence : OMHA Form-115 | File 23 | 1 | : 2 |
| Procedural - OMHA Level: Representative's New Evidence | File 23 | 3 | : 365 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 3 | 1 | : 201 |
| Procedural - OMHA Level: Request for ALJ Hearing: Request Only - Part 1 | File 3 | 1 | : 6 |
| Proceeding (Audios): Hearing audio | File 22 | 1 | : 1 |

| **Non-Exhibit Record** | **Administrative File Reference** | | |
|---|---|---|---|
| | File Name | Page Range | |
| Records not considered: RFH attachment Part 4: Incl. new evidence - no good cause | File 10 | 1 | : 187 |
| Records not considered: RFH attachment - Part 2: Incl. new evidence - no good cause | File 11 | 1 | : 201 |
| Records not considered: Non-Probative | File 13 | 12 | : 14 |
| Records not considered: Beneficiary not at issue | File 13 | 283 | : 287 |
| Records not considered: Beneficiary not at issue | File 13 | 291 | : 299 |
| Records not considered: Beneficiary not at issue | File 13 | 311 | : 313 |
| Records not considered: Beneficiary not at issue | File 13 | 384 | : 388 |
| Records not considered: Beneficiary not at issue | File 13 | 392 | : 399 |
| Records not considered: RFH Part 1: Incl. new evidence - no good cause | File 3 | 7 | : 201 |
| Records not considered: RFH attachment Part 3: Incl. new evidence - no good cause | File 9 | 1 | : 201 |

| **Exhibit Records for beneficiary A. [redacted]** | **Administrative File Reference** | | |
|---|---|---|---|
| | File Name | Page Range | |
| Position Statements: CMS contractor | File 20 | 1 | : 8 |
| Procedural - CMS Levels: Excel Spreadsheet | File 1 | 1 | : 1 |
| Procedural - CMS Levels: Request for Reconsideration: Includes Medical Records | File 12 | 1 | : 275 |
| Procedural - CMS Levels: Redetermination: Case File Request Form | File 13 | 1 | : 3 |
| Procedural - CMS Levels: Claim information | File 13 | 4 | : 11 |
| Procedural - CMS Levels: Request for Redetermination | File 13 | 15 | : 30 |

Index of the Administrative Record and Exhibit List

| | | | |
|---|---|---|---|
| Procedural - CMS Levels: Certificate of Service | File 13 | 31 | : 33 |
| Procedural - CMS Levels: Redetermination: Decision | File 13 | 34 | : 202 |
| Procedural - CMS Levels: CMS Receivables Balance Detail Report | File 13 | 203 | : 274 |
| Procedural - CMS Levels: Overpayment Letter : Initial Request | File 13 | 274 | : 282 |
| Procedural - CMS Levels: Overpayment Letter : Continuance | File 13 | 288 | : 290 |
| Procedural - CMS Levels: Overpayment Letter : Continuance | File 13 | 300 | : 304 |
| Procedural - CMS Levels: Overpayment Letter : Initial Request | File 13 | 305 | : 310 |
| Procedural - CMS Levels: Notice of Overpayment Findings | File 13 | 314 | : 368 |
| Procedural - CMS Levels: Emails | File 13 | 369 | : 373 |
| Procedural - CMS Levels: UPIC Overpayment Referral to MAC: Form | File 13 | 374 | : 375 |
| Procedural - CMS Levels: Overpayment Letter : Initial Request | File 13 | 376 | : 383 |
| Procedural - CMS Levels: Overpayment Letter : Continuance | File 13 | 389 | : 391 |
| Procedural - CMS Levels: Overpayment Letter : Continuance | File 13 | 400 | : 405 |
| Procedural - CMS Levels: Effectuation Acknowledgement | File 15 | 1 | : 3 |
| Procedural - CMS Levels: QIC Acknowledgement Letter | File 2 | 1 | : 4 |
| Procedural - CMS Levels: Effectuation Acknowledgement | File 21 | 1 | : 3 |
| Procedural - CMS Levels: Redetermination: Case File Request Form | File 4 | 1 | : 3 |
| Procedural - CMS Levels: Reconsideration: QIC Decision | File 5 | 1 | : 21 |
| Procedural - CMS Levels: Reconsideration: QIC Decision-Rep copy | File 5 | 22 | : 42 |
| Procedural - CMS Levels: Excel Spreadsheet | File 6 | 1 | : 1 |
| Procedural - CMS Levels: Reconsideration: QIC Decision | File 7 | 1 | : 22 |
| Procedural - CMS Levels: Reconsideration: QIC Decision-Provider copy | File 8 | 1 | : 22 |
| Procedural - OMHA Level: Report of contact | File 14 | 1 | : 1 |
| Procedural - OMHA Level: Notice of Hearing | File 16 | 1 | : 13 |
| Procedural - OMHA Level: Response to Notice of Hrg: UPIC NOI - participant | File 17 | 1 | : 2 |
| Procedural - OMHA Level: Response to Notice of Hrg: Appellant - includes AORs | File 18 | 1 | : 5 |
| Procedural - OMHA Level: UPS Tracking receipt for case file | File 19 | 1 | : 2 |
| Procedural - OMHA Level: Filing of New Evidence : OMHA Form-115 | File 23 | 1 | : 2 |
| Procedural - OMHA Level: Representative's New Evidence | File 23 | 3 | : 365 |
| Procedural - OMHA Level: Request for ALJ Hearing: Request Only - Part 1 | File 3 | 1 | : 6 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 3 | 1 | : 201 |
| Proceeding (Audios): Hearing audio | File 22 | 1 | : 1 |

