UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

DR. DANIEL BRANDWEIN, DPM, PA

Plaintiff,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,

Defendant.
_________________________________/

Case No.: 26-cv-60084

Judge Leibowitz

**PLAINTIFF'S SUPPLEMENTAL BRIEF FOLLOWING HEARING**

Plaintiff, Dr. Daniel Brandwein, DPM, PA, pursuant to this Court's Order [ECF No. 39], respectfully submits this Supplemental Brief in support of his Expedited Motion for Relief [ECF No. 26], and states as follows:

**INTRODUCTION**

The Government's admission that LCD L36377 (2019) controls the adjudication of this case is the death knell for recoupment efforts. Each intermediate level of administrative review concedes as much. JF and ST were denied solely on the purported lack of peer-reviewed evidence, not insufficient records. AJ was denied on a purported lack of records, an issue that was not before the ALJ. HHS may regret that skin-graft reimbursement proved costly — though it also spared the government far greater expense in amputations and post-

amputation care — and that the benefit was abused by others. However, regret or expenditure of authorized money does not entitle HHS to recoup these funds.

Dr. Brandwein committed no fraud. He provided medically reasonable and necessary treatment to three beneficiaries, saving their limbs and prolonging their lives. He was authorized to provide, and did provide, those treatments in accordance with applicable guidance. Only after the fact did HHS reverse course, did it pull the rug from underneath him, invoking a proposed LCD requirement that never took effect to justify its denials and a sweeping recoupment. HHS' conduct requires Dr. Brandwein hit a moving target: changing the requirements, reinterpreting guidelines, or adding requirements not present. Those efforts must now cease. Dr. Brandwein's treatment satisfies each aspect required under LCD L36377.

**I. The plain language requirement of LCD L36377 is that DFU skin substitute grafts will be covered when there is presence of a DFU(s) that failed to respond to conservative treatment for greater than four weeks.**

LCD L36377 in effect at the time of these patients' treatment provides for coverage for treatment of DFUs and VLUs using skin grafts and confirms that reimbursement should be provided. The LCD requires appropriate documentation and includes a list of documentation requirements: failure of conservative treatment measures including comprehensive patient assessment and an implemented treatment plan: history and management of comorbidities,

review of current blood sugars, diet and nutritional status, activity level, physical exam, and inspection of prosthetics or shoes for signs of normal wear. The LCD does not require perfect documentation; it requires only that the records support the use and medical necessity of the product. The LCD then advises that the implemented treatment plan may include debridement, pressure relief, infection control, management of exudate, and either non-smoker confirmation or counseling on cessation of smoking. The pre-service record must address why the wound failed to respond to standard wound care treatment and must reference specific interventions that failed.

Under the LCD, the requirements for appropriate documentation require: (1) failed conservative treatment longer than four weeks; (2) an assessment outlining the plan for skin replacement surgery and the choice of skin substitute product; and (3) an operative note that should include: (a) pre- and post-op diagnosis, (b) surgeon, (c) anesthesia, (d) reason for the procedure, (e) description of the procedure including product use, and (f) relevant findings. Dr. Brandwein's records include all these appropriate details. Thomas Merrill, DPM, an expert in Dr. Brandwein's field, reviewed the medical records and independently formed a clear picture of the necessity and reasonableness of the treatment and understood and concurred with the treatment plan. (AR-1, 1104:10-1105:5; AR-2, 1370:8-24, 1371:19-1372:11; AR-3, 2139:2-2140:3). HHS did not contradict his conclusions.

## II. JF's ALJ review was based on an improper standard.

The ALJ specifically stated that the sole issue for his consideration was the issue of peer-reviewed, evidence-based literature. (AR-1, 86-87). This is incorrect as LCD L36377 does not require peer-reviewed, evidence-based literature and instead only requires appropriate documentation of failed conservative treatment. (Compare AR-2, 282-290 v. AR-3, 1814-1883 "coverage will be provided for skin substitute grafts/CTP that have peer-reviewed, published evidence supporting their use…"). Since Dr. Brandwein satisfied the requirements of the LCD, coverage for this service was appropriate. JF's records were sufficient as conceded by the QIC:

> In review of the documentation provided the beneficiary was evaluated for advanced wound therapy for bilateral diabetic non-healing leg ulcers. The medical records contain a letter, which documents the baseline assessment, comprehensive evaluations as well as trialed conservative treatment. The documentation contains amount of product used, wasted, and how the skin substitute was secured.

