**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

DR. DANIEL BRANDWEIN, DPM,
Plaintiff,

v. Case No.: 26-cv-60084-DSL

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,
Defendant.
____________________________________/

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S SUPPLEMENTAL BRIEF FOLLOWING HEARING**

Pursuant to the Order entered July 22, 2026 (ECF No. 39), Defendant Robert F. Kennedy, Jr., in his official capacity as the Secretary of the United States Department of Health and Human Services ("Secretary"), by and through the undersigned Assistant United States Attorney, responds to Plaintiff's Supplemental Brief Following Hearing in support of Plaintiff's Expedited Motion for Relief (ECF No. 47) ("Plaintiff's Supplemental Brief").

Plaintiff's Expedited Motion for Relief ("Expedited Motion") seeks a preliminary injunction to stay the recoupment and Treasury offset of the disputed Medicare amounts. *See* ECF No. 26. The issue currently pending before the Court is, in essence, whether Plaintiff can show a substantial likelihood that he will prevail on the merits of his civil action. The substantial likelihood of prevailing on the merits is the single "most important" factor in determining whether a preliminary injunction is warranted. *Baker v. City of Atlanta*, 164 F.4th 850, 864 (11th Cir. 2026) (citation omitted); *Fla. Preborn Rescue, Inc. v. City of Clearwater, Fla.*, 161 F.4th 732, 738 (11th Cir. 2026). Still, it remains Plaintiff's burden to prove all four elements of the "extraordinary and drastic remedy" of the requested injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20

(2008); *Sofarelli v. Pinellas Cnty.*, 931 F.2d 718, 724 (11th Cir. 1991). For the reasons outlined below, Plaintiff fails to meet his burden on all four elements.

## ARGUMENT

### I. Under the applicable legal standards, Plaintiff cannot establish "substantial likelihood" that he will prevail on the merits of his case.

This is a suit for judicial review of an agency action denying Medicare payment. As such, the court's consideration is restricted to "the pleadings [submitted by the parties] and [the] transcript of the [agency's] record." 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1395ff(b)(1), for Medicare purposes).[1] The court looks to ascertain that the agency record contains substantial evidence in support of the agency's findings and that the agency applied the correct legal standards. *Gulfcoast Med. Supply, Inc. v. Sec'y, Dep't of Health & Hum. Servs.*, 468 F.3d 1347, 1350 n.3 (11th Cir. 2006) (citation omitted); *MedEnvios Healthcare, Inc. v. Becerra*, 725 F.Supp.3d 1343, 1346 (S.D. Fla. 2023) (citations omitted). That is the proper extent of the inquiry. The court "may not decide the facts" anew or "reweigh the evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Nor may the court "substitute [its] judgment for that of the [agency]." *Id.* In the face of substantial evidence, a court must affirm "[e]ven if [it] find[s] that the evidence preponderates against the Secretary's decision." *Baker o/b/o Baker v. Sullivan,* 880 F.2d 319, 321 (11th Cir. 1989).[2]

Plaintiff's Supplemental Brief makes no mention of the standard of review that applies to this case. Indeed, Plaintiff eschews any discussion of the law entirely. Plaintiff instead writes at

---

[1] References herein to the agency's certified Administrative Record will be designated "AR," followed by the applicable volume and page(s).

[2] The standard of review under 42 U.S.C. § 405(g) has been characterized by courts as "highly deferential," *Peets v. Kijakazi*, No. 21-3150, 2022 WL 17725391, at *1 (2nd Cir. Dec. 16, 2022), even "exceedingly" so," *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012).

length about Plaintiff's belief in the propriety and sufficiency of Plaintiff's treatment records. But the nature of judicial review in a civil action of this nature is not about what independent findings or conclusions someone other than the ALJs might have made. Rather, it is whether there is substantial evidence to support the decision of the three ALJs who were tasked with the findings of fact and their application to the law. A plaintiff's likelihood of prevailing on the merits of its case cannot be considered without properly recognizing the nature of the case: the case is about a limited and deferential review of the agency's decision.

In its Supplemental Brief, Plaintiff hastens to assert that Plaintiff "committed no fraud." ECF No. 47, at p. 2. But "fraud" is not a criterion that informs this civil action. Allegations of fraud, findings of fraud, and remedies for fraud are not at issue in this case. The matter at hand is strictly limited to a judicial review of three ALJ decisions--which all concern an administrative post-payment review of Medicare claims to ascertain whether or not payment was made consistent with Medicare regulations.

