**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

DR. DANIEL BRANDWEIN, DPM, PA,

Plaintiff,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,

Defendant.
_______________________________________/

Case No.: 0:26-cv-60084-DSL

Judge Leibowitz

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, Dr. Daniel Brandwein, DPM, PA, pursuant to Federal Rule of Civil Procedure 56, Local Rule 56.1, 42 U.S.C. § 405(g) (as incorporated by 42 U.S.C. § 1395ff(b)(1)(A)), and this Court's Order Setting Briefing Schedule for Summary Judgment [ECF No. 46], moves for summary judgment reversing the three decisions of the Secretary of Health and Human Services (the "Secretary") under review in this action, and states as follows.[1]

## INTRODUCTION

This case asks a single question: whether Dr. Brandwein's treatment of three Medicare beneficiaries met the governing standard for the use and application of skin substitute grafts. At the July 21, 2026, hearing, the Court framed that question as what Local Coverage Determination L36377 (Revision Effective January 8, 2019) (the "2019 LCD" or "LCD") requires and whether the record satisfies it. Hr'g Tr. ("Tr.") 32:17-24. Attached as Exhibit 2. Because the administrative record shows that Dr.

[1] The material facts are set out in Plaintiff's Statement of Undisputed Material Facts ("SUMF"), filed contemporaneously under Local Rule 56.1 as Exhibit 1. "AR-1," "AR-2," and "AR-3" refer to the Administrative Record for beneficiaries J.F., S.T., and A.J., respectively, ECF No. 29-1.

Brandwein met the LCD for each of beneficiary, summary judgment should be granted in Plaintiff's favor.

The Secretary conceded on the record that the 2019 LCD governs all three cases. Tr. 30:23-31:1. Each of the three Administrative Law Judges ("ALJs") recited the LCD, and each then denied the claims on grounds the LCD does not contain: the absence of product-specific, peer-reviewed literature for the Impax membrane (J.F. and S.T.), the granularity of records kept by other clinicians (S.T.), and the absence of wound photographs and narrative about graft "folding" and "trimming" (A.J.). As the Court observed, the phrase "peer-reviewed" appears nowhere in the 2019 LCD. Tr. 20:8-11. It appears only in a later revision that was scheduled to take effect months after the last date of service, yet never took effect. SUMF ¶ 12 (AR-1, 87 & n.2; AR-3, 1815). The record is not in dispute, and the Secretary does not allege fraud. SUMF ¶ 85 (Tr. 78:5-13). Plaintiff's provision of treatment was medically necessary, reasonable, and the records appropriately documented the plan of care for CMS coverage. Each Adminstrative Record confirms the medical records are sufficient:

**J.F.** The Qualified Independent Contractor ("QIC") for J.F. found that the records "document[] the baseline assessment, comprehensive evaluations as well as trialed conservative treatment" and "contain[] amount of product used, wasted, and how the skin substitute was secured." SUMF ¶ 53 (AR-1, 163-64).

**S.T.** The ALJ for S.T. found Dr. Brandwein's records "sufficient to overcome the other documentation issues raised by the MAC and the QIC" and that his initial visit "makes clear that whatever conservative treatment may have been done before is insufficient." SUMF ¶ 61 (AR-2, 48, 51).

**A.J.** The QIC for A.J. found that "[t]he documentation does support the application of the skin substitute graft as medically necessary," SUMF ¶ 68 (AR-3, 328-29), and the ALJ for A.J. found that the Zenith graft "meets the Medicare's reasonable and necessary criteria and is covered by Original Medicare." SUMF ¶ 71 (AR-3, 24-31, 36-37).

The only physician medical opinions in the record, from Dr. Brandwein and from Plaintiff's independent expert, Thomas Merrill, DPM, are that the treatment was medically reasonable and necessary, met the standard of care, and satisfied the LCD.[2] No contrary opinion exists. The treatment worked: each wound improved under Dr. Brandwein's care. SUMF ¶¶ 16-17, 26, 39 (AR-1, 85-86, 708-21; AR-2, 48; AR-3, 1216, 1244).

Because the ALJs applied the wrong legal standard, and because their findings are not supported by substantial evidence when measured against the correct one, the decisions must be reversed. The Court should enter judgment for Plaintiff, reverse the three decisions, and direct the Secretary to pay the claims and refund the amounts recouped, with interest.

## <u>STANDARD OF REVIEW</u>

Summary judgment is the appropriate vehicle for judicial review on a record, where the only question is whether the agency's decision is lawful and supported by that record. Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When reviewing a final agency decision under the Administrative Procedure Act, however, "the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." *Rolling Meadow Ranch Groves, LLC v. United States Dep't of Agric.*, 682

[2] The SE UPIC submitted a position paper for A.J. but did not appear at hearing. A contractor that elects participant status under 42 C.F.R. § 405.1010 may submit a position paper but is not a party, and the UPIC presented no witness to rebut Plaintiff's evidence. SUMF ¶¶ 72, 79 (AR-3, 18).