| **Non-Exhibit Records** | **Administrative File Reference** | | |
|---|---|---|---|
| | File Name | Page Range | |
| Records not considered: RFH attachment Part 4: Incl. new evidence - no good cause | File 10 | 1 | : 187 |
| Records not considered: RFH attachment - Part 2: Incl. | File 11 | 1 | : 201 |

| | | | |
|---|---|---|---|
| new evidence - no good cause | | | |
| Records not considered: Non-Probative | File 13 | 12 | : 14 |
| Records not considered: Beneficiary not at issue | File 13 | 283 | : 287 |
| Records not considered: Beneficiary not at issue | File 13 | 291 | : 299 |
| Records not considered: Beneficiary not at issue | File 13 | 311 | : 313 |
| Records not considered: Beneficiary not at issue | File 13 | 384 | : 388 |
| Records not considered: Beneficiary not at issue | File 13 | 392 | : 399 |
| Records not considered: RFH Part 1: Incl. new evidence - no good cause | File 3 | 7 | : 201 |
| Records not considered: RFH attachment Part 3: Incl. new evidence - no good cause | File 9 | 1 | : 201 |


To protect beneficiary privacy, names and references to other individuals have been removed from the beneficiary copies of the Administrative Record and Exhibit List.

Index of the Administrative Record and Exhibit List

| Exhibit Records for beneficiary A. J[redacted] | Administrative File Reference | | |
|---|---|---|---|
| | File Name | Page Range | |
| Position Statements: CMS contractor | File 20 | 1 | : 8 |
| Procedural - CMS Levels: Excel Spreadsheet | File 1 | 1 | : 1 |
| Procedural - CMS Levels: Request for Reconsideration: Includes Medical Records | File 12 | 1 | : 275 |
| Procedural - CMS Levels: Redetermination: Case File Request Form | File 13 | 1 | : 3 |
| Procedural - CMS Levels: Claim information | File 13 | 4 | : 11 |
| Procedural - CMS Levels: Request for Redetermination | File 13 | 15 | : 30 |
| Procedural - CMS Levels: Certificate of Service | File 13 | 31 | : 33 |
| Procedural - CMS Levels: Redetermination: Decision | File 13 | 34 | : 202 |
| Procedural - CMS Levels: CMS Receivables Balance Detail Report | File 13 | 203 | : 274 |
| Procedural - CMS Levels: Overpayment Letter : Initial Request | File 13 | 274 | : 282 |
| Procedural - CMS Levels: Overpayment Letter : Continuance | File 13 | 288 | : 290 |
| Procedural - CMS Levels: Overpayment Letter : Continuance | File 13 | 300 | : 304 |
| Procedural - CMS Levels: Overpayment Letter : Initial Request | File 13 | 305 | : 310 |
| Procedural - CMS Levels: Notice of Overpayment Findings | File 13 | 314 | : 368 |
| Procedural - CMS Levels: Emails | File 13 | 369 | : 373 |
| Procedural - CMS Levels: UPIC Overpayment Referral to MAC: Form | File 13 | 374 | : 375 |
| Procedural - CMS Levels: Overpayment Letter : Initial Request | File 13 | 376 | : 383 |
| Procedural - CMS Levels: Overpayment Letter : Continuance | File 13 | 389 | : 391 |
| Procedural - CMS Levels: Overpayment Letter : Continuance | File 13 | 400 | : 405 |