(AR-1, 163-164) and by the ALJ: "the sole basis for denial was [QICs] assertion that 'there is insufficient peer- reviewed, evidence-based literature to support the use of dual Layer Impax Membrane for wound care purposes.'" (AR-1, 21). The inquiry ends here. Dr. Brandwein is likely to prevail on the issue of coverage for

his treatment of JF. HHS' concession that LCD L36377 applies and the QIC and ALJ's acknowledgement that the only issue on appeal lay outside the sufficiency of the records refute HHS' newly raised documentation argument, which rests on an undefined standard the LCD never imposed. Although the records are not disputed for JF, out of an abundance of caution, the records satisfy the LCD.

**A. The initial visit records meet all the requirements of the LCD.**

Dr. Brandwein was first referred for care of the patient on July 26, 2023. This first office visit is titled "Initial Treatment Plan" and outlines the patient's condition, current treatment, provides nutrition counseling, states that conservative treatment has failed for six weeks (at this time, nearly 12 weeks before skin grafts are applied), and outlined a plan of care for skin grafting. (AR-1, 705). The record further documented the size of the ulcers, documented that Dr. Brandwein performed conservative wound care measures, discussed vascular consultation, and recommended antibiotics. (AR-1, 705). After covering all of those areas, Dr. Brandwein wrote that he is going to use amniotic tissue membrane grafts, and he has approval to apply them on this patient. (AR-1, 705). There is no lack of appropriate documentation.

| Requirement Language | Physician Documentation | Record Page (AR-1) |
|---|---|---|
| Presence of neuropathic diabetic foot ulcer | *"The patient has ulcers bilateral legs"* | 705; 709; 712; |

| | | |
|---|---|---|
| having failed to respond to documented conservative wound-care measures of greater than four weeks | *The patient has had the ulcers for six weeks or so and they are not healing and they have not decreased in size with local care. There is a wound care nurse which is taking care of him and if anything she is making it worse and they are increasing in size.*<br>*He is aware that in the past six weeks all conventional treatment has failed and the wound has increased in size and not decreased.*<br>*Dr. Merrill testified it was "clear from the records that the conservative treatment had failed, and this was the next step."* | 704; 705;<br><br>1104, 10-18 |
| Wound measurements (baseline / after conservative care / pre-graft) | *Baseline (7/26): left leg 200 cm, right leg 64 cm.*<br>*Pre-graft 10/1: "The ulcer now measures 64 cm. sq."; "The diameter of the ulcer was 6.4 x 10 with length and width, it was 2 mm in depth."*<br>*10/6: "left leg ulceration began at 198cm2 and with amniotic skin grafting weekly has continuously improved and decreased in ulcer size to 64cm2"; 6.4 cm, 1 mm depth.*<br>*10/10: Ulcer measured 56cm² left leg"; "5.6 x 10 length and width with 1 mm depth.*<br>*10/19: 38 cm in diameter after debridement"; "10 x 3.8 cm with 1 mm of depth.* | 705;<br><br>708–709;<br>712–713;<br>716–717;<br>720–721; |
| Comprehensive patient assessment | *I explained to the patient that although he is healthy he need to be nutritionally fit. I am encouraging him to work with the nutritionist to take his vitamins, medications and supplements as this will help him and to drink a lot of water. I recommended he stay under the care of his primary care doctor as well as his vascular doctor. The patient's neurovascular status is intact. He is also under the care of his orthopedic surgeon and he has a positive attitude regarding hearing the ulcers.*<br>*I explained to him about grafting and I told him there is no infection, no bone exposed, capsule, tendon, etc…He will do very well with the grafting…He feels and I told him that I care and I will be here every week to get him better and he was very relieved to hear that.* | 704-705<br><br>706-707; 1098<br><br>704 |
| Diabetes/systemic disease: [review of the current blood sugars/ HbA1c, diet and nutritional status, activity level, physical | *I explained to the patient that although he is healthy he need to be nutritionally fit. I am encouraging him to work with the nutritionist to take his vitamins, medications and supplements as this will help him and to drink a lot of water. I recommended he stay under the care of his primary care doctor as well as his vascular doctor. The patient's neurovascular status is intact. He is also under the care of his orthopedic surgeon and he has a positive attitude regarding hearing the ulcers.* | 704-705<br><br>708-709<br><br>712 |