Plaintiff opens his Supplemental Brief with a legally incorrect statement, and hence, sets out on the wrong footing: Plaintiff states that Local Coverage Determination ("LCD") L36377, a guidance document issued by First Coast Service Options in its capacity as a Medicare administrative contractor, "controls" this case. *See* Doc. 47, at p.1.[3] But an LCD does not "control" this case, nor any appeal of a Medicare coverage denial. The Court of Appeals for the

---

[3] Plaintiff says the Secretary "admi[its]" this. This is an overstatement of what was discussed at the hearing and what is in the Secretary's briefing. *See* ECF No. 27, at p. 8 n.6 (Secretary's previous statement that LCDs are not controlling). As stated by the Secretary, the ALJs give them "substantial deference", citing to 42 C.F.R. §§ 405.1062(a) - (b). *Id.* At the hearing, the Government agreed that the 2019 LCD applies in the three cases, as analyzed by the three ALJs in the three decisions, and not the future 2023 LCD as argued by Plaintiff. *See* Hearing Transcript at 29:18- 32:16.

Eleventh Circuit has addressed the topic, noting that while an LCD "contains guidelines," *U.S. v. Bergman*, 852 F.3d 1046, 1054 (11th Cir. 2017), an LCD is "not binding," *U.S. v. AseraCare*, 938 F.3d 1278, 1288 (11th Cir. 2019); *accord Agendia, Inc. v. Becerra*, 4 F.4th 896, 900 (9th Cir. 2021) (noting that the adjudicators of Medicare appeals are "not bound" by an LCD); *Porzecanski v. Azar*, 943 F.3d 470, 479-80 (D.C. Cir. 2019) (observing that an LCD binds no one except the Medicare contractor that issued the LCD) (citations omitted); *see In Home Health LLC, v. Kennedy*, 184 F.4th 499, 507 (6th Cir. 2026) (recognizing an LCD does not establish a substantive legal standard) (citations omitted). An LCD is not a source of law.

First Coast Service Options' LCD L36377 acknowledged that there are a large number of skin substitute products available in the United States.[4] The LCD did not discuss any individual skin substitute product. The LCD advised that "no individual product can be *considered* for payment unless the applicable skin replacement surgery code meets the requirements of this LCD." AR Vol. 1, pp. 82, 88 (emphasis added). As such, the LCD identified itself as effectively a starting point for inquiry. The LCD "d[id] not endorse particular products for payment." AR Vol. 1, p. 83. Rather, the LCD advised that a claimant's documentation "must support . . . the product used." AR Vol. 1, pp. 83, 87, 88, 91.

The Medicare statute's "reasonable and necessary" standard, *see* 42 U.S.C. § 1395y(a)(1), is the fundamental legal standard for whether Medicare will cover and pay for an item or service.[5]

---

[4] As of early 2020 the Agency for Healthcare Research and Quality, a federal agency within HHS, identified at least 75 skin substitute products available on the market. *See* https://www.ncbi.nlm.nih.gov/books/NBK554220/ (abstract of "Skin Substitutes for Chronic Wounds," Technology Assessment Program, Technical Brief) National Library of Medicine, National Institutes of Health. The number of products has continued to grow significantly since then.

[5] This inquiry is specific and unique to Medicare. For instance, the FDA's approval process and Medicare coverage decisions are separate matters, and FDA clearance does not equate to Medicare

There are myriad health care products and services available in the United States, and the number is always growing. A Medicare ALJ "ultimately must apply the statutory reasonable and necessary standard to determine whether to approve a [particular Medicare] claim." *Agendia*, 4 F.4th at 900. "The Medicare statute clearly vests the Secretary with the authority to interpret when a [product or service] is "reasonable and necessary," and therefore eligible for coverage . . ." *Almy v. Sebelius*, 679 F.3d 297, 308 (4th Cir. 2012). The Supreme Court, for its part, has long recognized that the Secretary's decisions about which products and services are due to be paid for, "and the means by which [he] implements [his] decision[s], whether by promulgating a generally applicable rule or by allowing individual adjudication, are clearly discretionary decisions." *See Heckler v. Ringer*, 466 U.S. 602, 617 (1984).