F. Supp. 3d 1253, 1257 (S.D. Fla. 2023) (*citing Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

Ordinary Rule 56 fact-dispute analysis does not apply because the district court acts as an appellate tribunal rather than a factfinder. *Rolling Meadow*, *supra* at 1257. Under the APA, a court must set aside agency action that is arbitrary or capricious, contrary to constitutional rights, beyond statutory authority, procedurally unlawful, or unsupported by substantial evidence when that form of record review applies. 5 U.S.C. § 706(2). Here, review proceeds under 42 U.S.C. § 405(g), as incorporated by § 1395ff(b)(1)(A), and is addressed in Part III below. "Summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Rolling Meadow*, at 1257 (cleaned up).

## MEMORANDUM OF LAW

### I. The Three Decisions Under Review Applied the Wrong Legal Standard and Are Not Supported by Substantial Evidence

Under 42 U.S.C. § 405(g), made applicable to this action by § 1395ff(b)(1)(A), the Court asks two questions: (1) whether the Secretary's findings are "supported by substantial evidence" and (2) "whether the correct legal standards were applied." *Gulfcoast Med. Supply, Inc. v. Sec'y, Dep't of Health & Hum. Servs.*, 468 F.3d 1347, 1350 n.4 (11th Cir. 2006). The first question may be deferential; the second is not. "[N]o similar presumption of validity attaches to the [Secretary's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (legal principles reviewed *de novo*). "Failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (superseded by statute on other grounds). Substantial-evidence review takes into account "whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). An adjudicator "cannot substitute his own opinion on medical issues for that of medical experts," *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982)[3], and "may not arrogate the power to act as both judge and physician." *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., concurring). Measured against the correct standard, the record shows that the treatment was reasonable and necessary and satisfied the LCD.

Finally, the Secretary's decisions must be judged on the grounds the ALJs actually invoked. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action"). Those grounds must reflect "reasoned decisionmaking," and an agency "may not…depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); 5 U.S.C. § 706(2)(A), (E).[4] Because the ALJs departed from the standard on the books, their decisions, which became the Secretary's final decisions, must be reversed.

[3] To the extent the treating-physician rule has been abrogated by regulation, the principles of substantial-evidence review still apply, and the fact that no other physician testified contrary to Dr. Brandwein or Dr. Merrill is addressed below to show that there is no medical evidence to support the ALJ decisions.

[4] *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), confirms that the Court exercises independent judgment on questions of law, including the meaning of the Medicare statute, the Secretary's regulations, and the LCD. Plaintiff's argument does not depend on any deference doctrine: the ALJs were bound by 42 C.F.R. § 405.1062 to apply the LCD or explain their departure, and the LCD's text is unambiguous on the points at issue. To the extent the Secretary invokes the MPIM, a manual provision receives at most the respect its persuasiveness earns, *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), and none where, as here, it is inapplicable by its own terms.

### A. The 2019 LCD Supplies the Governing Standard, and the ALJs Were Required to Apply It or Explain Their Departure

An LCD is, by statutory definition, a contractor's determination "respecting whether or not a particular item or service is covered…in accordance with section 1395y(a)(1)(A)," 42 U.S.C. § 1395ff(f)(2)(B), that is, the Secretary's own published articulation of when the item is reasonable and necessary. *See In Home Health, LLC v. Kennedy*, 184 F.4th 499, 503 (6th Cir. 2026) (LCDs "provide notice of how the contractor will determine whether an item or service satisfies the 'reasonable and necessary' standard"). The Secretary's regulations require an ALJ to "give substantial deference to these policies if they are applicable to a particular case," and "[i]f an ALJ…declines to follow a policy in a particular case, the ALJ…decision must explain the reasons why the policy was not followed." 42 C.F.R. § 405.1062(a)-(b). The Secretary conceded that the 2019 LCD applies to all three cases (SUMF ¶ 80; ECF No. 53 at 3 n.3), and each ALJ found as much. SUMF ¶ 50 (AR-1, 82; AR-2, 43; AR-3, 19, 36). Each ALJ nonetheless departed from the LCD, and none explained why.

The question is not whether an LCD "binds" an Article III court, the straw man the Secretary has erected. ECF No. 53 at 3-4 (citing *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1288 (11th Cir. 2019); *Agendia, Inc. v. Becerra*, 4 F.4th 896, 900 (9th Cir. 2021)). None of those authorities involves an adjudicator who professed to apply a governing LCD while importing a requirement from a different source. The question is whether the Secretary's adjudicators, having identified the applicable LCD and declined to explain any departure from it, could deny coverage on grounds the LCD does not contain. They could not. An agency that "simply disregard[s] rules that are still on the books" acts arbitrarily, *Fox,* 556 U.S. at 515, and an ALJ who announces the governing standard and then applies a different one commits legal error reviewed *de novo*. *Cornelius,* 936 F.2d at 1145-46.