| Procedural - CMS Levels: Effectuation Acknowledgement | File 15 | 1 | : 3 |
| Procedural - CMS Levels: QIC Acknowledgement Letter | File 2 | 1 | : 4 |
| Procedural - CMS Levels: Effectuation Acknowledgement | File 21 | 1 | : 3 |
| Procedural - CMS Levels: Redetermination: Case File Request Form | File 4 | 1 | : 3 |
| Procedural - CMS Levels: Reconsideration: QIC Decision | File 5 | 1 | : 21 |
| Procedural - CMS Levels: Reconsideration: QIC Decision-Rep copy | File 5 | 22 | : 42 |
| Procedural - CMS Levels: Excel Spreadsheet | File 6 | 1 | : 1 |
| Procedural - CMS Levels: Reconsideration: QIC Decision | File 7 | 1 | : 22 |
| Procedural - CMS Levels: Reconsideration: QIC Decision-Provider copy | File 8 | 1 | : 22 |
| Procedural - OMHA Level: Report of contact | File 14 | 1 | : 1 |
| Procedural - OMHA Level: Notice of Hearing | File 16 | 1 | : 13 |
| Procedural - OMHA Level: Response to Notice of Hrg: UPIC NOI - participant | File 17 | 1 | : 2 |
| Procedural - OMHA Level: Response to Notice of Hrg: Appellant - includes AORs | File 18 | 1 | : 5 |
| Procedural - OMHA Level: UPS Tracking receipt for case file | File 19 | 1 | : 2 |
| Procedural - OMHA Level: Filing of New Evidence : OMHA | File 23 | 1 | : 2 |

| | | | |
|---|---|---|---|
| Procedural - OMHA Level: Representative's New Evidence | File 23 | 3 | : 365 |
| Procedural - OMHA Level: Request for ALJ Hearing: Request Only - Part 1 | File 3 | 1 | : 6 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 3 | 1 | : 201 |
| Proceeding (Audios): Hearing audio | File 22 | 1 | : 1 |

| **Non-Exhibit Records** | **Administrative File Reference** | | |
|---|---|---|---|
| | File Name | Page Range | |
| Records not considered: RFH attachment Part 4: Incl. new evidence - no good cause | File 10 | 1 | : 187 |
| Records not considered: RFH attachment - Part 2: Incl. new evidence - no good cause | File 11 | 1 | : 201 |
| Records not considered: Non-Probative | File 13 | 12 | : 14 |
| Records not considered: Beneficiary not at issue | File 13 | 283 | : 287 |
| Records not considered: Beneficiary not at issue | File 13 | 291 | : 299 |
| Records not considered: Beneficiary not at issue | File 13 | 311 | : 313 |
| Records not considered: Beneficiary not at issue | File 13 | 384 | : 388 |
| Records not considered: Beneficiary not at issue | File 13 | 392 | : 399 |
| Records not considered: RFH Part 1: Incl. new evidence - no good cause | File 3 | 7 | : 201 |
| Records not considered: RFH attachment Part 3: Incl. new evidence - no good cause | File 9 | 1 | : 201 |

To protect beneficiary privacy, names and references to other individuals have been removed from the beneficiary copies of the Administrative Record and Exhibit List.

cc:

A. J[redacted]

C2C Innovative Solutions, Inc.
Part B South C2C
301 W Bay Street, Ste. 1110
Jacksonville, FL 32231-4006

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List