| | | |
|---|---|---|
| exam that includes assessment of skin and wound] | *The patient is a type 2 diabetic. The patient is in good control. He is in good metabolic control, blood sugars are normal. Blood sugar controlled. Sugars are in good control and he is well nourished.* | 716-717 |
| physical exam that includes assessment of skin and wound | *This patient has a history of infection.*<br>*The patient has ulcers bilateral legs.*<br>*He has 200 cm in diameter ulcer on the left leg which goes anterior and medial as well as the 64 cm ulcer on the right leg which is anterolateral.*<br>*Cultures were taken, aerobic, anaerobic, acid fast bacilli and fungal to the left leg as patient has a little bit of an abscess.* | 705 |
| Implemented treatment plan as indicated | *I debrided both of them with a #10 blade deep subcutaneous tissue and I applied Bactroban and dry sterile dressing. I also recommend vascular consultation although the temperature gradient is within the normal limits there is a wound care nurse which is taking care of him and if anything she is making it worse and they are increasing in size I am going to use amniotic tissue membrane graft and return in one week once I get approval I started applying on this patient.* | 705 |
| Pre-service record: rationale for graft & product choice | *7/26: I am going to use amniotic tissue membrane grafts and return in one week once I get approval I started applying on this patient; I explained to him about the grafting and I told there is no infection, no bone exposed, capsule, tendon, etc. He will do very well with the grafting.*<br>*10/1: I applied an Impax amniotic tissue membrane on this graft to see if it will be more effective.* | 704-705<br><br>708 |
| Risks/complications discussed | *7/26: I explained to him about the grafting and I told there is no infection, no bone exposed, capsule, tendon, etc.*<br>*10/6: Discussed treatment options and nature of his condition"*<br>*10/10: Discussed treatment plan* | 704-705<br>712<br>716 |
| Under care of physician for systemic disease | *I recommended he stay under the care of his primary care doctor as well as his vascular doctor… He is also under the care of his orthopedic surgeon.*<br>*He is under the care of his primary care doctor and vascular doctor. I have also spoke to his orthopedic doctor regarding the removal of the external fixator.*<br>*He is under the care of primary care doctor as well as the vascular doctor. The patient is stable.* | 704<br>709<br>703 |
| No contraindications (no active | *7/26: there is no infection, no bone exposed, capsule, tendon, etc.*<br>*10/1: there is no sign of infection… The patient is a type 2 diabetic. The patient is in good control*<br>*10/1: There is a red beefy base. There is no sign of infection* | 704-705<br>708-709<br>712 |

| | | |
|---|---|---|
| infection/uncontrolled DM) | *10/6: no cellulitis, no drainage, no malodor… Negative signs of infection… good metabolic control*<br>*10/10:No cellulitis, no malodor, no purulence*<br>*10/19: no signs of infection. Positive granulation tissue* | 716<br>720<br>721 |
| Every page of the record must be legible and include appropriate patient identification information | **Patient Name:** John Furford<br>**Clinician:** Daniel Brandwein, DPM, FACFAS<br>**Date of Service:** July 26, 2023 | 704, 705, 708, 709, 712, 716, 721, 721 |
| The documentation must include the legible signature of the physician | <br>Daniel Brandwein, DPM, FACFAS | 704, 705, 708, 709, 712, 716, 721, 721 |
| At a minimum, the operative note(s) should include pre and post op diagnosis, name of surgeon, anesthesia, reason for the procedure, complete description of the procedure including product used (with identifying package label in the chart), and relevant findings. | *This patient was seen at the beach breeze rehab facility.*<br>*The patient is going to get the external fixator on his upper left leg removed this Friday.*<br>*The ulcer is okay on the anterolateral aspect on his left leg.*<br>*It is granulating in well.*<br>*I will see this patient next week unless he is in the hospital getting his external fixator off.*<br>*Package labels in chart: "Human Amniotic Tissue Allograft," Membrane 4x8cm, with (SN) serial/lot numbers (e.g., BLS21-1715-0012, BLS21-1702-0021, BLS21-1721-0010) – labels also at ~714 (10/6) and ~718 (10/10: 4x6cm and 4x4cm IMPAX).* | 708<br><br><br><br><br><br><br>710-711, 714-715, 718-719, 722-723 |
| |  | 710 |
| Any amount of wasted skin substitute must be clearly | *10/1: There was no extra graft left over or wasted*<br>*10/6: He has two grafts, each measuring 32 cm.sq. Impax. In the progress note there is serial numbers. In addition to that I send to the bone bank… No graft was wasted* | 708<br><br>713 |

| | | |
|---|---|---|
| documented in the procedure note | *10/10: It is a repeat application. No graft was wasted*<br>*10/19: I am using two Impax grafts, one measures 6 cm and one measures 32 cm… I send to bone bank at the time of treatment… No graft was wasted*<br>*Units billed (64/application) match wound size (64/64/56/38 cm² covered per notes). QIC conceded: The documentation contains amount of product used, wasted, and how the skin substitute was secured.* | 717<br>721<br><br><br>710<br>163-164 |

## III. ST's ALJ review was based on an improper standard.

The ALJ specifically stated that the only issues for his consideration was whether there was appropriate "documentation of conservative wound care measures [and] whether the use of the Impax membrane was medically reasonable and necessary. (AR-2, 47). The ALJ then conceded that the various denial bases had been corrected and the only bases for the QIC denial was "their assertion that 'there is insufficient peer-reviewed, evidence-based literature to support the use of dual Layer Impax Membrane for wound care purposes…'" (AR-2, 48). The incorrect standard.