When a specific product is neither endorsed by nor categorically disqualified by an LCD, the guidelines in the Medicare Program Integrity Manual elucidate the way in which a Medicare adjudicator goes about evaluating a particular product under the Medicare statute's "reasonable and necessary" standard. As one court summarized, in another recent Medicare case in Florida about a particular skin substitute product:

> To determine whether a service is "reasonable and necessary," adjudicators must assess whether the "service is safe and effective, not experimental or investigational, and appropriate[,] based on the strongest evidence possible." . . . .

*Family Foot & Leg Ctr., P.A. v. Kennedy*, Case No.: 2:24-cv-547, 2025 WL 2538474, at *1 (M.D. Fla. Sept. 4, 2025); *accord Foot v. Kennedy*, Case No. 24-cv-00869, 2026 WL 875235, at *5 (D.D.C. Mar. 31, 2026) ("Application of the 'reasonable and necessary criteria' as required by the

---

coverage. *Int'l Rehab. Scis. Inc. v. Sebelius*, 688 F.3d 994, 1002 (9th Cir. 2012). Moreover, the simple fact that a billing code exists "has no bearing on the question of whether a [particular product use] is found to be reasonable and necessary," for Medicare payment purposes. *Almy v. Sebelius*, 749 F.Supp.2d 315, 332 (D. Md. 2010), *aff'd* 679 F.3d 297 (4th Cir. 2012).

Medicare statute for claim reimbursement necessitates considering whether an 'an item or service' is 'experimental or investigational' and 'safe and effective,' among other things.") (citing Medicare Program Integrity Manual ("MPIM"), CMS Publication 100-08, Chapter 3, § 3.6.2.2),[6] *appeal docketed* Case 26-5149 (D.C. Cir. May 5, 2026). In this regard, an agency adjudicator considers the same sorts of factors that a Medicare administrative contractor would look at in developing LCD guidance for a particular product, including a review of the research on a product that has been published in medical journals. *See RGP Prosthetic Research Ctr.*, Docket Number M-12-1769, 2013 WL 8700085, at *3 (Medicare Appeals Council, July 10, 2013). The concepts of "experimental or investigational" and "safe and effective" are evaluated by reference to the available evidence of general acceptance by the medical community, such as original research published in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines. MPIM, Chapter 13, § 13.5.3. Similarly, another manual, the Medicare Claims Processing Manual, CMS Publication 100-04, at Chapter 30, § 30.2.3, explains that a claimant is expected to know how the "published medical literature" and the "consensus of expert medical opinion" (as those criteria are characterized in the manual) have assessed the product before the claimant bills Medicare for the product.

Hence, an agency adjudicator commonly reviews the medical studies that a Medicare claimant submits to the adjudicator in the interest of supporting his claim. When a court performs

---

[6] Along with the other components of the Medicare manual system, the MPIM is available online, at https://www.cms.gov/regulations-and-guidance/guidance/manuals/internet-only-manuals-ioms-items/cms019033. A major purpose of the Medicare manuals is to "assist interested parties in navigating the shoals of the Medicare . . . reimbursement system." *Shalala v. St. Paul-Ramsey Med. Ctr.,* 50 F.3d 522, 524 (8th Cir. 1995).

eventual judicial review of the agency adjudicator's decision, "[i]t is not [the court's] office to tender an independent judgment on the value and validity of the various scientific studies submitted," but rather, "only [to ask] whether the [agency adjudicator's] assessment was a reasonable one [.]"). *Almy,* 679 F.3d at 305-06; *see, e.g., Family Foot & Leg Ctr.*, 2025 WL 2538474, at *4 (district court discusses with approval the agency adjudicator's review -- and ultimate discounting -- of the published studies submitted by the appellants for Procenta, the specific allograft product for which they sought Medicare payment).

If a product passes muster as not being investigational or experimental, the "reasonable and necessary" standard then also calls for a consideration of whether or not the product "meets, but does not exceed" the needs of the particular beneficiary who has been treated with the product. MPIM, Chapter 3, § 3.6.2.2. A claimant must "furnish[] such information as may be necessary" to support Medicare payment. *See* 42 U.S.C. § 1395l(e). It is a "well established" principle of Medicare law that the burden of establishing entitlement to Medicare payment always lies with the claimant who seeks the payment. *Almy*, 679 F.3d at 310.