**i. *The ALJs imposed a product-specific, peer-reviewed-literature requirement that the 2019 LCD does not contain and instead appears only in a later revision that never took effect.***

ALJ Grace and ALJ Preston each denied coverage because the published literature on Impax was, in their view, too thin: "a mere 10 wounds provides far too little data," and Dr. Brandwein "would have to submit much more Impax data from 'published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines,' as required by MPIM, *supra*, ch. 13, § 13.5.3." SUMF ¶¶ 58, 63 (AR-1, 91-92; AR-2, 52-56). Both reached that standard by the same route. Each quoted the MPIM provision that applies "[i]n the absence of either an NCD or LCD addressing a particular item or service," SUMF ¶ 51 (AR-1, 81; AR-2, 43), each repeated that "[w]hen no LCD exists for a particular item or service" the MPIM's three-part test governs, SUMF ¶¶ 52, 57 (AR-1, 87, 89; AR-2, 48-49), and each concluded, in identical words, that "because there is no NCD or LCD for the product at issue, I must analyze whether the Medicare coverage exists under the provisions of the MPIM." SUMF ¶¶ 58, 63 (AR-1, 91-92; AR-2, 52-56).

That premise is false, and the Secretary has admitted it. There is an LCD "addressing" the item: an LCD titled "Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities," which each ALJ found "governs the application of skin substitute grafts." SUMF ¶¶ 50, 56 (AR-1, 82, 87; AR-2, 43; AR-3, 19, 36). The MPIM passage the ALJs invoked is, by its own terms, a default rule for the absence of an LCD. It is the "surplusage" the Court identified at the hearing, "neither here nor there," (Tr. 31:2-9), and the Court's observation that the ALJs' MPIM discussion is "really of no moment," (Tr. 70:2), is correct as a matter of law: a default rule does not apply where the condition for the default is unmet. The Secretary's own district-court authorities confirm the point. In *Family Foot & Leg Center, P.A. v. Kennedy*, No. 2:24-cv-547, 2025 WL 2538474 (M.D. Fla. Sept. 4, 2025), the provider

injected an amniotic product into joints to treat orthopedic pain, and "[t]here [was] no dispute that no national coverage determination or local coverage determination applies." *Id.* at *2 n.2. The MPIM governed in that case because nothing else did. Here, the Secretary concedes the opposite. ECF No. 53 at 3 n.3; Tr. 30:23-31:1.

The ALJs' attempt to locate a literature requirement in the LCD itself fails on the text. Each reasoned that because the LCD "does not endorse particular products," a "product-specific analysis" of the published evidence was required and the treatment records had to "address the medical evidence supporting" the choice of product. SUMF ¶¶ 57-58, 63 (AR-1, 87, 89, 91-92; AR-2, 52-56). But the LCD's sentence reads in full: "This LCD does not endorse particular products for separate payment so the physician's documentation must support the need for skin replacement surgery and the product used." SUMF ¶ 4 (AR-1, 83). That sentence calls for physician documentation of two things, the need for skin replacement surgery and the product applied, both of which Article A57680 spells out as an assessment "outlining the plan for skin replacement surgery and the choice of skin substitute product" and an operative note identifying "product used (with identifying package label in the chart)." SUMF ¶ 10 (AR-1, 84-85). It does not say, and no reasonable reading can make it say, that the physician's chart must contain a literature review or that coverage turns on the number of published wound care studies addressing the product. To the contrary, the LCD's drafters knew the literature "examine[s] only a small portion of the skin substitute products available," and the conclusion they drew from that fact was not that unstudied products are noncovered, but that "no individual product can be considered for payment unless the applicable skin replacement surgery code meets the requirements of this LCD," with specific products to be listed as noncovered "in the future…based on clinical literature that establishes inferiority." SUMF ¶¶ 3-4 (AR-1, 82-83). The contractor thus made a deliberate choice: coverage would turn on the LCD's documented clinical criteria, and product-specific exclusions would be announced prospectively. The ALJs rewrote that choice by adjudication.

Plaintiff does not ask the Court to find that the ALJs consciously applied a later LCD; they said they did not, and the Court has taken them at their word. Tr. 19:9-20:6. The point is narrower. The literature requirement the ALJs enforced is not in the 2019 LCD. It appears only in a later revision, scheduled to take effect later, but never became effective, which provides that "coverage will be provided for skin substitute grafts/CTP that have peer-reviewed, published evidence supporting their use," and lists Impax as noncovered. SUMF ¶¶ 12, 56 (AR-1, 82, 87 & n.2; AR-3, 1815). Whatever its source, a requirement absent from the governing LCD on the dates of service cannot be enforced against those services. Retroactive application of a new coverage standard to completed services is unlawful. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). And imposing "potentially massive liability" for past conduct under an interpretation the agency had not announced when the conduct occurred is the "unfair surprise" that due process and ordinary principles of administrative law forbid. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155-56 (2012). The Medicare statute adds its own bar: no "rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing…the payment for services" may take effect unless promulgated by regulation. 42 U.S.C. § 1395hh(a)(2); *Azar v. Allina Health Servs.*, 587 U.S. 566, 571-76 (2019). A manual provision cannot create a substantive literature threshold that neither the statute, the regulations, nor the governing LCD contains, and the ALJs cannot do by adjudication what the Secretary could not do by manual.