Despite this concession, the ALJ found that "[w]hile Dr. Brandwein's addenda, in addition to his visit notes, were sufficient to overcome the other documentation issues raised by the MAC and the QIC, I find that the limited records from the Beneficiary's prior clinicians are insufficient to meet the requirements of LCD L36377 and its related policy article…" (AR-2, 51). The record does not support this conclusion and Dr. Brandwein is likely to prevail on the issue of coverage for his treatment of ST. In fact, the ALJ contradicts his own conclusion

at the outset when he concedes that the conservative treatment had failed: "Dr. Brandwein's initial visit on June 15, 2023, makes clear that whatever conservative treatment may have been done before is insufficient and that he would be beginning the use of a skin substitute immediately." The very fact that it was clear that conservative treatment had failed is enough to satisfy the requirements of the LCD.

**A. The initial visit records meet all the requirements of the LCD.**

Dr. Brandwein was first referred for care of the patient on June 15, 2023 – 4 days before the first treatment with a skin graft. (AR-2, 1022). This first office visit is titled "Initial Office Visit" and indicates that the chief complaint is a "chronic non-healing ulcer for well over a year." *Id.* The note outlines the patient's condition and current treatment, provides nutrition counseling, states that conservative treatment had failed, and sets out a plan of care for amniotic tissue membrane grafts. *Id*. The initial office visit then documented the size of the ulcers, documented that Dr. Brandwein performed conservative wound care measures, discussed vascular consultation, and recommended antibiotics. (AR-2, 1023-1024). There is a list of medication, list of previous surgeries, previous medical history, pathology testing, and vascular testing (AR-2, 1022). Nothing in the LCD asks for more, and the position that Dr. Brandwein did not do enough at this initial visit finds no support in the record.

After covering each area, Dr. Brandwein wrote that he is going to use amniotic tissue membrane grafts pending pre-approval and that the patient was excited for this course of treatment. (AR-2, 1023-1024). Dr. Brandwein's note does not recount, nor does it need to, the entirety of three years of home health treatment or a year of podiatry treatment, but as he testified at the hearing, his knowledge of this treatment was summarized in his conversation and documented by reference. (AR-2, 1327:21-1328:4; 1329:9-1331:10).

Notably, the ALJ highlighted a single ulcer for comparison to show that it may have decreased in size – despite the increase in depth – from April 2022 through May 2023. (AR-2, 51). Rather, what the ALJ did was document definitive proof that the patient's condition had deteriorated and she failed conservative wound care measures. The ALJ noted that the OASIS records documented the wound in April 2022 as 15.5 x 27 x 0.3 cm (total size of 125.55). (AR-2, 51). The ALJ assumes from an undated record that in May 2023, the wound measured 12 x 19 x .4 cm, but ignores that the annotation from that record indicates the wound had increased to 228 sq. cm. (AR-2, 51; 1021). If the wound was actually decreasing, there would have been no reason to refer ST to Dr. Brandwein. Instead, when Dr. Brandwein first saw the patient on June 15, 2023, her wound size had doubled from April 2022, increasing to over 340 cm. (AR-2, 1023; 1027). This is a baseline

measurement clearly present in the records and shows three years of failed conservative treatment. There is no lack of appropriate documentation.