II. Plaintiff can show no substantial likelihood that the ALJ decisions will be reversed.

In light of the applicable standard of review, and in light of the applicable law and guidance materials noted above, Plaintiff has not shown a "substantial likelihood" that the three ALJ decisions will be reversed on judicial review.

Each of the three ALJ decisions stands on its own, and each one must be reviewed on its own terms. The task of a reviewing court is to consider the individual decision that is on direct review, and not to compare and contrast that decision with other decisions. *See Int'l Rehab. Scis., Inc. v. Sebelius*, 688 F.3d 994, 1001-02 (9th Cir. 2012). Differing positions or approaches amongst the agency's decision-makers "simply reflect the agency's adjudicative process at work." *Cmty.*

*Care, LLC v. Leavitt*, 537 F.3d 546, 552 (5th Cir. 2008); *see In the Case of Lincare, Inc.*, Docket Number M-12-2156, 2012 WL 10067659, at *3 (Medicare Appeals Council Nov. 6, 2012) (explaining that one Medicare ALJ is not bound by another ALJ's ruling); *In the Case of Diabetes Clinical Servs., PSC*, Docket Number M-10-912, 2010 WL 7232794, at *1 (Medicare Appeals Council Nov. 22, 2010) ("As an independent adjudicator, an ALJ . . . [i[]s not bound by another ALJ's determination on . . . any . . . issue."). In matters governed by 42 U.S.C. § 405(g), there is no inconsistency in finding that two ALJs' decisions are both supported by substantial evidence "even when those decisions reach opposing conclusions." *See Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015).

Defendant addresses in turn each of the three ALJ decisions issued to Plaintiff:

A. <u>Decision of ALJ Grace, February 13, 2025; Medicare beneficiary J.F.</u>

The decision issued by ALJ Andrew Grace on February 13, 2025, for four Medicare claims pertaining to beneficiary J.F., is found at AR Volume 1, pp. 75 - 93. The skin substitute product in question was Impax grafts. AR Vol. 1, pp. 80, 86. Impax is an amniotic tissue membrane product. AR Vol. 1, p. 86. The ALJ noted that Medicare administrative contractor's LCD recognized there were a number of skin substitute products on the market. AR Vol. 1, pp. 82, 88. ALJ Grace also noted that the LCD (and, similarly, a local coverage article) did "not endorse particular products," and therefore, the clinician's documentation "must support . . . the product used." AR Vol. 1, pp. 83, 87, 88, 91. The ALJ observed that both the contractor's LCD and the contractor's coverage article "were clear that the choice of skin substitute product had to be explained and supported." AR Vol. 1, p. 89.

Plaintiff submitted medical studies to ALJ Grace in an effort to justify and support Plaintiff's use of the product Impax. AR Vol 1, p. 89. Plaintiff presented 6 journal articles as "new evidence" before the ALJ. AR Vol. 1, pp. 89, 750-51. But of these 6 studies, 5 studies did not

address Impax at all. AR Vol. 1, p. 90. The sixth study, by authors S. Carpenter *et al.*, considered 257 wounds, of which only 10 were treated specifically with Impax. AR Vol. 1, pp. 90, 920. And just 4 of those 10 wounds healed. AR Vol. 1, pp. 90, 924. Moreover, the study's authors themselves acknowledged that overall, their study had "several limitations." AR Vol. 1, pp. 925-926. This was negligible evidence in support of the safety and the effectiveness of this particular product. The ALJ concluded, quite reasonably, that "The study of a mere 10 wounds [treated with Impax] provides far too little data to support a conclusion that Impax is safe, effective, reasonable and necessary." AR Vol. 1, p. 91.

B. Decision of ALJ Robert Preston, March 10, 2025; Medicare beneficiary S.T.

The decision issued by ALJ Robert Preston on March 10, 2025, for 75 Medicare claims pertaining to beneficiary S.T., is found at AR Volume 2, pp. 35 - 62. The skin substitute product in question was Impax grafts. AR Vol. 2, pp. 41, 48. ALJ Preston noted that the Medicare administrative contractor's LCD recognized there are a number of skin substitute products on the market. AR Vol. 2, pp. 52, 55. The ALJ correctly assessed that LCD L36377 "merely discussed the general requirements for coverage of skin substitute products." AR Vol. 2, p. 52. The LCD did not address individual skin substitute products. AR Vol. 2, p. 52. Nor did the contractor's coverage article. AR Vol. 2, p. 53. A "product-specific analysis" was necessary. AR Vol. 2, p. 56. Accordingly, the ALJ properly looked to the MPIM guidance for his evaluation of the product with which Plaintiff claimant treated this beneficiary.