Even if a literature showing was relevant, the Court identified the problem with the ALJs' approach at the hearing: "Why isn't one enough?…It's a new field. Peer-reviewed studies can't exist -- the doctor can't control whether the scientific community has saw fit within the first nine years of the existence of the grafts to review IMPAX…Why is the doctor held to that under the LCD?" Tr. 34:4-16. The Secretary's answer was that "it goes back to the medical documentation," Tr. 34:20-

25, and the Secretary characterized the ALJs' literature analysis as a second chance to justify the product choice after the treatment records failed to explain it. Tr. 30:9-17, 33:17-21. Both answers depend on a premise the record refutes. The documentation for J.F. and S.T. was conceded adequate, SUMF ¶¶ 53, 61 (AR-1, 163-64; AR-2, 48, 51), and the product-choice rationale is in the record for every patient. SUMF ¶¶ 14, 23, 46 (AR-1, 704-05, 708; AR-2, 1023-24, 1027; AR-3, 1164, 1166, 1213). Nothing more is required. Indeed, in J.F.'s case the product-choice critique was not properly before the ALJ at all. ALJ Grace held that under 42 C.F.R. § 405.1032(a) his review was "limited to the issues that were considered in the lower-level decisions and not decided in the Appellant's favor," and that the sole such issue was literature. SUMF ¶ 55 (AR-1, 86-87 & n.1). Having so held, he could not deny the claims because the treatment records "did not discuss why the physician chose Impax," SUMF ¶ 57 (AR-1, 87, 89), a documentation point the QIC had already resolved in Dr. Brandwein's favor. SUMF ¶ 53 (AR-1, 163-64). An ALJ may consider a new issue only after notice to the parties before the hearing, 42 C.F.R. § 405.1032(b), and ALJ Grace gave the opposite notice: that literature – a non-applicable standard – would be "the sole issue." SUMF ¶ 55 (AR-1, 86-87 & n.1).

**ii.** ***The ALJs added documentation requirements the LCD does not contain.***

The same legal error appears in a second form. ALJ Preston conceded that the failure of conservative treatment was "clear" from Dr. Brandwein's initial visit and that Dr. Brandwein's own records were "sufficient," yet denied 75 claims because "the limited records from the Beneficiary's prior clinicians" did not contain serial measurements at four-to-six-week intervals. SUMF ¶¶ 61-62 (AR-2, 48, 50-51). The LCD requires that the ulcer have "failed to respond to documented conservative wound-care measures," with "measurements of the initial ulcer, measurements at the completion of at least four weeks DFU (4-6 weeks for VLU) of conservative wound-care measures and measurements immediately prior to placement of the skin

substitute graft." SUMF ¶¶ 6-7 (AR-1, 83-84). It does not require that the measurements be made by a particular clinician, that the prior clinicians' complete charts be placed in evidence, or that a three-year-old wound be measured on a four-week cadence by someone other than the treating surgeon before he may act. The record contains exactly what the LCD calls for: a baseline after surgical debridement in April 2022 (15.5 x 27 x 0.3 cm), interval measurements in October 2022 and May 2023, and Dr. Brandwein's intake measurement of more than 340 $cm^2$ on June 15, 2023, four days before the first graft. SUMF ¶¶ 24-25 (AR-2, 47-48, 51, 1017-21, 1023). On those numbers the wound increased in depth (0.3 to 0.4 cm), a fact the ALJ "admittedly" found, SUMF ¶ 62 (AR-2, 50-51), and remained open at hundreds of square centimeters after more than a year of home-health, podiatric and wound-center care. The LCD's definition of "failed response" is disjunctive: an ulcer that "increased in size or depth, or no change in baseline size or depth or no sign of improvement." SUMF ¶ 8 (AR-1, 84). The ALJ's own findings satisfy it. As the Court noted, a 0.1 cm increase in depth is still "an increase." Tr. 79:18-80:3. His conclusion that "the technical requirements of the LCD were not met" rests on a requirement the LCD does not contain. The ALJ also faulted the absence of "a baseline measurement of the wound in the record prior to the conservative wound treatments beginning," SUMF ¶ 62 (AR-2, 50-51), in other words, a measurement taken by other clinicians before years of home-health care began. Read that way, Article A57680's reference to a baseline "prior to beginning conservative wound care measures" would foreclose coverage for any chronic wound that reaches a specialist after prolonged care elsewhere, a result irreconcilable with an LCD whose covered indication is an ulcer that has already "failed to respond" to prior care. SUMF ¶¶ 6-10 (AR-1, 83-85).