| **Requirement Language** | **Physician Documentation** | **Record Page (AR-2)** |
|---|---|---|
| Presence of neuropathic diabetic foot ulcer | *The patient has ulcers going all around her leg, around her ankle, and underneath her heel that have been over a month*<br>*diabetic patient with lymphedema/venous insufficiency; pyoderma gangrenosum hx.* | 1023<br><br>1024 |
| having failed to respond to documented conservative wound-care measures of greater than four weeks | *The patient referred to me by home health as she has chronic non-healing ulcer for well over a year.*<br>*Leg infection, surgical debridement*<br>*putting the adaptic and Vaseline type gels on, it made it worse"; seen by a podiatrist "for a long period of time."*<br>*nonresponsive conservative treatments over a year... She has been to wound care center's podiatrist and home healthcare, nothing helped it at all. It has only gotten worse.*<br>*Home-health records document the wound persisting 4/2022–5/2023 despite treatment; still ~228 cm² (12x19 cm) in May 2023 and >340 cm² at intake* | 1023<br><br>1017<br>1023<br><br>1027<br><br>1017-1021 |
| Wound measurements (baseline / after conservative care / pre-graft) | *4/2022: 15.5 x 27 x 0.3 cm at surgical debridement*<br>*10/2022: 15 x 26 x 0.3 cm*<br>*5/2023: 12 x 19 x 0.4 cm = 228 cm²*<br>*6/2023: over 340 cm total in diameter at initial visit;*<br>*"measures 340 cm total / Ulcer large and measures 340cm2* | 1017-1018<br>1020<br>1021<br>1023 |
| Comprehensive patient assessment | *Initial visit documents chief complaint, HPI, drug allergies, current medications, PMH (~20 surgeries, cancer, diabetes, kidney failure, thyroid, HTN, asthma), bilateral arterial Doppler/segmental pressures with ABI and venous duplex ("unremarkable"), debridement and measurement of the ulcer, neurovascular exam*<br>*The patient has ulcers going all around her leg, around her ankle and underneath her heel that have been over a month. It is chronic. She has had home health care. They are putting the adaptic and Vaseline type gels on, it made it worse.*<br>*The patient came to me after being referred that I can help her. She has been seen a podiatrist and she has gotten over with him for a long period to time. I debrided the ulcers and measured them. It is over 340 cm total in diameter. It goes* | 1022-1025<br><br>1023<br><br>1024 |

| | | |
|---|---|---|
| | *around the leg and underneath the right foot This is on the right lower extremity. I debrided the area with #10 blade down to bleeding tissue and muscle belly. I applied Silvadene and dry sterile dressing on this patient.*<br>*The patient has lymphedema as well and she does not want the Unna boot though we do compression dressings on her as well. I put a compression dressing on today after putting on dry sterile dressing with Silvadene. The patient's A1C is well controlled. Neurovascular status is intact. ABI is within normal limits. I think she will do very well with the amniotic tissue membrane grafts* | 1023-1024<br><br><br><br><br>1024 |
| Diabetes/systemic disease: [review of the current blood sugars/ HbA1c, diet and nutritional status, activity level, physical exam that includes assessment of skin and wound] | *"The patient's A1C is well controlled. Neurovascular status is intact. ABI is within normal limits" (initial visit);*<br>*"Diabetes controlled*<br>*I think she will do very well with the amniotic tissue grafts* | 1024<br><br><br>1024 |
| Implemented treatment plan as indicated | *6/15: I debrided the area with #10 blade down to bleeding tissue and muscle belly*<br>*Compression (VLU element): "she does not want the Unna boot though we do compression dressings on her as well. I put a compression dressing on today"*<br>*6/19: debrided them with a number 10 blade down to muscle; applied Telfa and dry sterile compression dressing I wrapped her for her lymphedema over the dressings" (op note, per brief AR 22). Infection control/exudate: Silvadene + dry sterile dressing; antibiotics discussed*<br>*no drainage no malodor," no signs of infection, positive granulation*<br>*Ongoing weekly debridement + grafting through 8/30/2023.* | 1023<br><br><br><br><br><br><br><br>1026-1027 |

| | | |
|---|---|---|
| Pre-service record: rationale for graft & product choice | *I am going to get amniotic tissue membrane grafts preapproved and order some and start putting them on her next week*<br>*I think she will do very well with the amniotic tissue membrane grafts.*<br>*Patient returns today for her first amniotic tissue membrane graft using Impax. I believe this will help her due to nonresponsive conservative treatments over a year.* | 1023-1024<br><br>1027 |
| Risks/complications discussed | *Risk and complications of the graft were discussed with the patient and she wants to try anything as she is desperate*<br>*Treatment plan discussed with patient the benefits and risks of the grafting* | 1023-1024<br><br>1027 |
| Under care of physician for systemic disease | *The patient referred to me by home health care*<br>*6/19: This patient is also under the care of her primary care doctor and vascular doctor." Dr. Brandwein testified he spoke with her PCP and the referring podiatrist and reviewed ~800 pages of prior records*<br>*Reviewed all of the records with her prior physicians*<br>*She is healthy and under care of her primary care doctor and vascular doctor* | 1022<br><br>1026<br><br>1327 -<br>1331<br>1042 |
| No contraindications (no active infection/uncontrolled DM) | *No erythema, no drainage no malodor*<br>*There are no signs of infection. Positive granulation tissue appreciated*<br>*A1C is well controlled. Neurovascular status is intact. ABI is within normal limits*<br>*bilateral arterial/venous studies unremarkable.*<br>*Two-week treatment break in July 2023 when an infection arose (ALJ AR 105) shows infection was monitored and treatment held.* | 1027<br>1026<br><br><br><br>105 |
| Every page of the record must be legible and include appropriate patient identification information | *Notes are typed/dictated on practice letterhead; every note carries patient name and date of service*<br><br>**Patient Name:** Sherri Taykan<br>**Clinician:** Daniel Brandwein, DPM, FACFAS<br><br>**Date of Service:** June 15, 2023 | 1022,<br>1026,<br>1027,<br>1030,<br>1031,<br>etc. |
| The documentation must include the legible signature of the physician | <br>Daniel Brandwein, DPM, FACFAS<br><br>DB/vib<br>Job #: 295294225 | 1024,<br>1026,<br>1027,<br>1030,<br>1031,<br>etc. |