Plaintiff submitted medical studies to ALJ Preston in an effort to justify and support Plaintiff's use of the product Impax. AR Vol. 2, pp. 53 -54. Plaintiff presented 5 journal articles to the ALJ as "new evidence." AR Vol. 2, pp. 53 - 54. ALJ Preston observed that of these 5 studies, 4 did not address Impax at all, AR Vol. 2, p. 54, and hence, did not support the safety and

efficacy of Impax, AR Vol. 2, p. 54. The fifth study, by authors S. Carpenter *et al*., considered 257 wounds, of which only 10 were treated specifically with Impax. AR Vol. 2, pp. 54, 1265. And just 4 of those 10 wounds healed. AR Vol. 2, pp. 54, 1268. The authors themselves "did not reach any conclusions" about the use of Impax. AR Vol. 2, p. 54. ALJ Preston summarized, "This is the only substantive study data in the entire hearing record that addresses the Impax product." AR Vol. 2, p. 54. This was negligible evidence in support of the safety and the effectiveness of this product. *See* AR Vol. 2, p. 56.[7]

C. Decision of ALJ Kyle Alexander, March 17, 2025; Medicare beneficiary A.J.

The decision issued by ALJ Kyle Alexander on March 17, 2025, for 24 Medicare claims pertaining to beneficiary A.J., is found at AR Volume 3, pp. 11 - 41. The skin substitute product in question was Zenith grafts. AR Vol. 3, pp. 16, 18. Recognizing that the LCD did not endorse particular products, and thus, that he needed to inquire into whether or not the particular product was experimental or investigational, *see* AR Vol. 3, p. 21, the ALJ inquired under the MPIM criteria. Reviewing a number of published materials submitted by Plaintiff, AR Vol. 3, pp. 32 - 34, the ALJ decided that Zenith grafts were not experimental or investigational, AR Vol. 3, p. 37, and hence, that payment was not necessarily precluded.

Reviewing the medical records for the particular Medicare beneficiary in question, however, ALJ Alexander found that the clinical documentation prepared at the time of Plaintiff's treatment of this beneficiary was insufficient to establish that the repeated Zenith grafts were medically reasonable and necessary for the beneficiary. AR Vol. 3, p. 37. The ALJ reached his

---

[7] In addition, ALJ Preston also properly determined that "the provision of services at issue on the dates of services [were] not medically reasonable and necessary." AR Vol. 2 at 51-52. After careful review of the medical records, he found there was insufficient documentation of conservative wound care prior to the applications of the skin substitute. AR Vol. 2 at 49-52.

determination only after first undertaking an extremely comprehensive review (and lengthy chronological summary) of Plaintiff's treatment records for the beneficiary. AR Vol. 3, pp. 25 – 32. In his analysis on this score, AR Vol. 3, pp. 37 – 40, the ALJ took account of the documentation supplied, which included, *inter alia*, office visit notes and numerous Zenith graft bar codes. AR Vol. 3, p. 38.[8]

The ALJ discussed at considerable length his finding that the documentation tended to include many general statements that were accompanied by no more than minimal "objective information or measurements." AR Vol. 3, p. 39. Nor were there any photographs to support the stated wound sizes or wound conditions, or to document the quantity of graft material used. AR Vol. 3, p. 39. The ALJ expressed concern about the paucity of clinical information "about the technique used to apply [the Zenith products], whether any graft was folded, and whether the graft needed trimming[,] especially in light of any changes in wound sizes . . ." AR Vol. 3, p. 39. The ALJ acknowledged that Plaintiff decided in September 2022 that the previous use of a fish skin graft "did not work." AR Vol. 3, pp. 25, 40, 470. But the ALJ was concerned that Plaintiff's assessment that this beneficiary had not responded to prior conservative wound care was not sufficiently documented with specifics about the conditions of the wounds at the time, about the beneficiary's clinical status at the time, or about the beneficiary's response to those treatments. AR Vol. 3, pp. 39 - 40. In short, ALJ Alexander's conclusion that use of the Zenith graft product had not been duly established as reasonable and necessary for beneficiary A.J. was supported by substantial evidence – and a careful analysis.