ALJ Alexander's decision is the clearest example. Having found that Zenith is covered and reasonable and necessary, SUMF ¶ 71 (AR-3, 24-31, 36-37), he denied every claim because the notes lacked "objective information" behind statements such as "vital signs stable," lacked detail about "the technique used to apply, whether any

graft was folded, and whether the graft needed trimming," and because "the visit notes do not include any photos that would support the reported wound sizes, condition, and quantity of graft applied." SUMF ¶ 69 (AR-3, 37-40). The LCD and Article A57680 require none of those things. They require an assessment of the diabetic patient's management history and comorbidities, review of blood sugars and nutrition, a physical examination of the skin and wound, an implemented treatment plan, wound measurements, an operative note with specified elements, package labels, and waste documentation. SUMF ¶¶ 6-10 (AR-1, 83-85). Each is matched to the record for A.J. in Plaintiff's Supplemental Brief (ECF No. 47 at 17-21), including the initial assessment, SUMF ¶ 36 (AR-3, 1164-65), serial measurements at every visit, SUMF ¶¶ 39, 41 (AR-3, 1165, 1216, 1236, 1244), metabolic and nutritional review, SUMF ¶ 42 (AR-3, 1164, 1168, 1177, 1204, 1207, 1219-20), debridement, offloading, cultures and antibiotics, SUMF ¶ 43 (AR-3, 1164-67, 1200, 1220), the product-choice rationale, SUMF ¶ 46 (AR-3, 1164, 1166, 1213), and package labels and "no graft was wasted" entries on every application. SUMF ¶¶ 40, 44-45 (AR-3, 38, 1164-70, 1203, 1206, 1217-19, 1240-43, 1260). The Secretary has never identified an LCD element unmet by those citations. ECF No. 53 at 10-11. Demanding photographs, a narrative of folding and trimming, and objective readings behind every clinical observation is the same add-a-requirement error in different dress. An ALJ "may not…simply disregard rules that are still on the books" in favor of requirements of his own devising. *Fox,* 556 U.S. at 515.

The ALJ's remaining concern, that the notes do not describe "how/why" prior treatment failed in "specific details," SUMF ¶ 69 (AR-3, 37-40), is answered by the record he summarized: an ulcer open for more than two months after amputation, multiple debridements, IV, oral and topical antibiotics, an incision and drainage, and a fish-skin graft that "did not work," all before the first Zenith application. SUMF ¶¶ 36-37 (AR-3, 25, 1164-67). The LCD asks that the pre-service record "reference specific interventions that have failed." SUMF ¶ 9 (AR-1, 84). It does.

iii. ***The ALJs substituted their own lay medical judgment for the only medical opinions in the record.***

An ALJ abuses his discretion when he substitutes his own uninformed medical evaluation. *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982); *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992) (Johnson, J., concurring); *cf. Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892 (11th Cir. 2022) (holding that 20 C.F.R. § 404.1520c validly abrogated the treating-physician rule for Social Security disability claims filed after March 27, 2017; no comparable regulation governs Medicare Part B appeals, and *Harner* did not address an adjudicator's substitution of his own judgment for uncontradicted medical testimony). Although *Freeman* arose from a "sit and squirm" credibility finding, its principle applies with greater force here, where the only two physicians the ALJs heard testified, consistent with the records, that the treatment was appropriate and satisfied the LCD. Setting ALJ Alexander's no-photographs, folding-and-trimming critique against Dr. Brandwein's and Dr. Merrill's uncontradicted testimony that the records met the standard of care is precisely the substitution of an adjudicator's lay medical judgment for the only medical opinion in the record that *Freeman* and *Marbury* forbid. The same is true of ALJ Preston's finding, over "the testimony of the witnesses that the use of the Impax membrane on the Beneficiary was medically reasonable and necessary," that the "burden on these issues was not met," SUMF ¶ 64 (AR-2, 55), a finding that offers no reason for rejecting the testimony other than the literature count already addressed. No physician, no contractor medical reviewer, and no witness ever opined that the treatment of any of these three patients was medically unreasonable or unnecessary. The Secretary has never claimed otherwise.

**B. Measured Against the Governing LCD, the Undisputed Substantial Evidence Establishes Coverage for Each Beneficiary**

Because the ALJs applied the wrong standard, the Court must determine whether the record, measured against the correct one, supports coverage. Where "the

correct legal standards were [not] applied," *Gulfcoast,* 468 F.3d at 1350 n.3, and the record is closed and complete, the Court may decide the question. Plaintiff's Supplemental Brief matched each LCD requirement to pinpoint record citations for each beneficiary (ECF No. 47 at 4-21). The Secretary, directed to respond "as to why or why not that does not satisfy the governing LCD" on pain of waiver, (Tr. 69:17-20, 74:13-14), identified no unmet requirement. ECF No. 53. Although the Secretary has thus waived any contrary showing, the record is summarized below.