| | | |
|---|---|---|
| At a minimum, the operative note(s) should include pre and post op diagnosis, name of surgeon, anesthesia, reason for the procedure, complete description of the procedure including product used (with identifying package label in the chart), and relevant findings. | Every op note is signed by the provider indication/diagnosis (chronic >1-yr ulcer, 340 cm²), findings (pitting edema with induration, full-thickness ulceration not through muscle, 1/4 PT/DP pulses, diminished neuro indices), procedure ("cleaned up the ulcer, debrided them with a number 10 blade down to muscle, and then I applied 300 cm of Impax amniotic tissue allograft... then applied Telfa and dry sterile compression dressing"), surgeon identified.<br>Product/package labels in chart: Impax lot/barcode label sheets ("IMPAX... Tissue Type: Human Amniotic Tissue Allograft") and package label Impax Dual Layer Membrane, Size 4 x 8 cm, REF MP-0408 (also 2x3 cm, REF MP-0203).<br>ALJ: for *each* DOS the chart contains "a detailed office visit note and a check sheet(s)... as well as the Impax lot labels<br><br>Every note documents that the patient is improving and notes the changes/decrease in size of the wound | *Id.*<br>1022<br><br>105<br><br>1022, 1026, 1027, 1030, 1031, etc. |
| Any amount of wasted skin substitute must be clearly documented in the procedure note | *I applied 300 cm of Impax amniotic tissue allograft to the area with no wasted graft*<br>*All graft was used*<br>*No wasted graft*<br>*280 cm wound applied 272 cm graft*<br>*No graft was wasted*<br>*No wasted graft all utilized* | 1027<br><br>1031<br>1035<br>1039<br>1043<br>1047, etc. |

## IV. <u>AJ's records satisfy the LCD, and the ALJ's contrary finding is unsupported.</u>

The ALJ erred in his conclusion that the record documentation in this matter is insufficient. To the extent that the determination was based on exclusion of some record evidence, Dr. Brandwein disputes the ALJ conclusion that there was a lack

of good cause for submission of medical records. (AR-3, 73). To the extent any new records were submitted, that had not previously been considered, there is good cause for their consideration, and a good cause statement was submitted. On December 16, 2024, Dr. Brandwein provided correspondence to OMHA outlining the differences in the conclusions by the QIC and the MAC. (AR-3, 118-119). This noted that the initial decision denied coverage for suspected overbilling or overtreatment, but the subsequent decision was based on lack of medical necessity. The QIC even conceded that the records were sufficient to support the skin graft as medically necessary. (AR-3, 328). To the extent medical necessity was a determination before the ALJ, then good cause existed to allow for *de novo* review of all medical records. Dr. Brandwein did not believe he needed to submit additional records, because the QIC had already acknowledged his records supported the treatment.

However, even without consideration of all the records, the treatment provided by Dr. Brandwein should be found medically reasonable and necessary. Neither the controlling documents nor the standard of care requires perfect documentation. Rather the LCD, Zenith product information, and the MPIM require <u>appropriate</u> documentation.