[8] There are numerous Zenith product bar codes in AR Volume 3 at pp. 199, 304 – 314, 746 – 756, 798 – 811, 986 – 993. There are typed office visit notes at pp. 875 - 880, 886, 890, 900 – 906. (Visit notes for different dates are nearly identical to each other. *See* pp. 1184, 1192.) The product distributor's package insert for the Zenith product is at pp. 192 - 194.

Each of three separate ALJ decisions proceeded in accordance with the applicable criteria. Each of the decisions took due consideration of the relevant evidence before the ALJ. Plaintiff cannot show a "substantial likelihood" that the ALJ decisions will be reversed.

III. Plaintiff also fails to establish the three other factors required for injunctive relief.

In Plaintiff's Supplemental Brief, Plaintiff fails to address the three remaining factors he must establish to obtain injunctive relief. These are: (1) that the movant will suffer irreparable injury unless an injunction issues; (2) that the balance of equities tips in the movant's favor; and (3) and that an injunction would be in the public interest. The Secretary addresses each of these factors, and Plaintiff fails to establish all three.

First, Plaintiff fails to establish irreparable injury. As noted by the Court at the hearing, after filing the Complaint on January 14, 2026 [ECF No. 1], Plaintiff waited almost six (6) months to file the Motion for Injunction on June 11, 2026 [ECF No. 26] with no explanation.[9] This type of delay significantly undermines a finding of irreparable harm, as "[a] preliminary injunction requires showing 'imminent' irreparable harm" and "the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (affirming district court's denial of preliminary injunction and finding that plaintiff's five-month delay showed a lack of imminent irreparable harm). Thus, the Eleventh Circuit states "our sister circuits and district courts within this Circuit and elsewhere have found that a party's failure to act

---

[9] In response to the Court's question regarding the delay, Plaintiff's counsel stated that he was "working with Government's counsel, and I thought we were going to come to an agreement." *See* Hearing Transcript at 21:13-24. However, the Government was not properly served for months in this case and the request for a pause in the recoupment was not made until May 22, 2026, in connection with Defendant's request for an extension of time to answer the Complaint. *See* Hearing Transcript at 25:20- 26:1; ECF No. 18. Therefore, over five months passed since the filing of the Complaint when Plaintiff first broached the requested relief in the Motion for Injunction.

with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Id*. (collecting cases). Additionally, as noted by the Court, as this case will be decided on a closed administrative record, "the scheduling report for the rest of the case would be very short." *See* Hearing Transcript at 82:23-83:12. Thus, there is no need for the "extraordinary and drastic remedy of a preliminary injunction" when this case will soon be decided on the merits. *Wreal*, 840 F.3d at 1248-1249.

Additionally, Plaintiff failed to provide evidence of irreparable harm at the evidentiary hearing. Plaintiff only provided self-serving statements and did not provide financial records or documentations to confirm his statements. Furthermore, most of his testimony on this issue was speculative. As outlined in the cases provided in Defendant's Response in Opposition to Plaintiff's Expedited Motion for Injunction [ECF No. 27], as a general matter, monetary loss, such as loss of income, does not constitute irreparable harm. *See* ECF No. 27 at pg. 10-11. The argument that the failure of a business can be "irreparable harm" fails, especially in this Medicare context, as the argument seemingly presupposes that Medicare exists for giving any healthcare business that seeks Medicare dollars whatever outcome the business might hope for. On the contrary, many courts have stated that Congress did not create this Medicare program for the purpose of benefitting healthcare businesses. Instead, any benefit that a business may receive from Medicare is purely "incidental" to the purpose of Medicare. *See Dialysis Centers, Ltd. v. Schwieker*, 657 F.2d 135, 138 (7th Cir. 1981); *Case v. Weinberger*, 523 F.2d 602, 607 (2d Cir. 1975). Congress did not create Medicare to ensure that health care businesses would achieve the financial success they might hope for. *Fla. Med. Ctr., Inc. v. Shalala*, Case No. 94-7026, 1996 WL 636141, at *7 (S.D. Fla. Feb. 27, 1996); *Livingston Care Center Inc. v. United States*, 934 F.2d 719, 721 (6th Cir. 1991) (seeking Medicare revenues is no guarantee of solvency and stating "participation in Medicare involves a

degree of risk which increases directly with the percentage of patient services paid for with government funds" and noting that "participation in the Medicare program is a voluntary undertaking").