**1. J.F.** The QIC conceded the documentation. SUMF ¶ 53 (AR-1, 163-64). The ALJ confirmed that documentation was not at issue and that literature was "the sole issue." SUMF ¶ 55 (AR-1, 86-87 & n.1). On the LCD's terms: the July 26, 2023, initial note documents the ulcers, their six-week duration, their failure to decrease "with local care" by a wound-care nurse, debridement, cultures, nutritional counseling, vascular and orthopedic co-management, a controlled type 2 diabetic, and the plan for amniotic grafts, SUMF ¶¶ 13, 15 (AR-1, 85, 704-05); grafting began more than nine weeks later with a documented pre-graft measurement of 64 $cm^2$, SUMF ¶ 16 (AR-1, 85-86, 708-09); each operative note records the diagnosis, procedure, product, size, lot numbers, dressing, absence of infection, and absence of waste, SUMF ¶ 18 (AR-1, 708-23); and the units billed match the wound sizes recorded. SUMF ¶ 19 (AR-1, 710). Dr. Merrill confirmed that "it [was] clear from the records that the conservative treatment had failed, and this was the next step." SUMF ¶ 20 (AR-1, 1104:10-21). Every covered indication is met.

**2. S.T.** The ALJ found Dr. Brandwein's records sufficient on every documentation issue the contractors raised, found that the failure of conservative treatment was "clear," and found the wound shrank from 340 to 160 during treatment. SUMF ¶ 61 (AR-2, 48, 51). The remaining LCD elements are documented: a patient with diabetes, lymphedema and venous insufficiency, SUMF ¶¶ 21, 28 (AR-2, 47, 1022-24); a wound "well over a year" old that home health, a podiatrist and a wound-care center had failed to heal, SUMF ¶¶ 21, 29 (AR-2, 47, 1017, 1022-23, 1027); baseline

and interval measurements from the prior records and at intake, SUMF ¶¶ 24-25 (AR-2, 47-48, 51, 1017-21, 1023); a comprehensive initial assessment with medications, surgical history, arterial and venous studies, ABI, A1C and neurovascular examination, SUMF ¶¶ 22, 30 (AR-2, 47, 1022-25); debridement, compression dressings, infection control and a treatment hold when infection arose, SUMF ¶ 31 (AR-2, 47-48, 1023-27); the pre-service rationale for amniotic grafts, SUMF ¶¶ 23, 32 (AR-2, 1023-24, 1027); risks and benefits discussed, SUMF ¶ 32 (AR-2, 1023-24, 1027); and operative notes with product, lot labels and waste documentation on every date of service. SUMF ¶¶ 27, 33 (AR-2, 47, 1027-47). Dr. Merrill testified that Dr. Brandwein "sufficiently document[ed] his knowledge and awareness of the failed conservative measures" and that "there were no signs" of improvement in the three years before treatment. SUMF ¶ 34 (AR-2, 1370:8-15, 1371:12-18). Every covered indication is met, and the ALJ's contrary conclusion rests solely on the prior-clinician-records requirement the LCD does not impose.

**3. A.J.** The ALJ found the product covered and reasonable and necessary. SUMF ¶ 71 (AR-3, 24-31, 36-37). The QIC found that "[t]he documentation does support the application of the skin substitute graft as medically necessary." SUMF ¶ 68 (AR-3, 328-29). The record documents a diabetic, neuropathic patient on dialysis with a post-amputation ulcer open for more than two months, SUMF ¶ 35 (AR-3, 1164-67); failed conventional treatment including debridements, antibiotics, incision and drainage and a failed fish-skin graft, SUMF ¶¶ 36-37 (AR-3, 25, 1164-67); baseline and serial measurements, SUMF ¶¶ 39, 41 (AR-3, 1165, 1216, 1236, 1244); comprehensive assessment of comorbidities, metabolic control, nutrition and vascular status, SUMF ¶ 42 (AR-3, 1164, 1168, 1177, 1204, 1207, 1219-20); an implemented plan of debridement, offloading, cultures, antibiotics and dressings, SUMF ¶ 43 (AR-3, 1164-67, 1200, 1220); the rationale for the product and its repeat application, SUMF ¶ 46 (AR-3, 1164, 1166, 1213); operative notes with diagnosis, procedure, anesthesia, product and package labels, SUMF ¶ 44 (AR-3, 1164-69, 1203,

1206, 1217-19, 1240-43); and waste documentation on every application. SUMF ¶¶ 40, 45 (AR-3, 38, 1167-70, 1217-19, 1240-43, 1260). Even the ALJ acknowledged the visit notes included "a sheet with product barcodes for the Zenith graft," and procedure forms for each date of service. SUMF ¶ 40 (AR-3, 38, 1167-70, 1217-19, 1240-43, 1260).

Dr. Merrill testified that the patient "follows those guidelines," that the notes "explain the need for the graft," and that they "support the medical necessity and reasonableness of the treatment." SUMF ¶ 47 (AR-3, 2138:6-8, 2139:7-2140:3). Every covered indication is met.

Even under the deferential first prong of § 405(g), the decisions fail. Substantial evidence review asks whether a reasonable person would accept the record as adequate to support the ALJ's conclusion, *Crawford,* 363 F.3d at 1158, taking into account "whatever in the record fairly detracts from its weight." *Universal Camera,* 340 U.S. at 488. Three features of this record are dispositive.