**A. The initial visit records meet all the requirements of the LCD.**

Dr. Brandwein's initial plan of care is dated July 14, 2022, and indicates that when conditions are appropriate amniotic tissue membrane grafts will be provided. (AR-3, 1164). The addendum to this note establishes that the non-healing ulcer has been present for over two months since an amputation. (AR-3, 1165). These notes outline the patient's condition and current treatment, provide nutrition counseling, state that conservative treatment had failed, and set out a plan of care for amniotic tissue membrane grafts. *Id.* The addendum documents the size of the ulcers, the additional conservative wound care measures to be performed, and infection testing.[1] (AR-3, 1165). Dr. Brandwein's notes do not need to recount the entirety of every conversation he had, nor the specific results of every test, as that is not required by the documents or the standard of care, but as he testified at the hearing, this knowledge was summarized in his conversation and documented by reference in the records that were appropriate for this product.

| **Requirement Language** | **Physician Documentation** | **Record Page (AR-3)** |
|---|---|---|
| Presence of neuropathic diabetic foot ulcer | *This diabetic patient on dialysis comes in today for non-healing ulcers right foot. The ulcers are along the fifth [ray] and where the hallux amputation is at the end of the first metatarsal head.*<br>*Patient returned today with nonhealing ulcers on the lateral aspect of the right foot, as first metatarsal head is exposed.*<br>*The physician visit notes confirm the Beneficiary was a type 2 diabetic on dialysis with diabetic foot ulcer* | 1167<br><br>1166 |

[1] The excluded records consist of several pages of infection testing, such that these records further support the reasonableness of care and comprehensive nature of the records.

| | | |
|---|---|---|
| | | 80 |
| having failed to respond to documented conservative wound-care measures of greater than four weeks | *This ulcer has been opened since the amputation which is over two months.*<br>*(9/8/22): The fish graft did not work... incision and drainage performed... still on IV antibiotics*<br>*(9/22/22): All conventional treatments had failed before using the gra[f]ts... multiple debridements, antibiotics, IV, p.o., and topical" and fish grafts not responding well*<br>*(3/20/23) all conservative treatments have failed* | 1165<br>1166<br>1167<br>1236 |
| Wound measurements (baseline / after conservative care / pre-graft) | *7/14/22: The ulcer is 8[]cm squared; 4x2 with 1mm depth.*<br>*9/22/22: lateral ulcer 8 x 4 cm and first-metatarsal ulcer 8 x 4; Both ulcers... measured 64 centimeters square with one millimeter of depth.*<br>*Measurements recorded at every weekly visit through 5/1/23*<br>*2/13/23: Patient is improving, the first ray is decreased down to 24 sq. cm.*<br>*3/31/23: it has decreased in size and depth* | 1165<br>1236<br>94-95<br>1216<br>1244 |
| Comprehensive patient assessment | *Initial plan of care: "lengthy discussion... regarding his kidneys, his medical condition, his diabetes and his comorbidities... His diabetes is in good control. He is well nourished. His neurovascular status is intact... completely neuropathic"*<br>*1/2/23 duplex arterial exam of lower extremities "unremarkable"* | 1164<br>1207 |
| Diabetes/systemic disease: [review of the current blood sugars/ HbA1c, diet and nutritional status, activity level, physical exam that includes assessment of skin and wound] | *7/14/22: Patient is in good metabolic condition. His vital signs are stable... He takes Renvela, atorvastatin, Prolitazone [pioglitazone] and vitamin D. He is type 2 diabetic x12 years, kidney failure, dialysis x7 years with history of high blood pressure. I also talk[ed] to him about a nutritionist, about drinking as much water as his kidney doctor allows... He is well nourished" and works full time as an accountant*<br>*10/13/22, 2/20/23, 3/31/23: A1C is under control. His diabetes is under control blood sugars are under control recurs* | 1164, 1168<br>1177, 1204, 1219-1220, 1244 |