It is important to note that a business's participation in Medicare is voluntary, and a business is not required to treat Medicare patients. Indeed, Plaintiff testified that he does see patients through private insurers. *See* Hearing Transcript at 61:14-16. Providers like Plaintiff are aware from the beginning that, when enrolling in the Medicare Program, providers receive upfront payments on the honor system and that providers remain subject to post-payment reviews of claims submitted, and these providers also remain subject to recoupment of any overpayments determined on those claims reviewed. Plaintiff agreed that, in his Medicare Enrollment Application, he attested to the fact that "any existing or future overpayment made to me… or to the organization listed in Section 4(a) of this application… by the Medicare program may be recouped by Medicare through the withholding of future payments." *See* Hearing Transcript at 60:23- 61:8; Exhibit 1 to the Hearing [ECF No. 41-1]. Thus, recoupment is a fundamental and inescapable element of the Medicare payment system, and Plaintiff voluntarily entered the Medicare program knowing this.

In *VNA of Greater Tift Cnty. v. Heckler*, 711 F.2d 1020 (11th Cir. 1983), the Eleventh Circuit recognized that overpayments, and the recoupment of overpayments, are a constant and abiding fact of life in the Medicare payment system. Every business that seeks Medicare dollars is aware of that, or certainly should be. A health care business "take[s] a knowing risk," when it chooses to rely on Medicare payments, that payment may be delayed or denied. *Id*. Furthermore, the courts would be "inundated" with requests for relief from recoupment, if they stepped into the process and decided to create exceptions and exemptions for anyone who said they were going to go out of business because they were subject to this key and fundamental element of a federal payment

system that they chose to participate in. *Id*. And regardless, other than his self-serving statements, Plaintiff failed to present any evidence that his practice is going out of business.

For these many reasons, including the almost six-month delay in seeking this preliminary injunction, Plaintiff fails to meet his burden to establish irreparable harm.

Second, Plaintiff fails to meet his burden to establish that the balance of the equities is in his favor. As outlined above, Plaintiff delayed almost six months in seeking this extraordinary remedy and also knowingly and voluntarily entered the Medicare payment system, attesting to the fact that he is subject to recoupment of overpayments as determined by the Medicare system. Furthermore, the payments at issue consist of taxpayer money, and the Government's interest in conserving Medicare resources is much stronger than the financial interests of a corporation, as outlined in the cases cited by Defendant's Response to the Motion for Injunction [ECF No. 27 at pg. 11-12]. Congress laid out the administration of the Medicare program- Plaintiff cannot claim a right to treatment that is different from any other practice that is subject to the recoupment of a Medicare overpayment. If Plaintiff does prevail on the merits in this case, Congress supplied the remedy it wishes to supply in this context- repayment of the amount recouped with interest- not the extraordinary relief requested here by Plaintiff.

Third, Plaintiff has not met his burden to establish that an injunction would be in the public's interest. The public interest lies in the effective administration of the Medicare Program nationwide. Congress calls for recoupments by statute, and this does not occur until after the first two levels of an administrative appeal of a Medicare denial, so the provider has two opportunities to challenge the denial before the recoupment begins. The Secretary needs to uniformly and consistently carry out the responsibilities and authorities of the Medicare program as Congress

mandates. Plaintiff has not established that the injunction requested here would be in the public's interest.

## IV. Conclusion

For the reasons set forth above and for those previously set forth in Defendant's Response in Opposition to Plaintiff's Expedited Motion for Injunction or Alternatively Motion to Stay Recoupment and Treasury Offset Pending Judicial Review (ECF No. 27), the Secretary respectfully submits that Plaintiff's requested extraordinary and drastic remedy in his Motion should be denied.

Dated: September 18, 2026

Respectfully submitted,

**JASON A. REDING QUIÑONES**
**UNITED STATES ATTORNEY**

By: ***Mary Beth Ricke***
MARY BETH RICKE
Fla Bar No. 107213
Assistant United States Attorney
Email: mary.ricke@usdoj.gov
500 E. Broward Blvd., Suite:700
Fort Lauderdale, Florida 33394
Tel.: (954) 660-5137
*Counsel for Defendant*