First, there is no medical evidence on the Secretary's side of the ledger, nor can his counsel identify an unmet requirement. Two physicians testified under oath that the treatment was medically reasonable and necessary and that the records satisfied the LCD; no one testified otherwise. The UPIC's position paper in A.J.'s case is unsworn advocacy by a participant that declined to appear and be examined, 42 C.F.R. §§ 405.1010, 405.1012, and no contractor submitted anything in the other two cases. SUMF ¶¶ 78-79 (AR-1, 1071-1125; AR-2, 1313-82; AR-3, 18, 2076-2146). An ALJ's bare disagreement with uncontradicted expert testimony is not evidence. *Freeman,* 681 F.2d at 731.

Second, the ALJs' own findings establish the LCD's elements. ALJ Grace found that the ulcer was documented at 200 cm and 64 cm on July 26, that conservative care was in place, that grafting began October 1 at 64 cm², and that by October 19 the wound was 38 cm² and "nearly resolved." SUMF ¶¶ 13, 16-17 (AR-1, 85-86, 704-05, 708-21). ALJ Preston found that the June 15 visit "makes clear" conservative treatment was insufficient, that Dr. Brandwein's records were sufficient, that the wound

measured over 340 at intake, that depth had increased, and that the wound shrank to 160 under treatment. SUMF ¶¶ 60-62 (AR-2, 47-48, 50-51). ALJ Alexander found that A.J. was a dialysis-dependent diabetic with an ulcer open for over two months, that "[t]he fish graft did not work," that the records contained visit notes, barcodes and procedure forms for every date of service, and that Zenith is covered. SUMF ¶¶ 37, 40, 71 (AR-3, 24-31, 36-38, 1166-70, 1217-19, 1240-43, 1260). A reasonable person applying the LCD to those findings would conclude that its conditions were met. The ALJs reached the opposite conclusion only by applying a different standard.

Third, the denials rest on grounds that shifted at every level and that contradict one another. A.J.'s claims were denied by the UPIC for documentation, by the QIC for want of "double-blinded, randomized human clinical trials" in the same decision that found the documentation supported medical necessity, and by the ALJ for documentation after he found the product covered. SUMF ¶¶ 66-69, 71 (AR-3, 16-17, 24-31, 36-40, 328-29). J.F.'s and S.T.'s claims were denied for literature after every documentation objection had been resolved in Dr. Brandwein's favor. SUMF ¶¶ 53-55, 60-61 (AR-1, 86-87 & n.1, 163-64; AR-2, 47-48, 51).

"[A]gency action must be reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and an unexplained inconsistency is "a reason for holding an interpretation to be an arbitrary and capricious change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). Plaintiff does not contend, as the Secretary suggests, (ECF No. 53 at 7-8), that the three decisions are unlawful because they differ from one another; *Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015), is therefore beside the point. Plaintiff contends that each decision, read on its own terms, denies coverage on a ground the governing LCD does not supply and is internally inconsistent with the adjudicator's own findings. Repeating that error three times does not supply substantial evidence for any of them.

**C. ALJ Alexander's Exclusion of Records Was an Abuse of Discretion That Prejudiced Plaintiff**

ALJ Alexander excluded a set of records submitted with the hearing request because no good-cause statement accompanied them, 42 C.F.R. § 405.1028(a)(3), while admitting a later submission under § 405.1028(a)(2). SUMF ¶ 73 (AR-3, 18). The excluded records consisted of infection testing, (ECF No. 47 at 17 n.1), and Dr. Brandwein had explained in writing to OMHA, before the hearing, that the grounds for denial had shifted from "overbilling" at the UPIC level to medical necessity at the QIC level, which is itself good cause for presenting additional records on the new ground. SUMF ¶ 74 (AR-3, 118-19); *see* 42 C.F.R. § 405.1028(a)(2)(i) (good cause exists where new evidence is material to an issue addressed in the QIC's reconsideration that was not identified as material before it). The ALJ then relied on the supposed absence of infection-related documentation as a reason to deny coverage, SUMF ¶ 70 (AR-3, 39), and on the absence of "objective" clinical information generally. SUMF ¶ 69 (AR-3, 37-40). Excluding records on a procedural ground and then faulting the claimant for the gap those records would fill is the kind of error that "creates an evidentiary gap which results in unfairness or clear prejudice." *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997). Should the Court decline to reverse outright as to A.J. for any of the above reasons, this error independently requires relief.