| | | |
|---|---|---|
| Implemented treatment plan as indicated | *Debridement every visit: Aggressive debridement was performed with a #10 blade down to healthy bleeding tissue" (9/22/22 et. seq.).*<br>*Offloading: "dispensed an IPOS surgical sho[e] to the Beneficiary for off-loading pressure" (2/20/23)*<br>*Infection control: cultures ordered pre-graft (7/14/22); wound cultures both sides plus Cipro/clindamycin dosed for renal impairment (11/28/22; Bactroban/Betadine (9/8/22).*<br>*Exudate mgmt: dry sterile dressing with Adaptic and gauze each application (9/22/22 et seq.)* | 1164<br>1220<br>1164,<br>1165<br>1200<br>1166<br>1167 |
| Pre-service record: rationale for graft & product choice | *Initial plan: "they were going to do amniotic tissue membrane grafts... when the conditions are right," not over bone/capsule/tendon or infection (7/14/22); after fish-graft failure, "I am going to order stem cell graft which will help him try to close this and save his foot" (9/8/22);*<br>*2/6/23: patient "now revascularized so the plan was to try again with the grafts," which "worked last year"* | 1164<br>1166<br>1213 |
| Risks/complications discussed | *grafts must stay on a week; if infection/osteomyelitis/bone exposure, daily dressing changes with antibiotic solutions and topicals and medication whether it is p.o. or IV. The patient understands.* | 1164, 80 |
| Under care of physician for systemic disease | *9/22/22: He is under the care of his primary care doctor and vascular doctor*<br>*10/6/22: under the care of his primary care doctor, vascular doctor, and infectious disease specialist*<br>*record contains photos of medical records with contact information for the Beneficiary's various physicians*<br>*2/20/23: dialysis 3x/week* | 1165<br>1173<br>80<br>1219<br>2138:8-2139:1 |
| No contraindications (no active infection/uncontrolled DM) | *9/22/22 and virtually every application note: "Negative drainage. Negative signs of infection appreciated"; "No graft was applied to exposed tendon, bone, or capsule; blood sugars/diabetes "under control" (e.g., 3/31/23).* | 1167<br>1179<br>1244 |
| Every page of the record must be legible and include appropriate patient identification information | *Every OCR-checked note is typed on office letterhead, headed with patient name ("Patient Name: Andrew Jenkins") and date of visit, and closes with the signature block and handwritten signature of "Daniel Brandwein, DPM, FACFAS" plus transcription/job numbers;*<br>**Patient Name: Andrew Jenkins**<br>**DOV: February 6, 2023** | 1164-1168,<br>1216,<br>1219 |

| | | |
|---|---|---|
| The documentation must include the legible signature of the physician |  Daniel Brandwein, DPM, FACFAS<br>DB/vib/315741274 | |
| At a minimum, the operative note(s) should include pre and post op diagnosis, name of surgeon, anesthesia, reason for the procedure, complete description of the procedure including product used (with identifying package label in the chart), and relevant findings. | *Application notes state diagnosis (non-healing DFU), procedure ("aggressive debridement... #10 blade... applied Zenith amniotic graft on both sides, total 64 units"), anesthesia 12/5/22: ("no anesthesia was used due to neuropathy," 3/27/23" without local due to neuropathy, findings, and product/units; each DOS packet includes Zenith package barcode label sheets (product code, Q4253, expiration) – OCR-confirmed at AR 1217;*<br>*2/20/23: His serial numbers are included in the notes with stickers. Copies sen[t] to the bone bank (2/20/23)* | 1164, 1167, 1169, 1217, 1219, 1203, 1206 1240-1243 |
| Any amount of wasted skin substitute must be clearly documented in the procedure note | *"No graft was wasted" recorded on every application, with graft sizes selected to match wound size (e.g., 9/22/22: 64 units, no waste; 9/29/22: 48 sq cm, "No graft was wasted"; 2/20/23: "Two grafts were used, each one was 32 cm... No graft was wasted"; 5/1/23: "No graft was wasted with repeat application").* | 1167, 1168, 1170, 1219, 1260, 2121-2122 |

Rather than crediting this documentation, the ALJ seized on dictation typos, presumed inconsistencies, and similarities between notes, or discounted the notes as too general, to conclude that the documentation was insufficient. (AR-3, 38). This conclusion is unsupported by the records as Dr. Brandwein showed that he was treating with amniotic tissue graft, why he was treating the patient, what the plan for the patient was, when the plan was paused, and included the product

labeling which confirmed the size of the product used in relation to the size of the ulcer. In denying this claim, the ALJ effectively demanded a dissertation in every office note rather than a summary of the treatment. Neither the LCD nor A57680 requires that; both require only appropriate documentation. Dr. Merrill testified that Dr. Brandwein's records were adequate, met the standard of care, and that he, as an independent practitioner, was able to follow this patient's care and treatment plan. (AR-3, 2139:2-2140:3). The ALJ did not have any evidence to contradict this testimony, or similar testimony offered by Dr. Brandwein himself.

## CONCLUSION

For the foregoing reasons and those set forth in the Motion, Plaintiff respectfully requests that the Court enter an order staying recoupment and Treasury offset of the disputed Medicare amounts at issue in this action pending the Court's judicial review and final judgment, and granting such further relief as the Court deems just and proper.

Respectfully submitted,

**BLACK LAW P.A.**
*Attorneys for Plaintiff*
1401 East Broward Boulevard
Victoria Park Centre – Suite 304
Fort Lauderdale, Florida 33301
Telephone: (954) 320-6220

By: ______________________
**KELSEY K. BLACK, ESQ.**
Florida Bar No.: 0078925

kb@blacklawpa.com
para@blacklawpa.com
**PATRICK WIER, ESQ.**
Florida Bar No.: 1029540
pw@blacklawpa.com
para@blacklawpa.com