**D. Alternatively, the Findings That Dr. Brandwein Is Liable for the Overpayments Cannot Stand**

Even where a service is found not reasonable and necessary, Congress has provided that payment shall nonetheless be made, and recoupment barred, where the provider "did not know, and could not reasonably have been expected to know, that payment would not be made." 42 U.S.C. § 1395pp(a)(2); *see also* 42 U.S.C. § 1395gg(b) (no recovery from a provider "without fault"). The Secretary's regulation specifies the sources from which such knowledge may be imputed: "CMS notices, including manual issuances, bulletins, or other written guides or directives from Medicare

contractors," Federal Register notices, and "accepted practices in the local medical community." 42 C.F.R. § 411.406(e). The Sixth Circuit recently held that adjudicators must actually conduct that analysis and must consider whether the provider "reasonably interpreted" the guidance available to it when it furnished the service. *In Home Health*, 184 F.4th at 507-09 (remanding where the agency "did not address" whether the provider reasonably interpreted an LCD that had "multiple reasonable applications"). An LCD that is silent on a requirement cannot give notice of it, and under *In Home Health* the question is whether the provider reasonably interpreted the LCD. The record shows that Dr. Brandwein did. Nor can the Secretary avoid this analysis by recasting the denials as documentation-only denials outside § 1395pp. Each ALJ decided liability under the limitation-on-liability and without-fault provisions, SUMF ¶¶ 59, 65, 75 (AR-1, 92-93; AR-2, 56-57; AR-3, 40), and the decisions must be judged on that ground. *Chenery*, 332 U.S. at 196.

None of the ALJs performed the analysis *In Home Health* requires, but this Court can, because the record is complete. ALJ Grace held that Dr. Brandwein "should have known documentation did not support the product," SUMF ¶ 59 (AR-1, 92-93); ALJ Preston copied that sentence, SUMF ¶ 65 (AR-2, 56-57); and ALJ Alexander wrote one paragraph attributing "constructive knowledge of Medicare policies." SUMF ¶ 75 (AR-3, 40). None identified a CMS notice, contractor directive, or Federal Register publication in effect on the dates of service that would have told a Florida podiatrist that Impax or Zenith was noncovered, or that a coverage determination which never mentions peer-reviewed literature would be enforced as though it did. There was none. The only published guidance was the 2019 LCD and Article A57680, which Dr. Brandwein followed; the contractor paid the claims when submitted; the products carried CMS-assigned HCPCS codes; and the Secretary's own ALJ found that Zenith "meets the Medicare's reasonable and necessary criteria and is covered." SUMF ¶ 71 (AR-3, 24-31, 36-37). The first written indication that Impax would be treated as noncovered for want of literature was the later LCD revision, which was proposed in

2023, rescheduled to April 2025, and never took effect. SUMF ¶ 12 (AR-1, 87 & n.2; AR-3, 1815). A provider cannot "reasonably have been expected to know" in 2022 and 2023 a coverage position the contractor did not publish until later. At a minimum, the liability findings must be reversed and payment ordered under § 1395pp(a).

**E. The Appropriate Remedy Is Reversal With Directed Payment**

Sentence four of § 405(g) empowers the Court to enter "a judgment affirming, modifying, or reversing the decision of the [Secretary], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Reversal without remand is appropriate where the agency "has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes [entitlement] without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) (regarding social security benefits); *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991) (awarding benefits when improper legal standard was applied by the agency). That standard is met. The record is closed; the Secretary has conceded the governing standard; the contractors and ALJs have themselves found the documentation adequate (J.F., S.T.) and the product covered (A.J.); the only medical evidence supports coverage; and the Secretary, directed to identify any unmet LCD requirement on pain of waiver, identified none. A remand would serve no purpose other than to give the agency a fourth opportunity to find a new ground for denial, which is what has occurred at every prior level. The Court should reverse the three decisions, declare that the services at issue were covered and payable under the 2019 LCD, and direct the Secretary to pay the claims and to refund all amounts recouped or offset, together with interest as provided by 42 U.S.C. § 1395ddd(f)(2)(B). In the alternative, the Court should reverse and remand with instructions to apply the 2019 LCD as written, without any peer-reviewed-literature requirement, and to apply 42 U.S.C. § 1395pp(a) and 42 C.F.R. § 411.406(e) to the liability question.

## CONCLUSION

The Secretary's adjudicators announced the governing standard and then applied a different one. Measured against the standard the Secretary concedes applies, the undisputed record establishes that Dr. Brandwein's treatment of J.F., S.T. and A.J. was covered. Plaintiff respectfully requests that the Court grant summary judgment in its favor; reverse the Secretary's decisions in OMHA Appeal Nos. 3-14443431635, 3-14477192076 and 3-14470343406; declare that the services at issue were reasonable and necessary and covered under LCD L36377; order the Secretary to pay the claims and refund all amounts recouped or offset, with interest; alternatively, remand with the instructions set forth above; award costs and such further relief as the Court deems just; and reserve jurisdiction to consider any application for fees under 28 U.S.C. § 2412.

Dated: October 28, 2026.

Respectfully submitted,

**BLACK LAW P.A.**
*Attorneys for Plaintiff*
1401 East Broward Boulevard
Victoria Park Centre – Suite 304
Fort Lauderdale, Florida 33301
Telephone: (954) 320-6220

By: Patrick Wier

**KELSEY K. BLACK, ESQ.**
Florida Bar No.: 0078925
kb@blacklawpa.com
para@blacklawpa.com
**PATRICK WIER, ESQ.**
Florida Bar No.: 1029540
pw@blacklawpa.com
para@blacklawpa.com